UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
METSO MINERALS, INC.,                              :
                                                   :
       Plaintiff,                                  :
                                                   :
       v.                                          :    Civil Action No. CV-06-01446
                                                   :           (ADS) (ETB)
POWERSCREEN INTERNATIONAL                          :
DISTRIBUTION LIMITED,                              :
TEREX CORPORATION,                                 :
POWERSCREEN NEW YORK, INC., and                    :
EMERALD EQUIPMENT SYSTEMS, INC.,                   :
                                                   :
       Defendants.                                 :
----------------------------------------------------------------x

# PLAINTIFF METSO'S REPLY BRIEF IN SUPPORT OF ITS MOTION
# FOR PARTIAL SUMMARY JUDGMENT

Michael C. Stuart
Lisa A. Ferrari
Cohen Pontani Lieberman & Pavane LLP
551 Fifth Avenue
New York, New York 10176
Phone: 212-687-2770
Telefax: 212-972-5487

Counsel for Plaintiff
Metso Minerals, Inc.

**TABLE OF CONTENTS**

I.     Metso Is The Owner Of The '618 Patent And Has Standing To Sue ................................. 1

II.    Defendants Have Abandoned Their Defenses of Failure To Mark, Failure To Amplify, Failure To State a Claim, Lack Of Jurisdiction, Patent Invalidity Based Upon 35 U.S.C. §§ 101, 102(a), 102(b), 102(c), 102(d), 102(e) And 102(g), Unnamed Defenses "To Be Determined" ........................................................................................................................ 2

III.   Defendants' Patent Invalidity Defense Under 35 U.S.C. § 112 Is Baseless ....................... 3

IV.    Defendants Have No Corroboration That Richard Byrne Was The Sole Inventor Or A Joint Inventor ..................................................................................................................... 4

V.     Defendants Have Not Demonstrated That Rafferty Failed To Disclose Material Information To The USPTO ............................................................................................... 9

VI.    The Accused Screeners Infringe The '618 Patent, Both Literally And Under The Doctrine Of Equivalents ................................................................................................................... 15

VII.   Defendants Have Failed To Demonstrate Material Prejudice For Their Evidentiary Laches Defense ................................................................................................................. 15

# **TABLE OF AUTHORITIES**

Cases

*Abraxis Bioscience, Inc. v. Mayne*, 467 F.3d 1370 (Fed. Cir. 2006) .............................................. 3
*Bilstad v. Wakalopulos*, 386 F.3d 1116 (Fed. Cir. 2004).................................................................. 4
*Gemstar-TV Guide Int'l, Inc. v. ITC,* 383 F.3d 1352 (Fed. Cir. 2004) .................................... 5, 8, 9
*GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268 (Fed. Cir. 2001)......................................................... 12
*Hess v. Adv. Cardiovascular Sys., Inc.*, 106 F.3d 976 (Fed. Cir. 1997) ......................................... 6
*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 488 F.3d 982 (Fed. Cir. 2007)................ 10
*ICU Medical, Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368 (Fed. Cir. 2009) ................................. 4
*In re Caveney,* 761 F.2d 671 (Fed. Cir. 1985) .............................................................................. 11
*Kinzenbaw v. Deere & Co.*, 741 F.2d 383 (Fed. Cir. 1984) ............................................................ 3
*Martek Corp. v. Nutrinova Inc.*, 2009 U.S.App. LEXIS 20001 (Fed. Cir. 9/3/09) ........................ 4
*Molins PLC v. Textron, Inc.,* 48 F.3d 1172 (Fed. Cir. 1995)......................................................... 13
*Nartron Corp. v. Schukra USA, Inc.,* 558 F.3d 1352 (Fed. Cir. 2009) ........................................... 5
*Pfizer, Inc. v. Teva Pharm. USA, Inc.,* 518 F.3d 1353 (Fed. Cir. 2008) ....................................... 14
*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357 (Fed. Cir. 2008).............. 12, 13
*Symantec Corp. v. Computer Associates Int'l, Inc.,* 522 F.3d 1279 (Fed. Cir. 2008) ........ 5, 6, 8, 9
*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997) ........................................ 3

Statutes

35 U.S.C. § 101................................................................................................................................ 2, 3
35 U.S.C. § 102(a) ............................................................................................................................... 3
35 U.S.C. § 102(b) ................................................................................................................... 3, 11, 12
35 U.S.C. § 102(c) ............................................................................................................................... 3
35 U.S.C. § 102(d) ............................................................................................................................... 3
35 U.S.C. § 102(e) ............................................................................................................................... 3
35 U.S.C. § 102(g) ............................................................................................................................... 3
35 U.S.C. § 103(a) ............................................................................................................................. 12
35 U.S.C. § 112................................................................................................................................... 3
35 U.S.C. § 282................................................................................................................................... 5
35 U.S.C. § 287(a) ............................................................................................................................... 3

## I. Metso Is The Owner Of The '618 Patent And Has Standing To Sue

Defendants argue (pp. 26-8) that Malachy Rafferty was an *employee* of MastersKreen, that he failed to assign his interest in the '618 patent to MastersKreen, that he was not the owner of the '618 patent when he assigned it to Metso's predecessor (Nordberg), and that therefore Metso does not now own the '618 patent. This argument makes no sense. Malachy Rafferty was an *owner* of MastersKreen, not just an employee, so he could come to whatever business arrangement he wanted with his company, as well as with his co-owner brother, Kevin. In fact, Malachy was responsible for research, development and manufacturing, while Kevin handled sales and marketing. (Ferrari Reply SJ Dec., Exhibit 66 (Rafferty Dep.), 12:20-13:10; Exhibit 67 (Kelly Dep.), 137:18-23; Exhibit 68 (McMeel Dep.), 110:3-9, 115:10-15; Exhibit 69 (Byrne Dep.), 41:18-42:8). It is not surprising that the Rafferty brothers agreed that Malachy would own the patent rights for the machine designs that he invented. In fact, contrary to defendants' allegation, this agreement was not secret -- MastersKreen publicly disclosed it in 1998 to the Irish Development Board in an effort to obtain government funding. (Yankwitt Opp. SJ Dec., Exhibit 39, MN000580 (Coopers & Lybrand submission to Irish Development Board) ("Traditionally the company's products have been designed in-house and patents for the product designs are held by Malachy Rafferty, a 50% shareholder in the company")).

Defendants' unsubstantiated and libelous claims of a conspiracy between Nordberg and Malachy Rafferty to swindle Kevin Rafferty with respect to the '618 patent are baseless and, more significantly here, legally irrelevant. Nordberg acquired the entirety of MastersKreen (including its assets) from Malachy and Kevin Rafferty, and, at the same time, Nordberg acquired the '618 patent from Malachy Rafferty. (Ferrari Reply SJ Dec., Exhibit 70 (June 11, 1999 Agreement); Exhibit 71 (U.S. Patent Assignment). Thus, whether the '618 patent was owned by Malachy Rafferty or MastersKreen, ownership of the '618 patent was nevertheless transferred to Nordberg, Metso's

1

predecessor. Neither the non-exclusive license from Nordberg to MastersKreen (now part of plaintiff Metso), nor the quitclaim assignment by Metso Cappagh (formerly MastersKreen) to plaintiff Metso detracts from the fact that plaintiff Metso now owns MastersKreen (including all of its assets) and the '618 patent.

As to Byrne's putative rights in the '618 patent if he were an inventor (which he is not), defendants assert (p. 26) that the laws of the United Kingdom provide that "an invention made by an employee shall, as between him and his employer, be taken to belong to his employer." Thus, Byrne, as an *employee* of MastersKreen, never had any ownership rights in the '618 patent. By operation of U.K. law, any "ownership rights" in the '618 patent automatically reverted to MastersKreen, his then-employer. If Byrne's "ownership rights" belonged to MastersKreen (his then-employer), they were acquired by Nordberg, Metso's predecessor, when Nordberg bought MastersKreen, so Metso now also owns Byrne's "ownership rights". Defendants' defense challenging standing is frivolous and must be dismissed.

**II.    Defendants Have Abandoned Their Defenses of Failure To Mark, Failure To Amplify, Failure To State a Claim, Lack Of Jurisdiction, Patent Invalidity Based Upon 35 U.S.C. §§ 101, 102(a), 102(b), 102(c), 102(d), 102(e) And 102(g), Unnamed Defenses "To Be Determined"**

Defendants have abandoned, and thus concede summary judgment on, twelve affirmative defenses, but only after forcing Metso to spend time, money and briefing space (over 9 pages) on seeking to dismiss these admittedly frivolous defenses. On October 28, 2008, after the last fact deposition had finally concluded, Metso wrote to defendants (Ferrari Reply SJ Dec., Exhibit 77, p.2) to request that defendants withdraw many of their baseless and unsubstantiated affirmative defenses, but defendants ignored the letter. Instead, eight months later and less than a week before initial summary judgment briefs were due, defendants indicated informally in an e-mail that they would abandon only two of their defenses (patent marking and invalidity based upon 35 U.S.C. § 101).

Defendants did not present a formal, signed stipulation, nor did they indicate that they would abandon others of their baseless defenses. Defendants' e-mail was too little, too late.

Defendants apparently (pp. 29-30) are abandoning their affirmative defenses that Metso's claims are limited pursuant to 35 U.S.C. § 287(a) (the patent marking statute), that the Court lacks jurisdiction over Powerscreen New York, and that the '618 patent is invalid for failure to comply with 35 U.S.C. § 101. Defendants also concede (pp. 29-30) summary judgment against them on the defenses of failure to state a claim, failure to amplify the bases for infringement, patent invalidity under 35 U.S.C. §§ 102(a), 102(b), 102(c), 102(d), 102(e) and 102(g), and the catch-all defense that defendants "assert any and all additional affirmative defenses that may subsequently be determined". These defenses (and corresponding counterclaims) should therefore be dismissed.

### III.     Defendants' Patent Invalidity Defense Under 35 U.S.C. § 112 Is Baseless

Defendants' sole patent invalidity defense under 35 U.S.C. § 112 is that, if the claims cover defendants' track-mounted Screeners, the specification of the '618 patent fails to meet the written description requirement and is therefore invalid. This invalidity defense was raised and disclosed by defendants for the first time in defendants' brief in opposition to Metso's motion for summary judgment. Consequently, it will be the subject of Metso's pending motion to preclude.

Mounting screeners on a tracked chassis was unknown at the time the invention was conceived or patented (Byrne SJ Opp. Dec., ¶ 19; Whyte CC Dec., ¶ 27); therefore, construing claim 1 to include only tire-mounted screeners and excluding track-mounted screeners would be improper, since such a construction would exclude equivalents which were not known until the time of infringement. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997); *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389 (Fed. Cir. 1984); *Abraxis Bioscience, Inc. v. Mayne*, 467 F.3d 1370, 1382 (Fed. Cir. 2006). Additionally, as discussed in Metso's initial and reply claim construction briefs and in Metso's opposition to defendants' summary judgment

3

motion, a track-mounted chassis has three types of "wheels", and a tire-mounted chassis of a screener also has "wheels". Because claim 1 of the '618 patent recites a "wheel mounted chassis" and the '618 patent discloses what claim 1 recites, the written description requirement of 35 U.S.C. § 112 has been met. *ICU Medical, Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1377 (Fed. Cir. 2009); *Martek Corp. v. Nutrinova Inc.*, 2009 U.S.App. LEXIS 20001, *13-*14 (Fed. Cir. 9/3/09) (a claim is not necessarily invalid for lack of written description where claim is broader than specific examples in the specification; one must consider how an ordinarily skilled artisan would understand the text of the application; claims should not be limited to preferred embodiments or specific examples) (citing numerous cases); *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1123-6 (Fed. Cir. 2004) (same, especially "in the mechanical world -- a fairly predictable field") (citing numerous cases). If the Court permits defendants to assert this belatedly new affirmative defense (and counterclaim), it should be dismissed, particularly in view of defendants' lack of clear and convincing evidence.

## IV. Defendants Have No Corroboration That Richard Byrne Was The Sole Inventor Or A Joint Inventor

Although defendants responded to Metso's uncontested fact No. 286 that Byrne was "**an** inventive entity", meaning that Byrne was a *joint* inventor, in their brief, defendants continue to flip-flop (as they have throughout this litigation) on whether Byrne is a co-inventor or the sole inventor -- on page 11, defendants refer (see title) to Byrne as "An" inventor (not "the" inventor) and in the text as "the principal architect" whose "contribution" to the invention "was significant" (see also page 19), while on page 13, defendants refer to Byrne as the sole inventor who "conceived of, designed and engineered" the invention (*see also* Byrne Dec., ¶ 40 where Byrne claims sole inventorship). Even now, on summary judgment briefing, defendants cannot choose between advocating whether Byrne is the sole inventor or a joint inventor. Defendants do

4

not explain why, despite Byrne's insistence over the years that he is the sole inventor (Ferrari Opp. Dec., Exhibit 60 (Byrne Dep.), 82:15-83:19, 94:12-95:7), they nevertheless asserted in the parallel U.K. litigation (Ferrari SJ Dec., Exhibit 33 (UK Defense and Counterclaim) and initially in this litigation (Ferrari SJ Dec., Exhibit 19 (Answer and Counterclaim [Dkt No. 15], ¶¶ 56-7) that Byrne was not the sole inventor, but merely a co-inventor along with Rafferty. Defendants clearly do not believe their own witness. Although defendants acknowledge (p. 11) that the '618 patent is presumed valid, *see* 35 U.S.C. § 282, not mentioned by defendants is the additional presumption that the inventor named on an issued patent is presumed to be correct, and that here defendants, as the parties challenging inventorship, must prove their case by clear and convincing evidence. *Nartron Corp. v. Schukra USA, Inc.,* 558 F.3d 1352, 1356 (Fed. Cir. 2009). Defendants ask the Court to anoint Byrne as the sole inventor, based solely on his 17-page declaration say-so, with no documentary corroboration (which even Byrne admits never existed) and no other corroboration.

Corroborating evidence may be in the form of "records made contemporaneously with the inventive process," "[c]ircumstantial evidence of an independent nature," or "oral testimony from someone other than the alleged inventor." *Symantec Corp. v. Computer Associates Int'l, Inc.,* 522 F.3d 1279, 1295 (Fed. Cir. 2008) (quoting *Gemstar-TV Guide Int'l, Inc. v. ITC,* 383 F.3d 1352, 1382 (Fed. Cir. 2004)). In *Symantec,* 522 F.3d at 1295-96, the putative inventor, Levin, submitted a supporting declaration, swearing that he gave the named inventor the patented idea. Also submitted was a day planner, recording a discussion between Levin and one of the named inventors concerning the patent. Levin also argued that the lack of evidence showing the named inventor's contribution "further corroborated his own testimony." The court held that the day planner "was insufficient as corroborating evidence", stating that although the entry pre-

5

dated the patent application by more than two years and contained detailed notes of the discussion between Levin and the named inventor, "at most", the day planner established that Levin and the inventor spoke about the prior art. The court also held that the evidence regarding the named inventor's contribution "was not relevant to the question of Levin's contribution." The court stated that "an alleged co-inventor's testimony standing alone, cannot rise to the level of clear and convincing evidence; he must supply evidence to corroborate his testimony." The only remaining evidence was the declaration, which, the court held "failed to establish a genuine issue of material fact that ... [Levin] was a co-inventor..." Thus, *Symantec* establishes that Byrne's declaration cannot, on its own, establish Byrne's inventorship or even raise an issue of material fact. *Symantec* also establishes that defendants' reliance upon "missing" documents to support their inventorship claim is without legal basis, and in fact, defendants fail to cite a single court decision in which non-existent or missing evidence was sufficient to corroborate a claim of inventorship. That is not surprising, given the "temptation for even honest witnesses to reconstruct [events], in a manner favorable to their own position." *Hess v. Adv. Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997).

Defendants falsely imply (p. 16) that Metso has not produced <u>any</u> drawings prepared by Byrne for the patented Senator screener. To the contrary, Metso produced nearly 150 large drawings of MastersKreen's machines, about 72 of which were of the patented Senator screener; 39 of these were signed by Byrne. Although defendants' current employee, Joe Daly, claims to have seen at MastersKreen "sixteen or seventeen" large drawings by Byrne (Daly SJ Opp. Dec., ¶ 5), he does not say that he saw the particular drawings that Byrne now asserts existed and are missing. The Byrne drawings that Daly saw may have been among the 39 produced in this litigation.

Even if the "missing" documents were available, they would be insufficient to corroborate Byrne's inventorship claim. The drawings, existing or non-existing, were generated long after conception. Byrne asserts, now 16 years later, that he drafted drawings of the lateral conveyors that were labeled "210/6", "210/6A", "210/6B" and "210/6C" and that they would corroborate his inventorship claim. Only drawing "210/6" (Byrne Dec., Exhibit C) was located, and the index of drawings maintained by Byrne himself lists only the "210/6" drawing, but not the "210/6A", "210/6B" or "210/6C" drawings. (Ferrari Reply SJ Dec., Exhibit 73 (Index of Senator Drawings); Exhibit 69 (Byrne Dep.), 204:4-25, 207:20-208:10). Even if the "missing" "210/6A", "210/6B" or "210/6C" drawings existed, Byrne admitted that they were "layout drawings" intended "to determine the layout of one component relative to another", *i.e.,* drawings created well <u>after</u> the initial conception of the machine. (Ferrari Reply SJ Dec., Exhibit 69 (Byrne Dep.), 248:19-249:10). In fact, the produced "210/6" drawing (Byrne Dec., Exhibit C) post-dates by <u>nine months</u> a "general arrangement" drawing of the patented Senator screener by Brian Kelly, and thus fails to support Byrne's claim to have first conceived of the invention. (Ferrari Reply SJ Dec., Exhibit 74 (Kelly 10/15/92 Drawing)). Also, the "210/6" drawing contains detailed measurements for the components and has numerous revisions by at least three different people. (Ferrari Reply SJ Dec., Exhibit 69 (Byrne Dep.), 243:3-245:19). Byrne admits that it is not a conception drawing, but a "fabrication drawing"; that is, one used to manufacture the machine. (*Id.,* 242:18-243:2; 199:21-201:10). The "210/6" drawing was created long after conception and does not constitute "records made contemporaneously with the inventive process". *Symantec Corp.,* 522 F.3d at 1295. Other exhibits submitted by defendants (Yankwitt Opp. Dec., Exhibits 21-24) to purportedly corroborate Byrne's inventorship claim are actually drawings of components *other* than the lateral conveyors and are, like the "210/6" drawing,

7

fabrication drawings, not conception drawings, and are dated in or around May 1993, months after the late 1992 date on which Byrne claims he did a conceptual sketch of his idea. (Ferrari Reply SJ Dec., Exhibit 69 (Byrne Dep.), 86:9-87:8). Drawings prepared by employees other than Byrne were also not retained. Brian Kelly testified that a general arrangement drawing he had prepared of the lateral conveyor -- *i.e.,* one that would support Kelly's testimony that Rafferty had directed him to draw the heart of the invention -- was not located. (Ferrari SJ Dec., Exhibit 28 (Kelly Dep.), 137:7-14, 208:10-25, 211:15-25; Exhibit 29 (Whyte Dep.), 189:13-195:24). As to Byrne's "missing" logbooks, others' logbooks were not retained. Kelly also had logbooks in which he, like Byrne, made calculations, but these logbooks were kept only until he moved on to another project. (Ferrari Reply SJ Dec., Exhibit 67 (Kelly Dep.), 61:16-62:9). There simply was no conspiracy to destroy or hide Byrne's drawings and logbooks, as defendants assert.

And, of course, there is Byrne's unequivocal testimony, never responded to by defendants, that *even if* the supposedly missing drawings and logbooks were found, they would not show that Byrne invented what was contained in them. With *specific* reference to the "missing" "210/6A" drawing which defendants assert would corroborate Byrne's inventorship, Byrne admitted that his name on the drawing would "indicate that I drew the drawing; I prepared the drawing", but not that he conceived of what was shown in the drawing. (Ferrari SJ Dec., Exhibit 27 (Byrne Dep.), 180:13-181:21).

Byrne's declaration or trial testimony cannot convert the drawings and logbooks into corroborating evidence to "fill in the gaps"; the evidence must corroborate inventorship on its own, *without* the putative inventor's testimony to explain it. *Symantec,* 522 F.3d 1295; *Gemstar,* 383 F.3d at 1382-83. In *Symantec*, the declaration of the putative inventor could not convert the

8

day planner, which was meaningless without his testimony, into corroborating evidence. Similarly, in *Gemstar,* 383 F.3d at 1382-83, the putative inventor's testimony could not "fill in the gaps" of certain product disclosures which were ambiguous as to inventorship. Byrne admits that his drawings and logbooks, existing or not, show nothing about Byrne's inventorship without his self-serving testimony to explain them. (Ferrari SJ Dec., Exhibit 27 (Byrne Dep.), 180:24-182:2, 189:14-190:17). Thus, the documentary evidence is insufficiently corroborating, and must be rejected, leaving only Byrne's declaration, which is insufficient as a matter of law.

Defendants invite the Court to question the credibility of the sworn testimonies of Rafferty, Kelly and McMeel, which are corroborated, unlike Byrne's. However, at his deposition, Byrne refused to brand these witnesses as liars. (Ferrari SJ Reply Dec., Exhibit 69 (Byrne Dep.), 146:3-150:19). Defendants' invitation ignores the presumption of patent validity by improperly shifting the burden of clear and convincing proof from the challenger to the patentee. Defendants' accusations of lying by the named inventor are irrelevant. *Symantec,* 522 F.3d at 1296. Defendants' improper inventorship defenses and counterclaims must be dismissed.

### V. Defendants Have Not Demonstrated That Rafferty Failed To Disclose Material Information To The USPTO

Non-existent documents and Byrne's uncorroborated testimony do not establish either sole or joint inventorship by Byrne, and cannot provide a basis for an inequitable conduct claim, especially when Rafferty believed that he was the sole inventor. (Ferrari Reply SJ Dec., Exhibit 66 (Rafferty Dep.), 78:20-79:2; 86:23-87:2; 148:4-8).

Defendants admit that the Masterstock conveyors were cumulative to prior art already of record in the file wrapper. (Ferrari SJ Dec., Exhibit 37 (6/27/08 Goffney Expert Report), ¶ 97). Being cumulative, the Masterstock conveyors cannot be material, and thus cannot be the subject

9

of an inequitable conduct claim. *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 488 F.3d 982, 1000 (Fed. Cir. 2007).

Defendants argue (p. 20), but supply no evidence (clear and convincing or otherwise), that "a **number** of Dominators were sold into the U.S. prior to September 7, 1993." Defendants cite to a 155-page logbook relating to a variety of machines marketed by MastersKreen around the world over a number of years, but fail to identify the entries purportedly showing the "number" of Dominator sales into the U.S. prior September 7, 1993. Nor do defendants provide any evidence as to the meaning of any purported pertinent entries in this logbook. To the contrary, the logbook does not prove defendants' point. Rafferty was questioned on this very issue. For each customer that he was asked about, Rafferty identified the customer as located in Europe or Canada, <u>not</u> in the U.S. (Ferrari Reply SJ Dec., Exhibit 66 (Rafferty Dep.), 425:14-429:21). Patrick McMeel identified Paul Ward, a Metso purchasing manager, as the person who had prepared the logbook (Ferrari Reply SJ Dec., Exhibit 68 (McMeel Dep.), 25:4-6, 166:7-25), yet defendants failed to depose Ward. Defendants took no depositions of the U.S. customers that defendants allege are among the "numerous" who bought and received delivery in the U.S. of Dominators before September 7, 1993.

Defendants rely (p. 20) upon the deposition testimony of Metso's Ben Hansbury claiming that he "unambiguously" testified that three or four Dominator screeners had been sold into the U.S. before September 7, 1993. However, Hansbury testified that he "believed" three or four Dominators had been sold into the U.S. prior to the date but that the documents produced would show what sales there had actually been. Alternatively, defendants rely upon a letter by Metso's counsel discussing document production issues. However, that letter is hearsay and not admissible evidence, and certainly was not intended to set forth a position or admission by Metso

10

in this litigation by Metso. In stark contrast, when defendants sought a formal Admission "that the Dominator was sold into the United States by MastersKreen prior to September 7, 1993", Metso *denied* the Request. (Ferrari SJ Reply Dec., Exhibit 76 (Metso's Response to Request For Admission No. 343)). In October 2008 during Rafferty's deposition which took place after the letter and after Metso's Admission Request Response, defendants acknowledged that Metso had not admitted that any Dominator had been sold in the U.S. prior to September 7, 1993. (Ferrari SJ Reply Dec., Exhibit 66 (Rafferty Dep.), 170:22-172:18).

The invoice in question (Ferrari SJ Dec., Exhibit 35) is addressed to "Masterskreen International Ltd., **c/o** Masterskreen Chicago" ("**c/o**" meaning "in care of"). As defendants admit (p. 21), an on-sale bar under 35 U.S.C. § 102(b) occurs when control of the two entities at issue "[is] clearly different", (quoting *In re Caveney,* 761 F.2d 671, 676 (Fed. Cir. 1985)). If the invoice reflects a sale or offer for sale from Masterskreen Int'l. Ltd. to itself (as the invoice states, confirmed by the "c/o" indication), there is no on-sale bar event. Metso's Donnelly, who worked at Masterskreeen Int'l. Ltd. at the time, testified that a machine identified in an invoice "could either be sold within Metso or externally" (Ferrari Reply SJ Dec., Exhibit 75 (Donnelly Dep.), 59:23-60:9); *i.e.,* it could either be a transaction where there was no transfer of title, or an arms-length transaction. Defendants argue (p. 21) that "MastersKreen Chicago" was "a separate and distinct company" from MastersKreen Int'l. Ltd. such that any transfer of a Dominator from Masterskreen Int'l. Ltd. to Masterskreen Chicago should be deemed an arms-length transaction for purposes of the on-sale bar. However, defendants ignore what the invoice says, that the customer was the manufacturer, Masterskreen Int'l. Ltd., not Masterskreen Chicago. In addition, defendants present no evidence (clear and convincing evidence or otherwise) that control of Masterskreen Int'l. Ltd. and Masterskreen Chicago were "clearly different". In fact, the IDB

("Irish Development Board") Report relied upon by defendants states that Malachy's son, Damian, "moved to North America in 1992 and set up Masterskreen companies in both Canada and the USA" -- suggesting that the companies were set up on behalf of Masterskreen Int'l. Ltd., and that Masterskreeen Int'l. Ltd. and MastersKreen USA are not separate entities. Defendants failed to take the deposition of Damian Rafferty or anyone from MastersKreen USA in an attempt to establish the relationship between Masterskreeen Int'l. Ltd. and MastersKreen USA, or whether there actually was a sale, offer for sale, or delivery of the particular Dominator identified in the invoice, or if and when that Dominator (or others) was sold to a U.S. customer.

Having no real evidence, defendants argue (p. 21) that the invoice is "presumptive proof that a sale occurred". However, Rafferty testified that the invoice may have been generated simply to obtain financing for a possible future purchase, whenever that may have occurred. (Ferrari Reply SJ Dec., Exhibit 66 (Rafferty Dep.), 164:18-165:21; 424:7-12). If financing was the purpose of the invoice, it is unknown when (or if) the sale or delivery actually took place.

Defendants have not presented clear and convincing evidence that even one Dominator screener was sold, offered for sale or shipped into the U.S. to qualify as "prior art" to the '618 patent under 35 U.S.C. § 102. Since the Dominator screener does not qualify as "prior art", it cannot form the basis of an inequitable conduct defense (or, incidentally, an invalidity defense based upon the Dominator under 35 U.S.C. § 103(a)).

Defendants cannot prove the necessary intent element of inequitable conduct. Even if the omitted information were material, which it is not, "'materiality does not presume intent, which is a separate and essential component of inequitable conduct.'" *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1366 (Fed. Cir. 2008) (quoting *GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1274 (Fed. Cir. 2001)). "[T]he accused infringer must prove by clear and convincing

evidence that the material information was withheld with the specific intent to deceive the PTO." *Star*, 537 F.3d 1366 (quoting *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1181 (Fed. Cir. 1995). "[A]t least a threshold level of each element -- *i.e.*, both materiality and intent to deceive -- must be proven by clear and convincing evidence." *Star,* 537 F.3d at 1365. "'[C]lear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a known material reference.'" *Star,* 537 F.3d at 1366 (quoting *Molins*, 48 F.3d at 1181) (emphasis supplied). The inference "must ... be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Id*.

Rafferty's testimony concerning why Byrne, the Dominator, and the Masterstock were not disclosed to the USPTO is entirely credible and reasonable: he did not understand or believe that he had any obligation to disclose that information to his patent attorneys who dealt with the USPTO.

Rafferty's responsibility at MastersKreen "was looking after the manufacturing", and he was self-taught through years in the business. (Ferrari Reply SJ Dec., Exhibit 66 (Rafferty Dep.), 12:20-15:16). Rafferty, who was born and raised and still lives in Northern Ireland, had a very limited education, having dropped out of school at the age of 16, and has trouble reading, even today. (*Id.*, 5:25-6:13, 22:8-25:11; 38:23-40:25; 105:22-109:19; 291:11-292:24). As for the application for the '618 patent, Rafferty testified that "reading through the likes of them documents wouldn't be ... my best subject"; that his "education wasn't that good so there would have been a lot of words and stuff that I wouldn't have understood." (*Id.*, 22:8-21).

Rafferty never communicated with John Holman, the U.S. patent attorney hired by Rafferty's Irish patent attorney to prosecute the application for the '618 patent. (*Id.*, 54:19-22). Rafferty said that he had numerous meetings with his Irish counsel, the Cruickshank firm, and that he trusted Cruickshank to ask him what Cruickshank needed to know, and that he would provide the

13

information. (*Id.*, 49:7-10 ("[I]f I pay a lawyer to do something for me, he'd advise me on what to do and ... he'd asked me questions and I'd have answered and talked over with him"), *see also* 62:21-23, 312:2-3). Rafferty discussed with Cruickshank "what he should do and what he shouldn't do", and Cruickshank had "done a search to make sure there was no one else done my patent". (*Id.,* 54:22-23, 258:5-6).

Rafferty believed unequivocally that he was the sole inventor of the invention. (*Id.*, 78:20-79:2, 86:23-87:2, 148:4-8). Rafferty testified that he had conceived of folding the conveyors in an "**L**" shape, and that Byrne had merely performed calculations for him and "done" some of the drawings for the project. (*Id.*, 78:20-79:2; 86:23-93:12; 210:12-211:9; 405:14-408:22; 203:6-204:1; 273:24-275:23).

As for whether there might be an obligation to disclose the Dominator or the Masterstock conveyor to the USPTO or his patent attorneys, Rafferty viewed his invention as novel and understood that his patent attorney had cleared the invention by performing a patent search. He simply did not understand that he had any obligation to tell his attorney anything else because he did not think that he needed to disclose the Dominator or Masterstock conveyor that was "completely different" than his invention. (*Id.,* 307:17-310:10; 378:7-380:21; 321:2-9).

Rafferty's explanations are credible, and defendants have come forward with no evidence to show otherwise. Defendants offer only attorney argument (p. 23) to support their claim that Rafferty's statements "simply were not believable". Defendants thus cannot establish the essential element of intent to deceive the USPTO, and Metso's motion for summary judgment dismissing defendants' inequitable conduct claim must be granted. *See Pfizer, Inc. v. Teva Pharm. USA, Inc.,* 518 F.3d 1353, 1367 (Fed. Cir. 2008) (no inference of intent possible in face of credible good faith explanation for withholding).

14

**VI. The Accused Screeners Infringe The '618 Patent, Both Literally And Under The Doctrine Of Equivalents**

The Accused Powerscreen Mobile Screeners look exactly like the screener shown in the drawings of the '618 patent. (see Ferrari SJ Reply Dec., Exhibit 78). Rather than repeat what Metso has argued before in other briefs, Metso refers the Court to Metso's arguments on infringement set forth in Metso's initial brief on its summary judgment motion (including the supporting declarations and exhibits) and to Metso's brief in opposition to defendants' motion for summary judgment (pp. 8-14) (including the supporting declarations and exhibits).

**VII. Defendants Have Failed To Demonstrate Material Prejudice For Their Evidentiary Laches Defense**

Defendants have no evidence showing that they were materially prejudiced by Metso's alleged delay in commencing suit. If the allegedly missing drawings and logbooks were located, Byrne admits that they would not prove that Byrne conceived of the invention. Defendants have no proof that there are any missing "prior art" Dominator U.S. invoices -- defendants have identified only one pertinent U.S. invoice and no evidence of any others. As to the patent files of the Holman firm, Holman's files effectively still exist because a duplicate copy of Holman's files survive by combining the USPTO file, the Cruikshank file, and the Metso file. All non-privileged portions thereof have been produced and privileged portions are identified on Metso's privileged documents log. Defendants have already received those portions of Holman's files to which they are entitled. Defendants' laches defense is baseless, frivolous and must be dismissed.

Dated: September 11, 2009
        s/Michael C. Stuart
        Michael C. Stuart (MS 2707)
        Lisa A. Ferrari (LF 8081)
        COHEN PONTANI LIEBERMAN & PAVANE LLP
        551 Fifth Avenue
        New York, New York 10176
        (212) 687-2770

        *Attorneys for Plaintiff Metso Minerals Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day, I caused to be served a complete and correct copy of:

1. Plaintiff Metso's Reply Brief In Support Of Its Motion For Partial Summary Judgment

2. Reply Declaration of Lisa A. Ferrari In Support Of Plaintiff Metso's Motion For Partial Summary Judgment (including exhibits)

on defendants, by ECF (excluding exhibits) and Federal Express, addressed as follows:

>George B. Yankwitt, Esq.
>Mary M. Chang, Esq.
>Squire, Sanders & Dempsey L.L.P.
>30 Rockefeller Plaza
>New York, New York 10112
>
>*Counsel for Defendants Powerscreen International Distribution Limited, Powerscreen New York, Inc., Terex Corporation, and Emerald Equipment Systems, Inc.*

Dated: September 11, 2009                s/ Michael C. Stuart
                                         Michael C. Stuart

#138825v2