UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

METSO MINERALS INC.,

                            Plaintiff,

                         - against -

POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, now known as
TEREX GB, LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC., and EMERALD EQUIPMENT
SYSTEMS, INC.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Civil Action No. CV-06-01446
(ADS) (ETB)

## DEFENDANTS' TRIAL BRIEF

SQUIRE, SANDERS & DEMPSEY L.L.P.
30 ROCKEFELLER PLAZA. 23RD FL.
NEW YORK, NEW YORK 10112
TELEPHONE: (212) 872-9800

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 3

    A.    Powerscreen And The Other Defendants ........................................... 3

    B.    Malachy Rafferty And The '618 Patent ............................................ 4

    C.    The Chieftain Redesign Project ........................................................ 6

    D.    Metso Minerals, Inc. And The Present Lawsuit ............................... 6

DISCUSSION ...................................................................................................... 7

    A.    The Accused Screening Plants Do Not Literally Infringe The '618 Patent ........... 7

        1.    The Accused Screening Plants Do Not Satisfy The Head Articulation Means Limitation ................................... 9

        2.    The Accused Screening Plants With A Chassis Mounted On Tracks Do Not Infringe The Limitation In The '618 Patent Of A "Wheel-Mounted Chassis" Under The Court's Constructions ............... 11

    B.    The Accused Screening Plants Do Not Infringe The Asserted Claims Of The '618 Patent Under The Doctrine Of Equivalents ........................................ 12

        1.    Mr. Rafferty's Arguments To The PTO During Prosecution Of The '618 Patent Preclude Any Theory Of Equivalence Regarding The Claim Limitation That The Side Conveyors Not Project Beyond The Chassis In The Transport Position ................................... 12

        2.    The Accused Screening Plants Do Not Perform A Function Equivalent To The Function Of The Head Articulation Means Limitation ................................... 14

    C.    The '618 Patent Is Invalid Pursuant To 35 U.S.C. §103 Because It Would Have Been Obvious To A Person Of Ordinary Skill In The Art At The Time Of The Claimed Invention ........................................ 16

        1.    The Combinations Of Prior Art ............................................. 16

        2.    There Is No Availing Evidence Of Any Secondary Considerations Of Nonobviousness ................................... 19

            a.    Commercial Success ................................... 19

            b.    Copying ................................... 20

            c.    Attempts By The Defendant To Patent The Same Invention ...... 21

            d.    Long-Felt Need And The Failure Of Others To Fill That Need ................................... 21

            e.    Praise By Others ................................... 22

f.    Licensing .................................................................................. 23

g.    Unexpected Results .................................................................. 23

D.    The '618 Patent Is Unenforceable Because Malachy Rafferty Committed Inequitable Conduct Before The USPTO In Connection With The Prosecution Of The '618 Patent ........................................................ 24

E.    The Doctrine Of Laches Bars Plaintiff's Claims In This Action ........................ 26

1.    The Evidentiary Prejudice To Defendants .............................. 27

2.    Plaintiff's Spoliation Of Evidence ......................................... 28

F.    Even If The '618 Patent Is Infringed, Which It Is Not, Plaintiff Is Not Entitled To The Damages It Claims ..................................................... 31

1.    The Royalty Rate Is Unsupportable ...................................... 32

2.    The Royalty Base Is Improperly Inflated .............................. 35

G.    The Evidence Does Not Support A Finding Of Willful Infringement ................. 37

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Al-Site Corp. v. VSI Intern., Inc.,*
174 F.3d 1308 (Fed. Cir. 1999)...................................................................... 8

*Aquatex Indus., Inc. v. Techniche Solutions,*
419 F.3d 1374 (Fed. Cir. 2005)................................................................ 12, 14

*Asyst Techs., Inc. v. Emtrak, Inc.,*
544 F.3d 1310 (Fed. Cir. 2008)..................................................................... 19

*Baxter, Int'l v. McGaw, Inc.,*
149 F.3d 1321 (Fed. Cir. 1998)..................................................................... 25

*Bayer AG v. Elan Pharm. Research Corp.,*
212 F.3d 1241 (Fed. Cir. 2000)....................................................................... 8

*Bayer AG v. Sony Elecs., Inc.,*
229 F. Supp. 2d 332 (D. Del. 2002)............................................................... 22

*Black & Decker, Inc. v. Robert Bosch Tool Corp.,*
260 Fed. Appx. 284 (Fed. Cir. 2008)....................................................... 38, 39

*Black v. Ce Soir Lingerie Co.,*
2008 U.S. Dist. LEXIS 62484 (E.D. Tex. Aug. 15, 2008) ............................ 19

*Byrnie v. Town of Cromwell,*
243 F.3d 93 (2d Cir. 2001)........................................................................... 29

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,*
145 F.3d 1303 (Fed. Cir. 1998)....................................................................... 8

*Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington,*
103 F.R.D. 52 (D. D.C. 1984)........................................................................ 23

*Cornell Univ. v. Hewlett-Packard Co.,*
2008 U.S. Dist. LEXIS 41848 (N.D.N.Y. May 27, 2008)........................31-32, 36

*Cortland Line Co., Inc. v. Orvis Co., Inc.,*
203 F.3d 1351 (Fed. Cir. 2000)....................................................................... 8

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
424 F.3d 1293 (Fed. Cir. 2005)....................................................................... 8

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,*
851 F.2d 1387 (Fed. Cir. 1988)..................................................................... 19

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
567 F.3d 1314 (Fed. Cir. 2009)..................................................................... 38

*Digital Control, Inc. v. Charles Mach. Works*,
  437 F.3d 1309 (Fed. Cir. 2006)........................................................ 25

*Dow Chem. Co. v. Mee Indus., Inc.*,
  341 F.3d 1370 (Fed. Cir. 2003)........................................................ 32

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
  227 F.3d 1361 (Fed. Cir. 2000)........................................................ 19

*EWP Corp. v. Reliance Universal Inc.*,
  755 F.2d 898 (Fed. Cir. 1985)......................................................... 23

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
  535 U.S. 722 (2002).................................................................... 12

*Forest Labs., Inc. v. Abbott Labs.*,
  239 F.3d 1305 (Fed. Cir. 2001)........................................................ 13

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Intern., Inc.*,
  389 F.3d 1370 (Fed. Cir. 2004)......................................................... 8

*Fujitsu Ltd. v. Fed. Express Corp.*,
  247 F.3d 423 (2d Cir. 2001).......................................................... 29

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)..................................................................... 16

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999)........................................................ 32

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983)........................................................ 31

*Hearing Components, Inc. v. Shure Inc.*,
  600 F.3d 1357 (Fed. Cir. 2010).................................................... 26, 27

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
  488 F.32 982 (Fed. Cir. 2007)........................................................ 24

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
  585 F. Supp. 2d 636 (D. Del. 2008)................................................... 38

*In re Baxter Travenol Labs.*,
  952 F.2d 388 (Fed. Cir. 1991).................................................... 23, 24

*In re Foster*,
  343 F.2d 980 (C.C.P.A. 1965) ........................................................ 17

*In re Gosteli*,
  872 F.2d 1008 (Fed. Cir. 1989)....................................................... 17

*In re Seagate Techs., LLC,*
497 F.3d 1360 (Fed. Cir. 2007)..................................................................... 37, 38

*In re Soni,*
54 F.3d 746 (Fed. Cir. 1995)......................................................................... 23, 24

*IP Innovation L.L.C. v. Red Hat, Inc.,*
2010 U.S. Dist. LEXIS 28372 (E.D. Tex. Mar. 2, 2010)................................. 32, 36

*Iron Grip Barbell Co. v. USA Sports, Inc.,*
392 F.3d 1317 (Fed. Cir. 2004)..................................................................... 20, 21

*Jenn-Air Corp. v. Modern Maid Co.,*
499 F. Supp. 320 (D. Del. 1980).......................................................................... 22

*Katz v. U.S. Bancorp,*
No. 07-CV-2360RGK (C.D. Cal. May 1, 2009)................................................... 39

*Kronisch v. U.S.,*
150 F.3d 112 (2d Cir. 1998)................................................................................. 29

*KSR Int'l Co. v. Teleflex Inc.,*
550 U.S. 398 (2007)................................................................................... 16, 19

*Litton Systems, Inc. v. Honeywell, Inc.,*
87 F.3d 1559 (Fed. Cir. 1996)............................................................................. 22

*Lockwood v. Am. Airlines, Inc.,*
107 F.3d 1565 (Fed. Cir. 1997)........................................................................... 18

*Lucent Techs., Inc. v. Gateway, Inc.,*
580 F.3d 1301 (Fed. Cir. 2009)............................................................. 33, 34, 35

*Markman v. Lehman,*
987 F. Supp. 25 (D.D.C. 1997)............................................................................ 21

*Media Techs. Licensing, LLC v. Upper Deck Co.,*
596 F.3d 1334 (Fed. Cir. 2010)........................................................................... 19

*Metso Minerals, Inc. v. Powerscreen Int'l Distrib.,*
2010 U.S. Dist. LEXIS 68274 (July 9, 2010) ...................................................... 38

*Minton v. Nat'l Ass'n of Secs. Dealers, Inc.,*
226 F. Supp. 2d 845 (D. Tex. 2002) .................................................................... 21

*Norian Corp. v. Stryker Corp.,*
363 F.3d 1321 (Fed. Cir. 2004)........................................................................... 25

*Perkin-Elmer Corp. v. Westinghouse Elec. Corp.,*
822 F.2d 1528 (1987)........................................................................................... 14

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*,
   225 F.3d 1315 (Fed. Cir. 2000) ............................................................. 25

*Pfizer, Inc. v. Apotex, Inc.*,
   2010 U.S. Dist. LEXIS 80786 (N.D. Ill. Aug. 2010) ............................. 19

*Polaroid Corp. v. Eastman Kodak Co.*,
   641 F. Supp. 828 (D. Mass. 1985) ......................................................... 21

*Praxair, Inc. v. ATMI, Inc.*,
   543 F.3d 1306 (Fed. Cir. 2008) ........................................................ 25, 26

*RCA Corp. v. Data Gen. Corp.*,
   701 F. Supp. 456 (D. Del. 1988) ............................................................ 23

*Relume Corp. v. Dialight Corp.*,
   63 F. Supp. 2d 788 (E.D. Mich. 1999) ................................................... 20

*Residential Funding Corp. v. De-George Fin. Corp.*,
   306 F.3d 99 (2d Cir. 2002) ............................................................... 29, 30

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ................................................... 32, 34, 35

*Riles v. Shell Exploration & Prod. Co.*,
   298 F.3d 1302 (Fed. Cir. 2002) .............................................................. 32

*Rite-Hite Corp. v. Kelley Co., Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995) ......................................................... 35, 37

*Sage Prods. v. Devon Indus.*,
   126 F.3d 1420 (Fed. Cir. 1997) .............................................................. 14

*Sakraida v. Ag Pro, Inc.*,
   425 U.S. 273 (1976) ............................................................................... 16

*Seal-Flex, Inc. v. Athletic Track and Court Constr.*,
   172 F.3d 836 (Fed. Cir. 1999) ................................................................. 7

*Serdarevic v. Advanced Med. Optics, Inc.*,
   532 F.3d 1352 (Fed. Cir. 2008) .............................................................. 27

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
   537 F.3d 1357 (Fed. Cir. 2008) ........................................................ 25, 26

*Storage Technology Corp. v. Cisco Sys., Inc.*,
   329 F.3d 823 (Fed. Cir. 2003) ......................................................... 12, 14

*Studiengesellschaft Kohle mbH v. Dart Indust.*,
   549 F. Supp. 716 (D. Del. 1982) ............................................................ 22

*Tec Air, Inc. v. Denso Mfg. Michigan, Inc.*,
192 F.3d 1353 (Fed. Cir. 1999)..........................................................21, 22

*United States v. Adams*,
383 U.S. 39 (1966)...........................................................................22

*Univ. of Rochester v. G.D. Searle & Co.*,
249 F. Supp. 2d 216 (W.D.N.Y. 2003)..................................................18

*Utah Med. Prods., Inc. v. Graphic Controls Corp.*,
350 F.3d 1376 (Fed. Cir. 2003)..........................................................32

*Vas-Cath Inc. v. Mahurkar*,
935 F.2d 1555 (Fed. Cir. 1991)..........................................................18

*Vulcan Eng'g Co. v. Fata Aluminum, Inc.*,
278 F.3d 1366 (Fed. Cir. 2002)..........................................................22

*Wanlass v. GE*,
148 F.3d 1334 (Fed. Cir. 1998)..........................................................27

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)...........................................................................14

*West v. Goodyear Tire & Rubber Co.*,
167 F.3d 776 (2d Cir. 1999).............................................................28-29

*WMS Gaming Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999)........................................................8, 23

*Wyers v. Master Lock Co.*,
616 F.3d 1231 (Fed. Cir. 2010)..........................................................21

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003)......................................................29, 30

**FEDERAL STATUTES**

35 U.S.C. §102.................................................................................18

35 U.S.C. §102(a)...........................................................................2, 17

35 U.S.C. §102(b)......................................................................2, 3, 17, 31

35 U.S.C. §103..........................................................................1, 3, 17, 19

35 U.S.C. §103(a)...........................................................................16

35 U.S.C. §112(6).............................................................................8

35 U.S.C. §271..............................................................................7, 8

**Page**

35 U.S.C. §284.................................................................................................. 31, 38

35 U.S.C. §285.................................................................................................... 3

**FEDERAL REGULATIONS**

37 C.F.R. §1.56.................................................................................................. 24

**OTHER AUTHORITIES**

Donald S. Chisum, *Chisum on Patents*, §5.03[2] (2008)............................................. 17

**<u>INTRODUCTION</u>**

Plaintiff Metso Minerals Inc. ("Plaintiff") brought suit against Defendants Powerscreen International Distribution Limited ("Powerscreen"), Terex Corporation, Powerscreen New York, Inc., and Emerald Equipment Systems, Inc. (collectively, "Defendants") on March 29, 2006. Plaintiff alleges that certain mobile screening plants manufactured by Powerscreen—the Chieftain 1400, Chieftain 1700, Chieftain 1800, Chieftain 2100, Chieftain 2400, Chieftain 2100X, and the H5163 (collectively, the "Accused Screening Plants")—infringe claims 1 to 7 and 9 of U.S. Patent No. 5,577,619 ("the '618 patent"). Several defects doom Plaintiff's claims.

*First*, Plaintiff cannot carry its burden of proving that that the Accused Screening Plants meet every limitation of the asserted claims of the '618 patent,. None of the Accused Screening Plants has the head articulation means claimed in the '618 patent or defined by the Court. The Accused Screening Plants do not perform a function that is identical to that claimed in the '618 patent—namely, to cause the lateral conveyors, when folded in the transport position, to be positioned with respect to the input hopper and screen box in such a way that the head section does not project laterally beyond the chassis. Indeed, the function performed by the structure that articulates the lateral conveyors is very different from the function required by the '618 patent and precludes the lateral conveyors from achieving the transport position required by the claims. Plaintiff is estopped, moreover, from asserting any theory of equivalence on this claim limitation (of no projection beyond the chassis) because the applicant's clear and unequivocal statements and arguments made by the applicant, Malachy Rafferty, to the Examiner at the Patent and Trademark Office ("PTO") during prosecution of the '618 patent constitute a clear surrender of that ground, which may not be recovered under the doctrine of equivalents.

In addition, most of the Accused Screening Plants have a track-mounted chassis, which is not a "wheel mounted chassis" as claimed in the '618 patent.

*Second*, the '618 patent is obvious under 35 U.S.C. §103 in view of combinations of prior art references. These combinations include the "Dominator" mobile screening plant and the side-folding mechanism of "Masterstock 80" stand-alone conveyor, both of which were known

to the inventor of the '618 patent, Malachy Rafferty, because they were manufactured and sold by his own company, MastersKreen International Ltd. ("MastersKreen"). The undisputed evidence demonstrates that the Dominator is prior art for purposes of obviousness because it was sold or "on sale" in the United States, within the meaning of 35 U.S.C. §102(b) prior to September 7, 1993—a year before the application for the '618 patent was filed. In any event, the Dominator was known to others in the United States before the U.S. application the '618 patent was filed on September 7, 1994, and was not disclosed in Mr. Rafferty's Irish priority application, and so is properly considered prior art under 35 U.S.C. §102(a). The claims of the '618 patent are also obvious in light of other prior art combinations, including the Eriksson, Palmer and Johannsen references, among others.

*Third*, even if Plaintiff can clear the above hurdles, the '618 patent is still unenforceable because Rafferty committed inequitable conduct in the PTO during the prosecution of the '618 patent application. The evidence will show that Rafferty knew about—but failed to disclose to the PTO—the Dominator and Masterstock 80 conveyor—highly material information that would have influenced the Examiner's decision on patentability. And to this day, Rafferty declines to provide a credible explanation for his failure to disclose, providing instead only evasive testimony. At a minimum, these circumstances justify an inference of intent to deceive the PTO and, consequently, a finding of inequitable conduct.

*Fourth*, the doctrine of laches applies to limit Plaintiff's recovery, if any, to damages from sales after the lawsuit was commenced. Although Plaintiff knew or should have known of the first act of alleged infringement as early as February or early March 2000, Plaintiff unreasonably delayed for more than *six years* before filing suit. This delay prejudiced Defendants because during this six-year period, information highly material to Defendants' inequitable conduct, obviousness, and inventorship defenses—information material to the validity and enforceability of the '618 patent in the first place—was destroyed or otherwise "disappeared." In addition to drawings, logbooks, and other critical documentation that would have corroborated Richard Byrne's role as an inventor, invoices relating to the sale and shipment

of the Dominator in the U.S. as early as 1990, which would conclusively establish the Dominator as prior art pursuant to 35 U.S.C. §§102(b) and 103 for purposes of obviousness, inexplicably vanished. Moreover, Rafferty's U.S. patent counsel destroyed its *entire* '618 patent prosecution file in 2005, more than five years after Plaintiff became aware of its claims here, and after Plaintiff in fact filed suit in the United Kingdom. Not only were documents destroyed, but memories of key witnesses faded and witnesses became unavailable. For example, key portions of Mr. Rafferty's memory faded to the point where he could not remember when Dominators were first sold to the United States or even whether a company in Chicago owned by his sons ever received a Dominator shipped to it. Application of laches is easy, and absolutely required. Plaintiff's failure to preserve—indeed, its condoned destruction of—evidence that is not only relevant but crucial to Defendants' defenses in this action mandates an inference that Plaintiff spoliated key evidence.

*Finally*, given the foregoing, including most notably the conduct of Plaintiff and Rafferty, Defendants are entitled to a declaration that this case is exceptional and an award to their reasonable attorneys' fees and costs pursuant to 35 U.S.C. §285.

## FACTUAL BACKGROUND

The evidence proffered at trial will establish the following pertinent background facts.

### A.    POWERSCREEN AND THE OTHER DEFENDANTS

Powerscreen, a corporation organized under the laws of the United Kingdom, is an early innovator in the aggregate material field, having designed, manufactured, and sold screeners, conveyors, and other equipment since 1966. Dkt. No. 311, Joint Pretrial Order, Stip. Fact Nos. 2, 8. Powerscreen has designed, manufactured, and sold *mobile* screeners for over forty years. Among these mobile screeners, Powerscreen began designing, manufacturing, and selling its "Chieftain" model, the first screener in the industry to feature an integrated lateral conveyor having both a transport and operative position, since in or about 1983. *Id.*, Stip. Fact No. 9. In other words, the lateral conveyor of the Chieftain necessarily folded so that the screener could be transported from one location to another.

Powerscreen is a subsidiary of Terex Corporation, which is headquartered in Westport, Connecticut. Terex has not made or sold any of the Accused Screening Plants. Emerald is a distributor of Powerscreen equipment and is headquartered in Liverpool, New York. Powerscreen of New York is a former distributor of Powerscreen equipment that is now essentially defunct.

### B.    MALACHY RAFFERTY AND THE '618 PATENT

Malachy Rafferty, the listed inventor of the '618 patent, and his brother Kevin, owned MastersKreen International Ltd. (formerly known as M&K Quarry), which made equipment used in quarries. This equipment included screeners, as well as stand-alone conveyors that could be moved from one location to another to put screened material into piles from screeners that did not have their own, integrated conveyors.

Plaintiff will no doubt cast Mr. Rafferty as a small businessman and prototypical inventor, to whom the idea for the lateral conveyor folding mechanism claimed in the '618 patent came suddenly in the middle of the night in 1993, to solve the problem of designing aggregate material processing plants meant to be transported over the highways. Plaintiff will claim that Mr. Rafferty's spark of genius—folding the lateral conveyors of mobile screening plants so that they do not project beyond the chassis when in a transport position—"unexpectedly" allowed the screener to have a wider main conveyor and thus greater capacity. Finally, Plaintiff will assert that, after making "matchstick" and "cardboard" models, Mr. Rafferty developed a working model, consulted with a patent lawyer, and then filed the application for the '618 patent on September 7, 1994.

While this story of creativity and inventiveness has superficial appeal, it is unfortunately belied by critical facts that Plaintiff will *not* share with the jury. For example: Mr. Rafferty was not an engineer but was most definitely a cunning businessman. Before he and his brother Kevin formed M&K Quarry in 1977, Mr. Rafferty worked at *Powerscreen*, where he learned all about Powerscreen's equipment. Well before M&K Quarry made its first static screener (the "Challenger") in 1986, Powerscreen was already making mobile screeners with on-board,

integrated lateral conveyors that folded for transport. After he formed M&K Quarry, Mr. Rafferty made a secret and unauthorized visit to Powerscreen's plant in the dead of the night, and later purchased a used Powerscreen mobile screener so that he could take it apart and copy certain of its attributes.

Not long thereafter, and several years before Mr. Rafferty applied for the '618 patent, his company (which changed its name to MastersKreen) developed its own mobile screening plant, called the "Dominator." Like Powerscreen's Chieftain introduced in 1983, the Dominator was a wheel mounted screening plant capable of being towed over the public highways. It had a chassis, an input hopper, a main conveyor, a screen box, and integrated lateral conveyors that folded in two places for transport—virtually all of the elements claimed in the '618 patent. The only element of the claims of the '618 patent that the Dominator lacked was the "head articulation means." MastersKreen sold the Dominator in the United States as early as the late 1980s or early 1990s.

As discussed above, MastersKreen also produced stand-alone conveyors, including the Masterstock 80. The head section of this conveyor folds to the side for transport—much like the head section of the lateral conveyor ultimately claimed in the '618 patent and implemented in the "Senator," a commercial embodiment of the invention claimed in the '618 patent. As discussed below, the evidence will show that, to a person of ordinary skill in the art, combining the side-folding mechanism used on the Masterstock 80 stand-alone conveyor with the elements of the Dominator—both of which were manufactured and sold by Mr. Rafferty's company—would have been obvious and would have resulted in the design claimed in the '618 patent. Mr. Rafferty, however, never disclosed either the Dominator or the Masterstock 80 to the PTO during the prosecution of the application that resulted in the '618 patent, even though these references were highly material to patentability and obviously known to him. Indeed, he may never even have told his patent attorneys about them, although this cannot be known because the records of his U.S. patent attorney were destroyed just before this litigation was filed. The '618 patent issued on November 26, 1996.

## C.    THE CHIEFTAIN REDESIGN PROJECT

By 1998, Powerscreen had commenced a project to redesign its entire range of equipment, including the Chieftain mobile screeners. Dkt. No. 311, Joint Pretrial Order, Stip. Fact 10. Neill Suitor was the lead designer responsible for this project. *Id.*, Stip. Fact No. 10. Powerscreen's redesign was undertaken in part to compete with a track-mounted mobile screener introduced by Extec and to achieve manufacturing efficiencies, including the modularization of components and sub-assemblies that could be used in other Powerscreen products. Along with several other components of the plant, the lateral conveyors of the Chieftain were redesigned during this project.

At the time of the Chieftain redesign project, Powerscreen engineers involved were well aware of the '618 patent, as well as another patent held by Extec. It was their job not only to be aware of relevant patents and but to ensure that new designs did not infringe any such patents. The Powerscreen engineers responsible for the design of the new Chieftain lateral conveyors accordingly ensured that they implemented a design that did not infringe any of the patents they were aware of, including the '618 patent and the Extec patent. This new design also provided for particularly strong and robust lateral conveyors that folded for transport, but could not be folded within the confines of the chassis (as defined by the Court; *see* Dkt. No. 292).

In or about 1999, the redesign project was completed. Dkt. No. 311, Joint Pretrial Order, Stip. Fact No. 10. When the project concluded, Powerscreen was convinced its engineers had developed a unique, non-infringing lateral conveyor folding mechanism that would optimize efficiency when operating while at the same time fold into a transport position.

## D.    METSO MINERALS, INC. AND THE PRESENT LAWSUIT

In or about June 1999, Malachy Rafferty and his brother Kevin sold their stock in MastersKreen for $5 million to Nordberg Group OY, now known as Metso, which integrated the MastersKreen operations and personnel into its own business. In a simultaneous but separate individual transaction, Mr. Rafferty sold the '618 patent to Nordberg for about $126,000. Tellingly, he did not share the proceeds of the sale of the patent with his brother Kevin, indeed,

he did not want Kevin to know about this separate transaction. Nordberg changed its name to Metso shortly after acquiring MastersKreen, and subsequently (in 2006, just before Metso commenced this lawsuit) assigned all right, title and interest in the '618 patent to Metso, including the right to sue and collect damages for all prior, current and future infringements.

Plaintiff will not volunteer to the jury, however, that it was well aware of its claim of alleged infringement against Defendants well before March 2000 and that it did nothing to enforce its newly-acquired patent rights for the following *six years*—no doubt claiming instead that it was overwhelmed with corporate mergers, reorganizations and other activities to pursue its claim of alleged infringement. What occurred during that six-year lag, however, is at best disturbing. Invoices relating to the sale of the Dominator in the United States starting in the late 1980s mysteriously disappeared. Shipping records also disappeared. And more than five years after Metso came to the conclusion that Powerscreen products infringed the '618 patent, Mr. Rafferty's United States patent counsel, Jacobson Holman, advised Plaintiff that it would destroy the '618 patent prosecution file. Hearing no objection or instruction from Plaintiff to the contrary, and apparently with Metso's approval, Mr. Holman proceeded to destroy the entire '618 patent prosecution file (including all information material to prior art and patentability) in 2005 in violation of the Jacobson Holman firm's own document management policy and more than five years after Plaintiff was aware of its claim against Defendants. Not until March 29, 2006—when key evidence supporting Defendants' defenses was lost—did Plaintiff commence the present action.

## DISCUSSION

### A.    THE ACCUSED SCREENING PLANTS DO NOT LITERALLY INFRINGE THE '618 PATENT

To prove infringement, Plaintiff must persuade the jury by a preponderance of the evidence that Defendants have made, used, sold, offered for sale or imported within the United States a product that is covered by claims 1-7 and 9 of the '618 patent. 35 U.S.C. §271; *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999). A patent

claim may be infringed "literally" or, in proper circumstances, under the "doctrine of equivalents." 35 U.S.C. §271; *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310-11 (Fed. Cir. 2005).

In order to prevail on its claim of literal infringement, Plaintiff must prove by a preponderance of evidence that the Accused Screening Plants literally embody each and every limitation set forth in the asserted claims. *Cortland Line Co., Inc. v. Orvis Co., Inc.*, 203 F.3d 1351, 1358 (Fed. Cir. 2000). The absence of even one element of a claim will defeat Plaintiff's action for literal infringement as a matter of law. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

A means-plus-function requirement only covers the specific structure disclosed in a patent specification for performing the claimed function and the equivalents of that specific structure that perform the claimed function. 35 U.S.C. §112(6); *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Intern., Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004). A means-plus-function requirement does not cover all possible structures that could be used to perform the claimed function. *Frank's Casing Crew*, 389 F.3d at 1378. For a means-plus-function claim element to be infringed, the accused product must carry out the claimed function ***exactly*** and must incorporate the structure, or its equivalent, described in the specification to perform that function. *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1320-21 (Fed. Cir. 1999); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1353 (Fed. Cir. 1999); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1310 (Fed. Cir. 1998).

Defendants will prevail because none of the Accused Screening Plants has all of the limitations, or their equivalents, of the asserted claims of the '618 patent. Three defects doom Plaintiff's infringement case. First, the lateral conveyors of each and every Accused Screening Plant do not satisfy the "head articulation means" requirement of the claims because all the lateral conveyors project beyond the chassis and are not positioned with respect to the input hopper and the screen box as the claims require. Second, most of the Accused Screening Plants have a track-mounted chassis, not a "wheel mounted chassis" as claimed in the '618 patent.

### 1. The Accused Screening Plants Do Not Satisfy The Head Articulation Means Limitation

Each and every asserted claim of the '618 patent requires that the head section of the lateral conveyor, when in the transport position, is positioned "so that it ***does not project laterally beyond the chassis***." ('618 patent, col. 7; col. 7, lns. 43-47; col. 9, lns. 10-14 (emphasis added).) The Court has construed "chassis" to mean "the entire assembly of parts that rest beneath the plant support frame." Jan. 28, 2010 Memo. Of Decision And Order (Dkt. No. 292) at 17. The Court also has ruled that "does not project laterally beyond the chassis" means what it says: "does not extend, ***in any amount***, laterally beyond the chassis." *Id.* at 27 (emphasis added). The Court construed the function of the "head articulation means" to be:

> ***connecting the head section to the tail section in such a way that the head section*** is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it ***does not project laterally beyond the chassis***.

Dkt. No. 292 at 26 (emphasis added). The Court also ruled that the structures necessary to perform this function are "a pivot joint, a connecting pin, a bushing, wing plates, and a holding plate." *Id.* To literally infringe, the structure for the head articulation means in the Accused Screening Plants must: (1) include all of the elements required by the Court's construction; (2) ***connect the head section*** to the pivoting part of the ***tail section***; and (3) permit the head section to both move into a transport position so that it ***does not project laterally beyond the chassis***. But the Accused Screening Plants do not perform the required function.

First, the evidence will show that the structure that causes the folding and unfolding of the head section of the lateral conveyor of the Accused Screening Plants connects the head section, at one end, to the ***plant support frame***—not to the ***movable part of the tail section***, a distinct structure required by the '618 patent and the Court's construction. Indeed, in the Accused Screening Plants, two support struts are connected between the head section of the lateral conveyor and the plant support frame. One support strut is adjustable in length, while the other remains fixed in length. A single hydraulic cylinder is attached to the adjustable strut,

which connects the head section to the plant support frame, and controls the movement of both the head section and the movable tail section of the lateral conveyor of the Accused Screening Plants. Consequently, the head section and movable part of the tail section of the lateral conveyor in the Accused Screening Plants necessarily fold in one simultaneous movement.

In contrast, the evidence will show that the head section and movable part of the tail section required by the patent and shown on Plaintiff's commercial embodiments of the invention can *move independently*. Indeed, in Plaintiff's mobile screening plants that it claims embody the '618 patent, the head section and movable part of the tail section are controlled by separate hydraulic controls to permit this independent movement. This is not so in the Accused Screening Plants. Further, the single hydraulic control of the Accused Screening Plants permits the lateral conveyors to achieve only two positions: the operating position and transport position. The folding mechanism disclosed in the '618 patent, on the other hand, allows the lateral conveyor to achieve a variety of positions, including a maintenance position. Thus, the Accused Screening Plants do not perform the required function.

The evidence will demonstrate that the folding and connecting structures of the Accused Screening Plants perform different, non-equivalent functions:

- They provide greater support for the head section of the lateral conveyors in the working position and are stronger. This allows the conveyors to support and process more screened material (e.g., larger piles of screened material), and be more reliable.

- As an additional necessary consequence of their structure, they prevent the head section of lateral conveyors in the Accused Screening Plants from being "positioned with respect to the input hopper and the material processing means" as required by the '618 patent. In fact, the evidence will undeniably demonstrate that, when in the transport position, the lateral conveyors of the Accused Screening Plants are not positioned with respect to the input hopper and screen box to prevent their projection beyond the chassis.

- They prevent the lateral conveyor from folding as compactly as the lateral conveyor in the transport position claimed in the '618 patent, i.e. they prevent the lateral conveyor from *not* projecting laterally beyond the chassis in the transport position.

- They prevent the lateral conveyor from achieving the maintenance position claimed in claim 12 of the '618 patent.

In sum, the side conveyor connecting and folding mechanism of the Accused Screening Plants do not perform the identical function as that claimed in the patent, but instead perform a very different function. Accordingly, there can be no infringement.

2.    **The Accused Screening Plants With A Chassis Mounted On Tracks Do Not Infringe The Limitation In The '618 Patent Of A "Wheel-Mounted Chassis" Under The Court's Constructions**

Because the Accused Screening Plants with a chassis mounted on "tracks" do not have a "*wheel* mounted chassis," they do not infringe the '618 patent.

Each and every asserted claim is limited to a mobile, road-hauled aggregate material processing plant on "a *wheel* mounted chassis." (*E.g.,* '618 patent, col. 7, lns. 13-14.) The Court defined "wheel" to mean "a circular frame that has a hub at the center for attachment to or suspension from an axle, on which it revolves, and that served to bear the weight of the screening plant." Dkt. No. 292 at 19. In so doing, the Court rejected a definition that would equate wheels and tracks. *See id.* ("The Court also rejects the plaintiff's assertion that 'wheel' includes the 'endless track on a tracked machine.'") Indeed, "tracks" are nowhere mentioned either in the claims or the specification of the '618 patent; "tracks" are not described or illustrated in the '618 patent; nor are they included as an alternative embodiment.

Moreover, neither the guide rollers nor any other element that Plaintiff might call a "wheel" on track mounted machines are "wheels" within the meaning of the Court's definition. *See* Dkt. No. 292 at 17-19. Neither Plaintiff, Defendants, nor anyone else in the aggregate material screening industry equates "tracks" with "wheels." As the evidence will demonstrate, everyone in the industry—including Plaintiff—designates or refers to track-mounted machines differently from wheel-mounted machines. More importantly, the chasses on the wheel mounted screeners are very different from the chasses on track mounted screeners and perform different functions in different ways because of their different construction.

**B.** **THE ACCUSED SCREENING PLANTS DO NOT INFRINGE THE ASSERTED CLAIMS OF THE '618 PATENT UNDER THE DOCTRINE OF EQUIVALENTS**

Nor do the Accused Screening Plants infringe under the doctrine of equivalents, first because the doctrine of equivalents is not properly available here, and second because the Accused Screening Plants do not so infringe. Here, to prove infringement under the doctrine of equivalents, Plaintiff must prove that the connecting and folding mechanism of the side conveyors performs a function equivalent to the function specified in the claims using an identical or equivalent structure. Plaintiff cannot meet this burden because the function of the side conveyor connecting and folding mechanism is very different and the structure to accomplish it is different.

**1.** **Mr. Rafferty's Arguments To The PTO During Prosecution Of The '618 Patent Preclude Any Theory Of Equivalence Regarding The Claim Limitation That The Side Conveyors Not Project Beyond The Chassis In The Transport Position**

Plaintiff is estopped from asserting infringement by equivalence of the claim limitation that the lateral conveyors not project laterally beyond the chassis while in the transport position.

The doctrine of prosecution history estoppel precludes a patent owner in an infringement suit from obtaining a construction of a claim that would in effect resurrect subject matter surrendered during the course of proceedings in the PTO. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733-34 (2002). "Prosecution history estoppel can prevent a patentee from relying on the doctrine of equivalents when the patentee relinquishes subject matter during the prosecution of the patent, either by amendment or argument." *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005). Prosecution history estoppel by argument thus applies where an applicant makes "clear statements" during a patent's prosecution. *Storage Technology Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 836 (Fed. Cir. 2003) ("during prosecution the applicants clearly stated that the next operation information added by the preprocessor is used to reduce the processing time of the processor in the forwarding device. [Patentee] cannot now assert that the existence of a forwarding device containing both processors

is unnecessary and that any communication network may be the equivalent of a forwarding device."). The statement need not have been necessary to secure allowance of a claim for estoppel to attach. *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1314 (Fed. Cir. 2001). The court determining the applicability of argument-based estoppel must ask: "what would a reasonable competitor reading the prosecution history conclude has been surrendered?" *Forest Labs.*, 239 F.3d at 1314.

In this case, Mr. Rafferty's clear and unequivocal statements to the PTO evince a surrender of any projection beyond the chassis by the side conveyors in the transport position. In its January 28, 2010 Order, the Court rejected Defendants' argument that prosecution history estoppel applied because of **amendments** to the claims during prosecution. *See* Dkt. No. 292 at 39. Defendants did not make, and the Court did not address, the issue of prosecution history **estoppel by argument**. That estoppel applies here.

In his May 13, 1996 response to the office action dated January 17, 1996, Mr. Rafferty made two clear and unequivocal statements that no elements of the invention extend laterally beyond the chassis when in the transport position:

- "Claims 1 and 12 are further amended to more clearly indicate what constitutes the operative position and the transport position, the former having elements extending laterally of the chassis, the latter having **no elements extending laterally of the chassis**." [Office action] at 7 (emphasis added).

- "[I]t is more clearly recited that:

  - the tail section is connected to the plant frame, and it extends laterally for operation and substantially upright **without projecting laterally beyond the chassis for transport** . . .

  - the head articulation means renders the head section movable to extend longitudinally above the chassis and thereby be positioned with respect to other parts of the plant **so that it does not project laterally beyond the chassis**. *Id.* at 11 (emphasis added).

-13-

These statements are clear and unequivocal that **no** element of the invention is to project beyond the chassis. What is more, Mr. Rafferty's statements further abandoned any claim of even minimal projection beyond the chassis: "In a simple and unobvious manner, the invention provides for storage of a lateral conveyor during the transport in a compact and simple manner where ***it does not extend laterally***. ***This solves a very difficult and awkward transport problem*** for mobile processing plants which has heretofore caused significant modification of certain items of the plant on the chassis in order to accommodate the lateral conveyor." *Id.* (emphasis added). In other words, Mr. Rafferty's clear statements demonstrate that it was important for no element to extend laterally beyond the chassis to solve the specific problems addressed by the '618 patent. This constitutes a clear surrender of subject matter—that any elements of a mobile screener may extend laterally beyond the chassis—and Metso cannot now recover that subject matter through the doctrine of equivalents. *See Aquatex Indus.*, 419 F.3d at 1382; *Storage Tech. Corp.*, 329 F.3d at 836.

> **2.** **The Accused Screening Plants Do Not Perform A Function Equivalent To The Function Of The Head Articulation Means Limitation**

An accused device infringes under the doctrine of equivalents if Plaintiff proves that every claim element or its substantial equivalent is present in the accused device. *Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997). An element in the accused device is equivalent to a claim element if the differences between them are insubstantial to one of ordinary skill in the art, *i.e.*, if the accused device performs substantially the same function in substantially the same way to achieve substantially the same result as that claimed in the patent. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 38-41 (1997). The doctrine must be applied to each individual claim element, not to the invention as a whole or even to a single claim in its entirety. *Id.* at 40; *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (1987).

Once again, Plaintiff's theory of equivalence will fail because "tracks" do not (indeed, cannot) perform substantially the same function, in substantially the same way, to obtain substantially the same result as "wheels." Nor are track mounted chasses structurally equivalent to wheel mounted chasses.

First, wheels and tracks do not perform the same or substantially the same function. For example, tracks help a vehicle to distribute its weight over a larger surface than wheels can, and by their very nature, keep a vehicle from sinking in off-road, uneven terrain where wheeled vehicles of the same weight would otherwise sink. Tracks thus have greater mobility than pneumatic tires over rough terrain. Tracked vehicles move very slowly and are not used on public roads. Further, an Accused Screening Plant mounted on tracks weighs significantly more overall than an Accused Screening Plant, has a chassis that is stronger and that weighs more, and is designed to withstand the forces of being self-propelled over uneven terrain. Because track mounted mobile screeners are self-propelled, they do not need a tractor for mobility and are more maneuverable on-site. In contrast, wheel mounted chasses are designed to permit the screener to be connected to a tractor and hauled along the public road on wheels, something that a track mounted chassis cannot accomplish.

Second, the evidence will show that the aggregate industry—including Plaintiff and the patentee—distinguishes clearly between wheels and tracks. In the aggregate industry, for example, mobile screening plants are referred to and marketed as *either* plants on "wheels" *or* plants on "tracks." As shown above, even the designation of Plaintiff's own machines reflects this dichotomy.

In short, the Accused Screening Plants do not infringe the '618 patent, either literally or under the doctrine of equivalents.

**C.** **THE '618 PATENT IS INVALID PURSUANT TO 35 U.S.C. §103 BECAUSE IT WOULD HAVE BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE ART AT THE TIME OF THE CLAIMED INVENTION**

At trial, Defendants will establish that the '618 patent is invalid because it was obvious in view of prior art. A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art. 35 U.S.C. §103(a). Whether a claimed invention is obvious is a question of law, although the underlying inquiries are factual. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). A patent claim is considered obvious when a combination of two or more prior art references contain all of the elements claimed in a patent, and the motivation to combine the prior art references existed to an individual of ordinary skill in the art. 35 U.S.C. §103(a). Thus, "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *KSR Int'l Co.* at 417 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)).

**1.** **The Combinations Of Prior Art**

As Defendants' witnesses will testify, the invention claimed by the '618 patent represents at least one of a number of combinations of prior art references. For example, the evidence will show that one prior art reference, the MastersKreen Dominator, was known to the claimed inventor—since it is a device that was manufactured by Mr. Rafferty's own company—but not disclosed to the PTO during the prosecution of the '618 patent. The Dominator was a mobile aggregate material processing plant with a chassis mounted on wheels and having two integrated lateral conveyors that had, as claimed in the '618 patent, both a tail articulation means and a head articulation means. The only difference between the Dominator and the invention claimed in the '618 patent is the orientation of the hinge connecting the head section to the tail section.

Section 103 of Title 35 of the United States Code, the obviousness statute, does not expressly define what sources may constitute prior art. The statute does clearly suggest, however,

that Section 102 is the guide. *See* 35 U.S.C. §103 ("A patent may not be obtained though the invention is not identically disclosed or described as set forth in §102 of this title…"). Section 103 normally fixes the time period for an invention's obviousness at the time of invention. *Id.* As such, a prior art reference under §102 must usually have an effective date prior to the date of invention. *See* Donald S. Chisum, *Chisum on Patents* §5.03[2] (2008). But §102(b)-based prior art is always valid to show obviousness, regardless of the date of invention, if it has an effective date more than one year earlier than the patent's U.S. filing date. The Dominator is thus prior art because the undisputed evidence—the very same evidence Plaintiff unsuccessfully attempted to exclude *in limine*—affirmatively establishes that the Dominator was on sale or sold in the United States prior to one year before the application for the '618 patent was filed, *i.e.* prior to September 7, 1993. *See* 35 U.S.C. §§102(b), 103; *In re Foster*, 343 F.2d 980 (C.C.P.A. 1965); *UMC Electronics Co. v. United States*, 816 F.2d 647, 655-56 (Fed. Cir. 1987) ("With respect to non-claimed subject matter of the sale in a sections 102(b)/103 situation, it is meaningless to speak of "reduction to practice" of what was sold.").

In a similar vein, the Dominator also qualifies as prior art under 35 U.S.C. §102(a). The evidence will show clearly and convincingly that it was used by others in this country before September 7, 1994, the filing date of the '618 patent. Plaintiff will attempt to argue that §102(a) is inapposite because the '618 patent is entitled to the filing date of Mr. Rafferty's Irish application and, therefore, use by others after that date (September 7, 1993) cannot be prior art. This argument fails.

The evidence will show that the Dominator was created by Richard Byrne (the sole engineer at MastersKreen at that time, who will so testify at trial)., The Dominator is a full screening plant, but the Irish patent application to which the '618 patent claims priority is for a side conveyor only. When a U.S. patent claims priority to a foreign application, courts compare the U.S. patent's claims to the foreign specification. *In re Gosteli*, 872 F.2d 1008, 1010-11 (Fed. Cir. 1989). To be entitled to priority, the foreign application must fully support the claims in accordance with Section 112's written description requirement. *Id.* Thus, an applicant must

"describe[e] the invention, with all its claimed limitations, not that which makes it obvious," by using "such descriptive means as words, structures, figures, diagrams, formulas, etc., that set forth the claimed invention." *Univ. of Rochester v. G.D. Searle & Co.*, 249 F. Supp. 2d 216, 222 (W.D.N.Y. 2003) (*citing Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)). The purpose of this requirement is to "guard against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991).

Here, Mr. Rafferty's Irish application (the '654 application) is directed to only one component of the invention claimed '618 patent: the lateral conveyor. It does not describe—or even purport to describe—an entire mobile aggregate material processing plant. The '654 application cannot, therefore, support the claims of the '618 patent and the priority claim cannot stand. Accordingly, the Dominator is prior art under multiple sections of 35 U.S.C. §102 and can properly be combined with other prior art to show obviousness.

When the Dominator is combined with the Masterstock 80 stand-alone conveyor, which had an articulation means that permitted the head section of the conveyor to fold sideways in a horizontal, 180-degree arc, the invention claimed in the '618 patent would have been obvious to a person of ordinary skill in the art. That is, when folded halfway, the Masterstock 80 conveyor would form an "L" shape such that the movable part of the tail section extended substantially upright and the movable head section extended longitudinally—the very movement described in the '618 patent. Other prior art references, including the Palmer and Johannsen patents (U.S. Patents 3,444,987 and 4,160,501, respectively) disclose similar conveyors. It would have been obvious to a person of ordinary skill in the art to combine these references to arrive at the plant claimed in the '618 patent: a plant with an "L" shaped, side-folding conveyor.

All Mr. Rafferty did was that precise combination. He changed the orientation of the head section disclosed in the MastersKreen Dominator, a device well-known to him and not disclosed to the PTO, from vertical to longitudinal by replacing the plant's "top-fold" mechanism

with the side-folding mechanism disclosed in the Masterstock 80 stand-alone conveyor or Palmer or Johannsen. Pursuant to *KSR* and its progeny, the asserted claims of the '618 patent are invalid as obvious in view of prior art. As the evidence will demonstrate, the following combinations of the teachings of prior art further support such a finding: (1) the Dominator or U.S. Patent 4,983,280 (Eriksson) taken together with U.S. Patent 4,160,501 (Johannsen); and (2) the Dominator or U.S. Patent 4,983,280 (Eriksson) taken together with U.S. Patent No. 3,444,987 (Palmer). The '618 patent is invalid pursuant to 35 U.S.C. §103.

## 2. There Is No Availing Evidence Of Any Secondary Considerations Of Nonobviousness

There is no evidence of any secondary considerations weighing in favor of a finding that the '618 patent is not obvious.

### a. Commercial Success

A patentee may use commercial success evidence to rebut a showing of obviousness. First, the patentee must show that a product is commercially successful. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed. Cir. 1988). Second, the patentee must connect "the thing … that is commercially successful [to] the invention disclosed and claimed in the patent." *Id.* Put differently, the patentee must prove that a nexus between the commercial success and the patented invention exists. *Id.* A patentee is not entitled to any kind of presumption of commercial success unless it can show that the successful product "is the invention disclosed and claimed in the patent." *Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1339 (Fed. Cir. 2010); *see also Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000). Further, the patentee bears the burden of showing that the commercial success is not due to something existing in the prior art. *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008); *Pfizer, Inc. v. Apotex, Inc.*, 2010 U.S. Dist. LEXIS 80786, *10 (N.D. Ill. Aug. 2010) ("the patentee must tie the commercial success to the patent at issue beyond what was readily available in the prior art."); *Black v. Ce Soir Lingerie Co.*, 2008 U.S. Dist. LEXIS 62484, *39 (E.D. Tex. Aug. 15, 2008) ("A patentee cannot

demonstrate commercial success unless they can show that the commercial success of the product results from the claimed invention, and also that the success was due to the merits of the claimed invention beyond what was readily available in the prior art"). "If the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant. So too if the feature that creates the commercial success was known in the prior art, the success is not pertinent."

Here, Plaintiff cannot prove that each of its mobile screeners that it has identified as commercial or preferred embodiments of the '618 patent in fact meet all the limitations of the patent. Indeed, most of them do not for several reasons, including because their side conveyors project laterally beyond the chassis in the transport position (as do the side conveyors on all of the Accused Screening Plants) and their side conveyors are not positioned with respect to the input hopper and screen box while in the transport position, so as to preclude projection beyond the chassis as the claims of the '618 patent require. The modest sales of the few models Plaintiff may be able to show meet each limitation of the patent are too small to demonstrate any kind of commercial "success."

Moreover, Plaintiff has not shown, and cannot show, that the commercial success of its designated mobile screeners results from the invention in the '618 patent or that the success was due to the merits of the claimed invention beyond what was readily available in the prior art—rather than from an unclaimed feature of the screeners. Plaintiff cannot rely on sales of the Accused Screening Plants, either, based solely on its naked assertions that such accused screeners *infringe* the patent, to prove *nonobviousness*. *See, e.g., Relume Corp. v. Dialight Corp.*, 63 F. Supp. 2d 788, 827 (E.D. Mich. 1999). This factor consequently does not weigh in favor of rebutting a showing of obviousness.

### b. Copying

"[C]opying by a competitor may be a relevant consideration in the secondary factor analysis" for showing the nonobviousness of a patent. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Copying, for purposes of showing nonobviousness,

means making a copy of the ***physical embodiment*** of the invention claimed in the patent. "Not every competing product that arguably falls within the scope of a patent is evidence of copying," else "every infringement suit would automatically confirm the nonobviousness of the patent." *Iron Grip*, 392 F.3d at 1325. Rather, evidence of copying that is probative of nonobviousness must show "***the replication of a specific product***." *Id.* (emphasis added); *accord Wyers v. Master Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010).

In this case, Plaintiff has not presented any evidence—beyond mere conclusory assertions by its technical expert witness, Stephen Whyte—that anyone "copied" the physical embodiment of the invention claimed in the '618 patent. Nor has Plaintiff indicated it will proffer any evidence of the reasons for such copying or what precise elements were copied. Plaintiff similarly has not presented, and ostensibly will not present, evidence that any alleged inability or unwillingness of competitors to respond to Plaintiff's invention in the marketplace is rooted in the subject matter claimed in the '618 patent. Consequently, this factor does not demonstrate nonobviousness, either.

### c. Attempts By The Defendant To Patent The Same Invention

Plaintiff offers no evidence whatsoever of any attempt by Defendants to patent the same folding mechanism for lateral conveyors that is claimed in the '618 patent. This factor thus does not weigh in favor of a finding of nonobviousness. *See Polaroid Corp. v. Eastman Kodak Co.*, 641 F. Supp. 828, 949 (D. Mass. 1985).

### d. Long-Felt Need And The Failure Of Others To Fill That Need

To demonstrate these indicia of nonobviousness, a patentee must show (a) that others in the relevant art perceived a long felt need, and (b) that the patented invention satisfied that need. *Markman v. Lehman*, 987 F. Supp. 25, 43 (D.D.C. 1997); *Minton v. Nat'l Ass'n of Secs. Dealers, Inc.*, 226 F. Supp. 2d 845, 881 (D. Tex. 2002). The following types of evidence are relevant to make this showing:

- how previous products or techniques were unsatisfactory (*Tec Air, Inc. v. Denso Mfg. Michigan, Inc.*, 192 F.3d 1353, 1361 (Fed. Cir. 1999));

- that the relevant industry, in general, experienced problems with prior methods or devices (*Id.*);

- that an accused infringer had to resort to less effective methods after it stopped infringing the patent (*Id.*);

- that others researched the patented invention (*See Bayer AG v. Sony Elecs., Inc.*, 229 F. Supp. 2d 332, 356 (D. Del. 2002));

- that the accused infringer and others repeatedly tried — and failed — to develop the claimed invention (*Litton Systems, Inc. v. Honeywell, Inc.*, 87 F.3d 1559, 1570 (Fed. Cir. 1996)); and

- that the claimed invention satisfies the long-felt need.

Here, Plaintiff has not offered, and apparently does not intend to offer, any evidence supporting these factors. Therefore, they are not probative of nonobviousness.

### e. Praise By Others

Approval by those within the relevant field of art is another indicia of nonobviousness. Such professional approval evidence may include, for example:

- recognition of the patented invention in articles in trade journals encompassing the relevant art (*Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002); *see also Jenn-Air Corp. v. Modern Maid Co.*, 499 F. Supp. 320, 326-27 (D. Del. 1980) ("Favorable comments in trade and public publications may be evidence that supports the inference of validity raised by acquiescence, since such comments would encourage competitors to infringe or to challenge in some other way an invalid patent.")); and

- awards won by the inventor for his invention (*Studiengesellschaft Kohle mbH v. Dart Indust.*, 549 F. Supp. 716, 732 (D. Del. 1982) (that inventor won Nobel prize for his work "indicates the intellectual as well as commercial importance of his work.")).

Professional approval evidence is especially probative when it shows that contemporaries initially expressed skepticism, surprise, or incomprehension upon learning of the invention and thereafter praised its value. *See United States v. Adams*, 383 U.S. 39 (1966).

Again, Plaintiff offers not a single shred of proof of such praise or laudatory statements by others in the industry. Any reports by Mr. Hansbury of such praise are pure hearsay.

### f.    Licensing

A patentee may also rebut a showing of obviousness by producing evidence that it successfully licensed its patented invention. *WMS Gaming*, 184 F.3d at 1360 (royalty revenue generated from licenses is indicative of nonobviousness). Accordingly, the following types of evidence are probative of nonobviousness:

- that a patent owner licensed his invention (*Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 57 (D. D.C. 1984)); and

- that the licensees have been able to sell the product (*Id.*)

Such evidence is probative of nonobviousness because presumably "such licenses are entered into only after studies of the relevant prior art and the question of infringement." *RCA Corp. v. Data Gen. Corp.*, 701 F. Supp. 456, 471 (D. Del. 1988). License evidence becomes insignificant when the license is attributable to factors other than a belief in the validity of that patent. *See EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907-08 (Fed. Cir. 1985). Plaintiff offers no evidence that the '618 patent was licensed to any third party.

### g.    Unexpected Results

Objective evidence of nonobviousness includes evidence of unexpected results. *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995). "Mere improvement in properties does not always suffice to show unexpected results." *Id.* at 751. Rather, results are unexpected when the claimed invention exhibits some superior property or advantage that a person in the relevant art would have found surprising or unexpected. *Id.* at 750. Such results must be unexpected as compared to the closest prior art, i.e., substantial improvements over the closest prior art. *Id.* at 751; *see also In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

Plaintiff offers evidence of only expected, intended results of the invention claimed in the '618 patent—not *unexpected* results. Plaintiff will present testimony that the supposedly unexpected result of the more compact folding mechanism for the lateral conveyors is that it allowed the central conveyor to be 33% wider, resulting in an increase of throughput of 77%, and making possible much longer lateral conveyors enabling larger stockpiles of processed material.

Such a result—increased capacity and a wider central conveyor—was not unexpected. Far from it, the trial testimony of Malachy Rafferty, the inventor of the patent-in-suit, demonstrates that this result was *specifically intended* in the commercial embodiment of the patent, to continue the advances made in previous mobile screeners manufactured and sold by Mr. Rafferty's company (and Plaintiff's predecessor) MastersKreen. This testimony will be confirmed by Richard Byrne. Further, Plaintiff does not explain at all why such an obvious consequence of an intentional design is unexpected as compared to the closest prior art. All the '618 patent achieves is a mere reallocation of a fixed space represented by the width of the machine. If the lateral space occupied by the conveyors is diminished, the lateral space occupied by other components, like the main conveyor, can be increased. This is hardly surprising or unexpected. Indeed, this reallocation is readily calculable by simple mathematics, and Plaintiff fails to explain why one skilled in the art would consider this improvement surprising or unexpected. *See, e.g., In re Soni*, 54 F.3d at 750; *In re Baxter Travenol Labs.*, 952 F.2d at 392. This consideration does not demonstrate the validity of the '618 patent, either.

Because Plaintiff's evidence regarding any secondary considerations of nonobviousness is either nonexistent or irrelevant as a matter of law, Defendants should prevail on their defense of obviousness.

**D.** **THE '618 PATENT IS UNENFORCEABLE BECAUSE MALACHY RAFFERTY COMMITTED INEQUITABLE CONDUCT BEFORE THE USPTO IN CONNECTION WITH THE PROSECUTION OF THE '618 PATENT**

The affirmative relief Plaintiff seeks is also barred by Rafferty's inequitable conduct.

Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith dealing with the Patent and Trademark Office ("PTO"), including a duty to disclose to the PTO all information known to that individual to be material to patentability. 37 C.F.R. §1.56; *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.32 982, 999 (Fed. Cir. 2007). A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or

submits materially false information to the PTO during prosecution.  *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006); *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330-31 (Fed. Cir. 2004).

To successfully prove inequitable conduct, the accused infringer must present evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the Patent and Trademark Office.  *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).  An inference of intent to deceive is generally appropriate when (1) highly material information is withheld; (2) the applicant knew of the information and knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding.  *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313-14 (Fed. Cir. 2008).  Materiality is judged based upon the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner.  *Baxter, Int'l v. McGaw, Inc.*, 149 F.3d 1321, 1328 (Fed. Cir. 1998).  The more material the omission, the less evidence of intent will be required to find inequitable conduct.  *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1218-19 (Fed. Cir. 2000).

The evidence will show that Malachy Rafferty knew about—but admits he failed to disclose to the PTO—the Dominator and Masterstock 80 conveyor, which prior art references are highly material information that would have influenced the Examiner's decision on patentability.  Mr. Rafferty admitted that Masterstock 80 stand-alone conveyors, manufactured by his company MastersKreen and sold in the U.S. prior to September 7, 1993, used the same hinge design disclosed in the '618 patent, which allows the head section of the conveyor to fold sideways in a horizontal, 180-degree arc.  *See* Rafferty Depo. at 190-91, 220-22, 283-85.  Mr. Rafferty also admitted that the only pertinent difference between the lateral conveyor of the MastersKreen Dominator and that claimed in the '618 patent was the orientation of the head section.  *See id.*  The Dominator, also manufactured by MastersKreen, embodied all of the claim limitations of the '618 patent except the head articulation means.  And the record demonstrates unequivocally that

the Dominator was "on sale" and in fact sold in the U.S. prior to September 7, 1993—one year before the date the '618 patent application was filed. Indeed, the evidence—and Plaintiff's repeated admissions—of this fact are described in detail in Defendants' motion *in limine* to exclude any contrary evidence or argument by Plaintiff. Further, as discussed above, combining the Dominator with the side fold of the Masterstock 80 conveyor would have been obvious to a person of ordinary skill in the art at the time of the claimed invention, thereby resulting in the entire invention claimed in the '618 patent. The Dominator and Masterstock 80 were thus highly material prior art references that Mr. Rafferty *had* to know about.

But still Mr. Rafferty did not disclose them to the PTO. Nor did he provide a credible explanation for his failure to disclose. When pressed, Mr. Rafferty acknowledged only that the advice of patent counsel about what should or should not be disclosed to the PTO absolutely depended on the information he gave to his counsel in the first place. This provides little comfort, since at the same time Mr. Rafferty claims that he did not disclose either the Dominator or the Masterstock 80 to his counsel. In view of (1) the high materiality of the MastersKreen Dominator, (2) the high materiality of the MastersKreen Masterstock 80 conveyor, (3) Mr. Rafferty's failure to disclose these prior art references to the PTO, and (4) Mr. Rafferty's consistent inability to provide a credible answer as to why he did not disclose these references, an inference of his intent to deceive the PTO is not only proper, it is warranted. Therefore, Mr. Rafferty's inequitable conduct before the Examiner renders the '618 patent unenforceable. *See Star Scientific*, 537 F.3d at 1365; *Praxair*, 543 F.3d at 1313-14.

### E. THE DOCTRINE OF LACHES BARS PLAINTIFF'S CLAIMS IN THIS ACTION

The doctrine of laches should be applied to this case to limit Plaintiff's recovery, if any, to damages from sales after the lawsuit was commenced.

The doctrine of laches requires proof of two elements: (1) Plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time it knew or reasonably should have known of its claim against Defendants; and (2) the delay operated to the prejudice or injury of Defendants. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1375 (Fed. Cir. 2010).

Plaintiff's delay is measured from the time it knew or reasonably should have known of the alleged infringer's alleged infringing activities to the date of suit. *Id.* Constructive knowledge of the infringement may be imputed to the patentee even where he has no actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor. *Id.* The patentee who is negligently or willfully oblivious to these types of activities cannot later claim his lack of knowledge as justification for escaping the application of laches. *Wanlass v. GE*, 148 F.3d 1334, 1338 (Fed. Cir. 1998).

A delay of more than six years raises a presumption that it is unreasonable, inexcusable, and prejudicial. This presumption shifts to the patentee the burden of producing evidence, which if believed, would show that either the patentee's delay was reasonable or excusable under the circumstances or the defendant suffered neither economic nor evidentiary prejudice. *Id.* at 1337. Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died. *Id.* at 1337, 1340 (loss of evidence may occur where either party destroyed records or other evidence pursuant to a company destruction policy); *see also Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1360 (Fed. Cir. 2008) (evidentiary prejudice established by defendant's showing that three witnesses with knowledge of plaintiff's inventorship claim all died during the period of her delay). Evidentiary prejudice must consist of some separate disadvantage resulting from the delay, such as loss of records or unavailability of evidence, which prevents a party from proving a separate claim or defense. *Hearing Components, Inc.*, 600 F.3d at 1376.

## 1. The Evidentiary Prejudice To Defendants

Here, the evidence will demonstrate that Plaintiff unreasonably delayed in commencing this action, which delay prejudiced Defendants. Plaintiff claims that the first infringing sale or act was in February or March of 2000 but that Plaintiff did not learn of it until later. Notwithstanding Plaintiff's assertions to the contrary, the evidence will show that Plaintiff knew or should have known of that allegedly infringing act at that time. Yet, Plaintiff did not bring

suit until March 29, 2006 and offers no credible reason why it waited so long to do so. During that six-year lag:

- Invoices relating to the sale of the Dominator in the U.S. starting in the late 1980s disappeared or were not produced;

- Witnesses like Malachy Rafferty suffered significant and selective memory losses;

- Mr. Rafferty's U.S. patent counsel, Jacobson Holman, destroyed, with Plaintiff's consent, its entire '618 patent prosecution file (and all information material to patentability) in 2005—more than five years after Plaintiff was aware of its claim against Defendants—in violation of the law firm's own document management policy; and

- Drawings and logbooks prepared by Richard Byrne, the sole engineer working at Mr. Rafferty's company (MastersKreen International Ltd.), which would have corroborated Mr. Byrne's invention of the subject matter of the '618 patent, either disappeared or were not produced.

There can be no dispute that this lost evidence prejudiced Defendants. For purposes of Defendants' obviousness defense and counterclaim of inequitable conduct, the Court correctly notes that "the relevant issue is whether any Dominator screener was sold in the United States prior to September 7, 1993." Jan. 28, 2010 Memorandum of Decision and Order (Dkt. No. 292) at 52. The mysterious vanishing of invoices relating to the sale of the Dominator hampers Defendants' ability to support their obviousness and inequitable conduct defenses by proving up the dates of sales of the Dominator in the United States. Further, the premature and unauthorized destruction of the '618 patent prosecution file is particularly egregious given the failure to disclose to the PTO the Dominator and Masterstock 80 prior art, which is central to Defendants' inequitable conduct defense. Finally, of course, Mr. Rafferty's selective memory lapses speak for themselves. The doctrine of laches applies in the present case.

## 2. Plaintiff's Spoliation Of Evidence

The mysterious and unexplained disappearance of records helpful to Defendants' case raises an issue of Plaintiff's possible spoliation of evidence. Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d

776, 779 (2d Cir. 1999). "The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for the destruction.'" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998)).

For there to be spoliation, there must be an obligation to preserve evidence. That obligation "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake*, 220 F.R.D. at 216. Anyone who anticipates being a party or is a party to a lawsuit, or such a party's agents, must not destroy unique, relevant evidence that might be useful to an adversary. *Id.* at 217. The broad contours of the duty to preserve extend to any documents or tangible things made by or for individuals likely to have discoverable information that the disclosing party may use to support the claims or defenses of any party. *Id.* at 217-18.

The appropriate sanction for spoliation is a matter left to the trial court's sound discretion. *Fujitsu*, 247 F.3d at 436. One such sanction is an adverse inference jury instruction. *Zubulake*, 220 F.R.D. at 219. "A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind,' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that would support that claim or defense." *Id.* at 220 (citing *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001)). "In this circuit, a 'culpable state of mind' for purposes of spoliation inference includes ordinary negligence." *Id.* (citing *Residential Funding Corp. v. De-George Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)). Further, when evidence is

destroyed in bad faith (intentionally or willfully), "that fact alone is sufficient to demonstrate relevance." *Id.* (citing *Residential Funding Corp.*, 306 F.3d at 109).

Here, the evidence will support a sanction against Plaintiff for spoliation of evidence. It is undeniable that Plaintiff had control over the evidence at issue and had an obligation to preserve it. For example, in 2005, five years after Plaintiff knew or should have its known of its claims against Defendants, Plaintiff had an obligation to preserve Mr. Holman's prosecution history files relating to the sole patent-in-suit and prevent—not condone—their destruction in contravention to Mr. Holman's office's own document retention policy. In October 2004, Plaintiff's agent advised U.S. patent counsel, Jacobson Holman, that they would no longer be responsible for maintaining the '618 patent. Jacobson Holman's document management procedures in effect at that time provided that upon such instruction from a client, the applicable file was "docket[ed] for two-year destruction." Jacobson Holman accordingly advised Plaintiff's agent that they were going to destroy their file. Pursuant to the document management policy in effect, the Jacobson Holman file should not have been destroyed *before October 5, 2006*. However, on *October 27, 2005* -- nearly one year earlier -- Jacobson Holman destroyed their '618 patent file, and any and all information material to patentability was destroyed along with it. Regardless of when the file was destroyed, Plaintiff did not object to this planned destruction, nor did it provide any instruction to the contrary.

This intentional destruction obviates the need to show the relevance of the files. In any event, they are relevant to Defendants' defense of inequitable conduct because they would reveal Mr. Rafferty's understanding of his duty of candor to the PTO and why the Dominator was not disclosed during the prosecution of the '618 patent.

Similarly, since Plaintiff purchased MastersKreen years before this action was filed, records of sales and shipments of the MastersKreen Dominator before the critical date of September 7, 1993—which Defendants requested but did not receive in discovery—would undoubtedly be in Plaintiff's control. It is all the more troubling that, despite Plaintiff's excuse that Dominator records were "likely" destroyed in the ordinary course of business (this is as far

Plaintiff will explain), Plaintiff produced only a selective sampling it obviously believed would not hurt its case: of the three produced invoices for sales of Dominators, two are unresponsive because they reflect a sale *after* the critical date, and the third Plaintiff has sought to exclude *in limine* as irrelevant because it was only between MastersKreen International and MastersKreen Chicago, which Plaintiff contends is insufficient to evidence a "sale" within the meaning of 35 U.S.C. §102(b). This selective production—and apparent destruction of all other records of the Dominator—betrays Plaintiff's culpable state of mind. Equally disturbing is Plaintiff's representation that the destruction of records of Dominator sales occurred *at the time Plaintiff bought MastersKreen's stock and the '618 patent*. Of course, shipping logs, invoices, and other documents regarding sales of the Dominator—a mobile screener meeting nearly all of the limitations of the '618 patent, and which Plaintiff admits was not disclosed to the PTO—in the United States a year before the patent application was filed are fundamentally relevant to establishing that the Dominator is prior art, both for obviousness and for inequitable conduct.

The same is true for each of the other types of evidence that is now missing or otherwise not produced. These circumstances evince spoliation of evidence and call for the Court to sanction Plaintiff as appropriate.

### F. EVEN IF THE '618 PATENT IS INFRINGED, WHICH IT IS NOT, PLAINTIFF IS NOT ENTITLED TO THE DAMAGES IT CLAIMS

A successful plaintiff is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty rate for the use made of the invention by the infringer, together with interests and costs as fixed by the court." 35 U.S.C. §284. A reasonable royalty contemplates a hypothetical negotiation between the patentee and the infringer at a time before the infringement began. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). "Even though consideration of the hypothetical is an essential aspect of computing reasonable royalty damages, the Federal Circuit 'requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture' in all damages calculations." *Cornell Univ. v. Hewlett-Packard Co.*, 2008 U.S.

Dist. LEXIS 41848, *4 (N.D.N.Y. May 27, 2008) (quoting *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999)). That "some approximation" may be necessary in the reasonable royalty context does not negate the requirement of "sound economic and factual predicates" for that analysis. *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). The burden of proving damages falls on the patentee. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003).

Plaintiff seeks $27,882,614 for Defendants' alleged infringement of the '618 patent, based on a hypothetically agreed-upon 10% royalty on the net sales of accused infringing screeners and related crushers. Plaintiff is not entitled to such damages for two fundamental reasons. First, the royalty rate reached—the very starting point for Plaintiff's damages analysis—finds no support in the licensing history for these parties or in the screener industry more generally, or in any other identified evidence. Second, the royalty base used by Plaintiff is improperly inflated to include sales of unrelated crushers based on an incorrect application of the entire market value rule.

### 1. The Royalty Rate Is Unsupportable

To support a proposed royalty rate, a patentee must offer evidence that the alleged industry license agreements are comparable to the patent-in-suit. *See, e.g., ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) (discrediting plaintiff's expert's reliance on license agreements because "none of these licenses even mentioned the patent in suit or showed any other discernible link to the claimed technology"); *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385-86 (Fed. Cir. 2003) (affirming trial court's exclusion of plaintiff's expert's opinion testimony on royalty rate based on industry license agreements and patentee's license agreements because those agreements were not comparable to the patent-in-suit). Only license agreements from the specific industry are probative for purposes of establishing a reasonable royalty rate. *See, e.g., IP Innovation L.L.C. v. Red Hat, Inc.*, 2010 U.S. Dist. LEXIS 28372, *9-12 (E.D. Tex. Mar. 2, 2010) (precluding expert opinion testimony because expert relied on "irrelevant or unreliable evidence" of license agreements in "software

industry" and "computer and electronic products manufacturing industry," which "encompass much more than the desktop switching feature at issue").

The Federal Circuit's recent decision in *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) is illustrative. In *Lucent*, the court vacated and remanded in part a jury award because the damages calculation lacked sufficient evidentiary basis. Looking at the second *Georgia-Pacific* factor, whether "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit," the court emphasized that the licenses relied on by Lucent's expert, Roger Smith, "are radically different from the hypothetical agreement under consideration for the Day patent." *Id.* at 1327. For example, two agreements were "vastly different from any Microsoft and Lucent would have struck" because they were for multiple patents to broad, PC-related technologies" and directed to a "vastly different situation than the hypothetical licensing scenario of the present case involving only one patent, the Day patent, directed to a narrower method of using a graphical user interface tool known as the date-picker." *Id.* at 1328. For three other agreements, "Lucent's expert supplied no explanation to the jury about the subject matter or patents covered by those agreements." *Id.*

The court discounted evidence of another agreement, the Vox agreement, because "no testimony described how the patented technology of the Vox agreement related to the licensed graphics boards" at issue and "Lucent's expert never explained to the jury whether the patented technology is essential to the licensed product being sold, or whether the patented invention is only a small component or feature of the licensed product (as is the case here)." *Id.* at 1330. For yet another agreement, the Acer agreement, the court noted that "Lucent did not explain how the fact that the Acer agreement involved eight patents [and various commercial products] affects how probative it is of the Microsoft-Lucent hypothetical negotiation over one patent." *Id.* at 1331. Finally, the court also reasoned that the 31-page MPEG agreement, covering various related products at different royalty rates, could not support a higher royalty rate because "the structure of the MPEG agreement is more complicated, and the jury had little to no testimony

explaining how such complexity would have affected the hypothetical negotiation analysis." *Id.* The court concluded that these defects weighed strongly against the jury's award.

The agreements upon which Plaintiff relies, notably through the testimony of its only damages expert Catharine Lawton, in arriving at a reasonable rate are precisely as irrelevant and unreliable as the ones rejected in *Lucent* and *ResQNet*. In particular, Ms. Lawton first concedes that there appears to be little, if any, licensing activity in the screening and crushing industry. Neither Plaintiff nor Powerscreen Ltd. has granted licenses or taken licenses; there are thus no established royalty rates or portions of the profits or selling price that are customary in the screening and crushing industry on which to base a royalty rate. Plaintiff relies only on certain Metso license agreements that are based on a running royalty as a % of net sales, which royalties generally ranged from 4% to 10%.

The license agreements upon which Plaintiff (and Ms. Lawton) relies, however, are in fact neither related nor relevant to any hypothetical agreement that might have been struck between Plaintiff and Defendants at the time of alleged infringement. Specifically, of these agreements:

- Only one agreement actually deals with the patent-in-suit: the agreement for the sale of the '618 patent by Nordberg Group OY to MastersKreen. Yet, Ms. Lawton does not state any information about its terms and does not otherwise rely on it in reaching her opinion of a reasonable royalty. This license provides for a fixed royalty of GBP 20,000 per year and so could not support a running royalty based on a percentage of sales.

- Aside from the Nordberg-MastersKreen agreement, only five other agreements (are licenses to use patented technology. But none of these is for lateral conveyors of mobile screening plants or for any other feature of a mobile screening plant or for a plant as a whole. Moreover, these licenses also cover other forms of intellectual property (such as know-how, trademarks, and trade names), which Plaintiff does not bother to distinguish or account for in its calculation of a reasonable royalty.

- The other agreements concern "know how," trademarks, trade names and other use rights, which have absolutely no bearing whatsoever on calculating the reasonable royalty for a *patent* license.

- Aside from the Nordberg-MastersKreen agreement which, again, Plaintiff does not rely on, *no agreement* relied upon even deals with lateral conveyors of mobile screening plants (or with a screening plant as a whole), the technology at issue in the present case. All of the agreements deal with crushers, screens and

replacement parts. These products are fundamentally different from—and thus not relevant to—the technology claimed in the '618 patent. And Plaintiff certainly does not describe how the technology in these agreements is comparable to the technology claimed in the '618 patent such that these agreements are at all relevant. *Cf. ResQNet.com*, 594 F.3d at 870; *Lucent*, 580 F.3d at 1327-31.

- **Only one agreement** actually covers the territory of the United States, the pertinent territory here in any negotiated royalty between the parties. But that agreement is a supply agreement, not a patent license. Indeed, it is prominently described as such. Every single other agreement in Schedule 16 covers territories like France, South Africa, Brazil, Japan and China —but ***not*** the United States. As a result, their terms bear no relevance to any reasonable royalty Powerscreen and Plaintiff may have negotiated concerning the '618 patent *in the United States*.

- Two-thirds of the agreements are agreements between Metso entities or between Nordberg entities. They are not agreements bargained for at arms length between competitors—like Powerscreen and Plaintiff were at the relevant time of first act of alleged infringement. As such, the royalty rates or other terms of such agreements have no bearing on how Plaintiff and Powerscreen would have negotiated the hypothetical license.

What is more, Plaintiff does not—and indeed cannot—explain how the license agreements it relies upon pertain to patented inventions that were essential to, rather than merely a small feature of, the component of the licensed product(s) being sold. *Cf. Lucent*, 580 F.3d at 1330. Nor does Plaintiff explain how the complexity of the purportedly comparable Metso license agreements—which vary from a handful of pages to 47 pages, and most of which are for several patents and/or licensed products—would affect the hypothetical negotiation analysis or justify concluding that the higher end of the 4% to 10% range should apply to Powerscreen's alleged infringement. *Cf. Lucent*, 580 F.3d at 1331. This information is necessary for Plaintiff to prove that the reasonable royalty it seeks is supported by relevant license agreements. Because this information is absent, Plaintiff cannot support its damages calculation.

### 2. The Royalty Base Is Improperly Inflated

Under the entire market value rule, damages are recoverable only if "the patented apparatus was of such paramount importance that it substantially created the value of the component parts." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). "For the entire market value rule to apply, the patentee must ***prove*** that the patent-related feature is the basis for customer demand." *Lucent*, 580 F.3d at 1336 (emphasis added; faulting

application of entire market value rule where there was a lack of evidence demonstrating that the patented method formed a basis for consumer demand); *see also IP Innovation L.L.C. v. Red Hat, Inc.*, 2010 U.S. Dist. LEXIS 28372 at *5-9; *Cornell Univ.*, 2008 U.S. Dist. LEXIS 41848 at *6-11.

With respect to whether the folding mechanism of the '618 patent drives customer demand for Powerscreen accused screeners, Ms. Lawton's opinion (and thus Plaintiff's determination of an appropriate royalty base) is deficient because it does not sufficiently account for Powerscreen's reputation, price point, or distribution reach, to explain customer demand for Powerscreen screeners. *See, e.g., Cornell Univ.*, 2008 U.S. Dist. LEXIS 41848 at *7 (excluding expert testimony because plaintiff and plaintiff's expert did not offer "sufficient economic proof" that the patented component in defendant's accused entire server and workstation products were basis of customer demand and the record "shows that purchasers opt for [the accused] products because of their superior performance"). Plaintiff's expert (Ms. Lawton) instead merely relies on the generalized customer demand for screeners that have higher mobility, increased screener capacity, reduced set-up time/increased uptime, and improved serviceability. But to support this assertion, she relies only on the second-hand testimony of Metso personnel, including Benjamin Hansbury and Patrick McMeel; there is no direct customer evidence (e.g. surveys) reflecting that such traits are in fact what drives customer demand for Powerscreen's mobile aggregate material processing plants. In contrast, Defendants' expert Christopher Vellturo will testify that, based on his interviews with market-participants, some of the primary demand drivers are quality, reliability and price—three of the aspects Plaintiff's Patrick McMeel testified helped explain Powerscreen's higher sales of screeners. Plaintiff thus cannot support the inclusion of sales for the entire Powerscreen screeners.

Further, there is even less support for Plaintiff's application of the entire market value rule to include sales of crushers in the royalty base. "The [entire market value] rule has been extended to allow inclusion of physically separate unpatented components normally sold with the patented components . . . However, in such cases, the unpatented and patented components

-36-

together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit." *Rite-Hite Corp.*, 56 F.3d at 1550. Here, there is no evidence—or, at best, insufficient evidence—that the invention claimed in the '618 patent drives the demand for the fully separate crusher apparatus or that they operate as a single functional unit. Crushers and screeners often work independently and are not purchased simultaneously, much less by the same customers or from the same dealers. Many other types of machines, including backhoes, may be used to feed material into screeners; it need not be crushers. Plaintiff's own documents reveal that, according to UCC filings, merely 25% of the customers in the United States that purchased track mounted crushers also purchased a mobile screen during the 2000-2004 period. This data, however, in no way indicates whether any of the screeners and crushers were purchased at the same time, or, if they were not, which was purchased first. Indeed, Ms. Lawton specifically concedes that the available data demonstrates that screeners and crushers are not always and, in fact most of the time are *not*, purchased at the same time. At most, the evidence shows that crushers and screeners are sometimes marketed together out of business advantage, not because they form a single functional unit. This is insufficient as a matter of law to warrant inclusion of crusher sales in the royalty base. *See Rite-Hite Corp.*, 56 F.3d at 1550-51.

### G. THE EVIDENCE DOES NOT SUPPORT A FINDING OF WILLFUL INFRINGEMENT

In the event that Defendants are found to infringe any of the claims of the '618 patent, any such infringement is not and has not been willful.

To establish willful infringement, Plaintiff must show by clear and convincing evidence that, prior to the filing date of the complaint, Defendants acted despite an objectively high likelihood that their actions constituted infringement of a valid and enforceable claim of the '618 patent. *In re Seagate Techs., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). Defendants' state of mind is not relevant to this objective inquiry. *Id.* If this threshold objective standard is satisfied, Plaintiff must also demonstrate that this objectively-defined risk was either known or so obvious that it should have been known to Defendants. *See id.*

Defenses that may ultimately be successful, but are substantial and reasonable, are sufficient to defend against a claim of willfulness. *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed. Cir. 2009); *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed. Appx. 284, 291 (Fed. Cir. 2008); *Metso Minerals, Inc. v. Powerscreen Int'l Distrib.*, 2010 U.S. Dist. LEXIS 68274, *6 (July 9, 2010); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 585 F. Supp. 2d 636, 642 (D. Del. 2008). In deciding whether an alleged infringer acted with reckless disregard for the patentee's patent, the jury should consider all of the facts surrounding the alleged infringement including, but not limited to, the following: (1) whether the alleged infringer acted in a manner consistent with the standards of commerce for its industry; (2) whether the alleged infringer intentionally copied a product of the patent holder covered by the patent; and (3) whether the alleged infringer relied on a legal opinion that was well-supported and believable and that advised the alleged infringer (a) that the product did not infringe the patent holder's patent or (b) that the patent was invalid or unenforceable. 35 U.S.C. §284; *In re Seagate Techs., 497 F.3d at 1371.*

The evidence does not support a finding of willful infringement. First, the Court has properly excluded the impermissible testimony of Plaintiff's "expert," Arthur Steiner regarding willful infringement. The Court also granted Defendants' motion *in limine* to exclude any evidence or argument for any purpose of Defendants' privilege log, including an improper inference that Defendants did not obtain an opinion of counsel regarding the validity of the '618 patent or Defendants' alleged infringement, or that any such opinion was unfavorable. Combined, these two things are the only evidence of willfulness Plaintiff intends to present at trial. Absent evidence, Plaintiff plainly cannot carry its burden at trial.

Second, it is stipulated that in or about 1999, Powerscreen completed a project to redesign the entire Chieftain range of mobile screening plants. Dkt. No. 311, Joint Pretrial Order, Stip. Fact Nos. 9-10. Prior to the completion of this redesign project, Powerscreen was not only aware of both the '618 patent and a patent held by Extec, but took steps throughout the design process to ensure that it did not infringe either patent. Specifically, it was the

responsibility of Powerscreen engineers involved not only to be aware of relevant patents but also to ensure that new designs did not infringe any of the patents they were aware of, including the '618 patent and the Extec patent. In or about 1999, the redesign project was completed. Dkt. No. 311, Joint Pretrial Order, Stip. Fact No. 10. When the project concluded, Powerscreen was convinced its engineers had developed a unique, non-infringing lateral conveyor folding mechanism that would optimize efficiency when operating while at the same time fold into a transport position. Powerscreen's efforts in this regard belie, which it still considered to be successful, any claim of willfulness.

Third, Defendants' conduct was not undertaken with an objectively high likelihood that it infringed a valid patent as a matter of law because, as discussed above, Defendants have several credible and reasonable defenses to Plaintiff's claims of infringement—including their defenses that (1) the '618 patent is invalid as obvious in view of prior art, and (2) the '618 patent is unenforceable because of inequitable conduct. *See Black & Decker*, 260 Fed. Appx. at 291; *Katz v. U.S. Bancorp*, No. 07-CV-2360RGK, at 14 (C.D. Cal. May 1, 2009) ("it is inconsequential as to when these arguments were made and even arguments made on 'summary judgment are relevant to the willfulness inquiry'").

Simply put, the evidence does not support a finding of infringement, much less willful infringement.

Dated: New York, New York
       October 17, 2010

SQUIRE, SANDERS & DEMPSEY L.L.P.

By: /s/ George B. Yankwitt
    George B. Yankwitt
    Mary M. Chang
    Nathan Lane III
    Xavier M. Brandwajn

30 Rockefeller Plaza, 23rd Floor
New York, New York  10112
(212) 872-9800

*Attorneys for Defendants Powerscreen International Distribution Limited, now known as Terex GB, Limited, Terex Corporation, and Emerald Equipment Systems, Inc.*