**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
METSO MINERALS, INC.,

                           Plaintiff,

                -against-

 POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, now known as
TEREX GB LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

                           Defendants.
----------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
06-cv-1446 (ADS)(ETB)

**APPEARANCES:**

**Cozen O'Connor**
*Attorneys for the Plaintiff*
277 Park Avenue
New York, NY 10172
          By:     Michael C. Stuart, Esq.
                  Lisa Ferrari, Esq., of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all the Defendants*
30 Rockefeller Plaza
New York, NY 10112
          By:     George B. Yankwitt, Esq.
                  Mary Margaret Chang, Esq.
                  Andrew H Fried, Esq., of Counsel

**Merchant & Gould, P.C.**
*Attorneys for all the Defendants*
1050 17th Street
Suite 1950
Denver, CO 80265
          By:     Jon Trembath, Esq., of Counsel

**Clauss & Sabatini, PC**
*Attorneys for the Defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
      By:    Ava R. Maynard, Esq., of Counsel

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the Defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
      By:    Andrew E. Curto, Esq., of Counsel

**SPATT, District Judge.**

      The Defendants in this patent infringement case, Powerscreen International Distribution Limited ("Powerscreen"), Terex Corporation ("Terex"), Powerscreen New York, Inc. ("PSNY"), and Emerald Equipment Systems, Inc. ("Emerald"), have filed several post-trial motions. The Court now addresses four of these motions: (1) a renewed motion for judgment as a matter of law; (2) a motion for a new trial; (3) a motion for a new trial on the basis of newly discovered evidence; and (4) a motion for judgment as a matter of law, or, alternatively, for a new trial, filed only by the Defendant Terex. For the reasons that follow, the Court denies the Defendants' motions in their entirety and therefore will not enter judgment as a matter of law in their favor or grant a new trial.

### I. BACKGROUND

      The Court described the background of the relevant patent in detail in its previous decision in this case, Metso Minerals, Inc. v. Powerscreen Intern. Distr. Ltd., 681 F. Supp. 2d 309 (E.D.N.Y. 2010) ("Metso I"), and familiarity with that

decision is assumed. Nevertheless, the Court restates this information as a background for the decision.

United States Patent 5,577,618 (the "'618 patent") was granted to Malachy J. Rafferty on November 26, 1996 for a "mobile aggregate material processing plant". The patent covers an invention whose primary function is to sort debris— usually construction debris—into piles of like-sized particles. Figure 2, below, is a cross sectional drawing from the '618 patent showing the invention's preferred embodiment.



*Fig. 2*

In this preferred embodiment, the plant sits on a structure akin to a flat-bed trailer, and extends the length of the trailer. When in its operating position, the plant takes mixed debris into an input hopper, and separates the debris into one of four size groupings. The largest debris is then dumped out of the input hopper, while the remaining three groupings are placed on one of three conveyors. Two of these conveyors extend out from the sides of the plant (called "lateral conveyors"),

while the third extends from the back end of the plant.  The debris travels the length of these conveyors, and is dumped at the end of each to form three separate piles, each of like-sized debris.  In Figure 2, above, the lateral conveyors [20] are shown in their operative position, extending out from the plant base.

All of these functions, however, are incorporated into the prior art that preceded the '618 patent.  The primary innovation claimed in the '618 patent is a way of folding the lateral conveyors so that the plant is more easily transported from worksite to worksite.  Previous plants were transportable, but they were arguably less practical.  For example, one cited invention required the lateral conveyors to be manually removed from the plant and stored above it for transport.  Others allowed the lateral conveyors to fold onto the plant, but required that the plant be of sufficient length to accommodate the full size of the conveyors.  By contrast, the '618 patent describes an invention whereby the lateral conveyors are double-jointed and fold into the plant more compactly.  This is the essence of the innovation.

Based on this innovation, the United States Patent and Trademark Office issued the '618 patent, in which the patentee claimed, among other things:

> A mobile road-hauled aggregate material processing plant comprising:
>
> a wheel mounted chassis extending in a longitudinal direction;
>
> a plant support frame mounted on the chassis;
>
> a raw material input hopper mounted on the plant support frame;
>
> a material processing means mounted on the plant support frame and fed from the input hopper and having an outlet;

a processed material outfeed delivery means mounted on the plant
 support frame and fed from the material processing means;

at least one lateral delivery conveyor incorporated in the outfeed
 delivery means, said conveyor comprising:
 a conveyor frame tail section;
 a conveyor frame head section;

a tail articulation means connecting the tail section to the support
 frame in such a way that at least part of the tail section is movable
 relative to the plant support frame from an operative position
 extending laterally of the chassis with respect to the longitudinal
 direction for outfeed of processed material, to a transport position
 extending substantially upright above the chassis and positioned
 with respect to the input hopper and material processing means so
 that it does not project laterally beyond the chassis,

a head articulation means connecting the head section to the tail
 section in such a way that the head section is movable from an
 operative position to a transport position with the head section
 extending longitudinally above the chassis and positioned with
 respect to the input hopper and material processing means so that it
 does not project laterally beyond the chassis; [and]

an endless conveyor belt . . ., said belt defining a conveyor plane.

 ('618 patent, col. 7.)

 Thus, according to this description, the "wheel mounted chassis" that

underlies the invention is outfitted with a "plant support frame".  On the plant

support frame is attached an "input hopper" that, in the preferred embodiment,

accepts rubble of various sizes.  This hopper feeds a "material processing means"

that sorts the rubble into various sizes, and feeds the sorted material to the "outfeed

delivery means."  This outfeed delivery means comprises, in the preferred

embodiment, two lateral conveyors extending from the sides of the plant.  Each of

these lateral conveyors is mounted with a conveyor belt and has two movable joints.

The first joint is called the tail articulation means ("TAM"), and it connects the

lower portion of the conveyor (the "tail section") to the plant support frame. The second joint is called the head articulation means ("HAM"), and it attaches the top part of the conveyor (the "head section") to the conveyor's tail section. By using these two joints together, the conveyor can be folded into a flat L shape using the HAM and raised next to the plant support frame using the TAM. This way, the conveyor sits snugly next to the plant support frame during transport mode. Figure 4, below, shows the preferred embodiment of the invention in transport mode. The lateral conveyors [20] are shown folded into the L shape for transport.



Fig.4

The Plaintiff Metso Minerals commenced the present law suit in 2006, alleging that the Defendants manufactured and sold products that infringed the '618 patent. Following discovery, claim construction, and summary judgment, the Plaintiff tried its case to a jury in late 2010. At the seven-week trial, the Defendants challenged the validity of the '618 patent, but on December 6, 2010, the jury returned a verdict rejecting this challenge, in part finding that no asserted claim of the '618 patent would have been obvious to a person of ordinary skill in the art at

the time of the invention. The jury concluded that the Defendants had willfully

infringed, either literally or by equivalents, claims 1, 2, 3 and 7 of the '618 patent

with respect to the manufacture and sale of eleven screening machines in the United

States over a ten year period. In addition, the jury issued an advisory verdict

denying the defenses of laches and inequitable conduct. The jury awarded the

Plaintiff $15.8 million in damages. On March 3, 2011, the Court entered Judgment

on the jury verdict.

After the conclusion of the trial, both the Plaintiff and the Defendants have

filed a large number of post-trial motions. In this Decision and Order, the Court

will now address only those particular filings relating to the Defendants' motions

for judgment as a matter of law and for a new trial.

## II. DISCUSSION

### A. Relevant Law

#### 1. The Renewed Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50(b) ("Fed. R. Civ. P. 50(b)"

or "Rule 50(b)"), a renewed judgment as a matter of law ("JMOL") may be made

"at the close of all the evidence" and after the verdict. A motion for JMOL may be

granted where "there is no legally sufficient evidentiary basis for a reasonable jury

to find [in favor of the non-moving] party." Fed. R. Civ. P. 50(a). In patent cases, a

motion for JMOL pursuant to Rule 50(b) is reviewed under the law of the regional

circuit. Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312 ,1317 (Fed. Cir.

2009).

When ruling on a motion for JMOL, the court must "'consider the evidence in the light most favorable to the [non-moving party] and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence.'" Concerned Residents for the Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994), cert. denied, 514 U.S. 1082, 115 S. Ct. 1793, 131 L. Ed. 2d 721 (1995), (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988)). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097 (2000); Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001). Accordingly, when ruling on a motion brought pursuant to Rule 50, the court may not rule on the credibility of the witnesses or the weight of the evidence. Caruso v. Forslund, 47 F.3d 27, 32 (2d Cir. 1995). In other words, the court may not itself weigh credibility or otherwise consider the weight of evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. See Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

In order to grant a motion for JMOL, there must be a "'complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against [it].'" Concerned Residents, 34 F.3d at 117,

(quoting <u>Song v. Ives Lab., Inc</u>., 957 F.2d 1041, 1046 (2d Cir. 1992)); <u>Mattivi v.</u>

<u>South African Marine Corp. "Huguenot"</u>, 618 F.2d 163, 168 (2d Cir. 1980).

"The same standard that applies to a pre-trial motion for summary judgment

pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of

law during or after trial pursuant to Rule 50." <u>Piesco v. Koch</u>, 12 F.3d 332, 341 (2d

Cir. 1993); <u>see also </u>the Advisory Committee Note to 1991 Amendment of Fed. R.

Civ. P. 50. This Rule is well and clearly explained in the seminal case of <u>This Is</u>

<u>Me, Inc. v. Elizabeth Taylor,</u> 157 F.3d 139 (2d Cir. 1998). In <u>Taylor</u>, the Court

commented that the then recent adoption of the term "judgment as a matter of law"

to replace both the term "directed verdict" and the term "judgment N.O.V." was

intended to call attention to the close relationship between Rule 50 and 56. 157

F.3d at 142. The Court then went on to explain the basis for granting a post-verdict

Rule 50 motion, as follows:

> A district court may not grant a motion for a judgment as a matter
> of law unless "the evidence is such that, without weighing the
> credibility of the witnesses or otherwise considering the weight of
> the evidence, there can be but one conclusion as to the verdict that
> reasonable [persons] could have reached." <u>Cruz v. Local Union</u>
> <u>No. 3, Int'l Bhd. of Elec. Workers</u>, 34 F.3d 1148, 1154–55 (2d Cir.
> 1994) (quoting <u>Simblest v. Maynard</u>, 427 F.2d 1, 4 (2d Cir. 1970))
> (internal quotation marks omitted). Weakness of the evidence does
> not justify judgment as a matter of law; as in the case of a grant of
> summary judgment, the evidence must be such that "a reasonable
> juror would have been compelled to accept the view of the moving
> party." <u>Piesco</u>, 12 F.3d at 343.

<u>Id.</u>; <u>see also Fabri v. United Techs. Int'l Inc.</u>, 387 F.3d 109, 119 (2d Cir. 2004)

(same); <u>Sanders v. New York City Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir.

2004).

A JMOL is thus "proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.' " Fiacco v. City of Rensselaer, 783 F.2d 319, 329 (2d Cir. 1986) (quoting Simblest, 427 F.2d at 4). Such motions "should be granted cautiously and sparingly." 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 252 (1995); Japan Airlines Co. Ltd. v. Port Auth. of New York & New Jersey, 178 F.3d 103, 112 (2d Cir. 1999). In order to grant a new trial, the court must find that the verdict is "seriously erroneous" or constitutes a "miscarriage of justice." Smith, 861 F.2d at 370; Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983).

## 2. The Motion for a New Trial

Under Federal Rule of Civil Procedure 59 ("Fed. R. Civ. P. 59" or "Rule 59"), a court "may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). " 'A motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.' " DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998) (quoting Song v. Ives Labor, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)). The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the

jury; or (4) damages are excessive. 12 Moore's Federal Practice, § 59.13[1] at 59-43 (3d Ed. 2005).

In evaluating a Rule 59 motion, the trial judge's duty is essentially to see that there is no miscarriage of justice. Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978). However, in general, as stated above, a motion for a new trial should not be granted unless the Court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 875 (2d Cir. 1992); see also Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005); Smith v. Nurse Carpenter, 316 F.3d 178, 183 (2d Cir. 2003); Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 623 (2d Cir. 2001).

In comparison to a Rule 50 motion for judgment as a matter of law, the Second Circuit has held that the standard for a Rule 59 motion in some respects is less onerous for the moving party in two ways: first, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." DLC Mgmt. Corp, 163 F.3d at 134. Second, in deciding a Rule 59 motion "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." Id.

Federal Rule of Civil Procedure 60(b)(2) ("Fed. R. Civ. P. 60(b)(2)" or "Rule 60(b)(2)") provides that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . newly discovered evidence that, with reasonable diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). Evidence is

considered "newly discovered" for the purposes of Rule 60(b)(2) "if it existed at the time of the prior adjudication but . . . was discovered by the movant only after the entry of judgment."  Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112, 114 (S.D.N.Y. 2001) (quoting Walker v. Dep't of Veteran Affairs, No. 94 Civ. 5591, 1995 WL 625689, at *1 (S.D.N.Y. Oct. 25, 1995)).  The moving party who seeks relief from judgment pursuant to Rule 60(b)(2) must meet an "onerous standard" by showing that:  1) the newly discovered evidence was of facts in existence at the time of the dispositive proceeding; 2) he was justifiably ignorant of those facts despite due diligence; 3) the evidence is admissible and of such importance that it probably would have changed the outcome; and 4) the evidence is not merely cumulative or impeaching.  United States v. Int'l Bhd. of Teamsters ("Teamsters"), 247 F.3d 370, 392 (2d Cir. 2001).

The standard for newly discovered evidence under Rule 59 is identical to that under Rule 60(b)(2).  Brocuglio v. Proulx, 478 F. Supp. 2d 297, 300 (D. Conn. 2007) ("Whether moving on the basis of presentation of new evidence under Rule 59(e) or Rule 60(b)(2), the standard for newly discovered evidence is the same.") (internal quotation marks and citation omitted).

One of the present motions is also based upon Rule 60(b)(3), which provides that "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for . . . fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." Fed. R. Civ. P. 60(b)(3).  A party seeking relief pursuant to Rule 60(b)(3) must establish by clear and convincing evidence that the

opposing party engaged in fraud or other misconduct. See Fleming v. New York Univ., 865 F.2d 478, 484 (2d Cir. 1989). Moreover, "[t]o prevail on a Rule 60(b)(3) motion, a movant 'must show that the conduct complained of prevented the moving party from fully and fairly presenting his case.'" State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d Cir. 2004) (internal citation omitted).

Finally, the Defendants also argue for a new trial on the basis of the catch-all provision of Rule 60, which is subsection (b)(6). It is well established that the appropriate occasion for Rule 60(b)(6) relief is limited to cases where the movant can show "extraordinary circumstances" or "extreme hardship." United States v. Harris, 367 F.3d 74, 80 (2d Cir. 2004) (citing United States v. Cirami, 563 F.2d 26, 32 (2d Cir. 1977)). However, Rule 60(b)(6) does, "confer[ ] broad discretion on the trial court to grant relief when appropriate to accomplish justice." Matarese v. LaFevre, 801 F.2d 98, 106 (2d Cir. 1986). Indeed, clause (6) has been characterized as "a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by [Rule 60(b)' s] preceding clauses." Cirami, 563 F.2d at 32. Nevertheless, relief under clause (6) is only appropriate where all of the more specific clauses of Rule 60(b) are inapplicable. See Teamsters, 247 F.3d at 391-92 ("Controlling cases have held that if the reasons offered for relief from judgment can be considered in one of the more specific clauses of Rule 60(b), such reasons will not justify relief under Rule 60(b)(6)") (citations omitted).

The granting of a new trial is extraordinary relief, and one that "is properly granted only upon a showing of exceptional circumstances." Id. at 391.

**B. As to The Defendants' Motions for a New Trial and Judgment as a Matter of Law**

  In addition to the Defendants' motion for a new trial on the basis of newly discovered evidence addressed above, the Defendants have filed two additional motions which the Court will now address— a renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) ("Def. Mem. 2") and a motion for a new trial pursuant to Fed. R. Civ. P. 59 ("Def. Mem. 3").  In sum, the Defendants believe they are entitled to a new trial or judgment as a matter of law on the issues of literal infringement, infringement by equivalents, willful infringement, invalidity, and damages.  The two motions at issue overlap extensively in their relevant facts and legal arguments.  Thus, for sake of efficiency, the Court will consider the numerous subjects addressed in both motions simultaneously.  The Court will then address the one remaining argument which appears only in the Defendants' motion for a new trial.

**1.  As to the Alleged Errors Regarding Claim Terms**

  First, in their motion for a new trial, the Defendants argue that the Court erroneously charged the jury in the context of infringement.  Specifically, the Defendants allege that the Court (1) erroneously instructed the jury on the meaning of "chassis" and "wheel-mounted chassis", (2) did not correctly instruct the jury regarding the correct standard for determining whether the "head articulation means" limitation was literally infringed; and (3) vitiated the "does not project laterally beyond the chassis" limitation when it permitted the jury to apply the doctrine of equivalents.  The Defendants similarly allege in their renewed motion

for judgment as a matter of law that no reasonable, properly instructed jury could have concluded that (1) the accused track mounted screeners have "wheel mounted chasses" as the claims require; (2) any accused screener met the "head articulation means" limitation; and (3) as a matter of law, that the doctrine of equivalents was applicable to the "does not project laterally beyond the chassis" limitation.

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard, or does not adequately inform the jury on the law." Cameron v. City of New York, 598 F.3d 50, 68 (2d Cir. 2010). In order to justify a new trial, the jury instruction must be both erroneous and prejudicial. Millea v. Metro-North R. Co., 658 F.3d 154, 163 (2d Cir. 2011); see Sulzer Textil AG v. Picanol NV, 358 F.3d 1356, 1363 (Fed. Cir. 2004). An erroneous jury instruction is prejudicial unless "the court is convinced that the error did not influence the jury's verdict." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). In addition, Fed. R. Civ. P. 50 provides that if a jury returns a verdict for which there is not a legally sufficient basis, then the district court may direct entry of judgment as a matter of law. This is Me, 157 F.3d 139, 142 (2d Cir. 1998).

### a. "Chassis"

The first major source of contention in the post-trial motion context, raised in the Defendant's motion for a new trial, involves the term "chassis." This word is utilized in the patentee's claim that the invention comprises "a plant support frame mounted on the *chassis*." The claim term also appears in the description of the "head articulation means" as connecting the head section to the tail section in such a way that the head section "does not project beyond the *chassis*."

In the parties' claim construction motions, the parties requested the Court to construe this term. The Defendants requested a narrower definition—they asked the Court to construe "chassis" to mean "a pair of longitudinal beams." The Plaintiff requested a broader definition—it asked the Court to construe the term to mean "a structure onto which other elements are attached or mounted," such that it would include the tires, tracks, and wheels running on the tracks. For reasons outlined in an earlier decision, the Court construed "chassis" to mean "the entire assembly of parts that rest beneath the plant support frame," which included the "wheels, tracks, and other related parts on which would rest the other operative structures of the screening plant." Metso I, 681 F. Supp. 2d at 321. The Court also recognized at that time that that the chassis incorporate[d] the wheels and the wheel arches in the preferred embodiment." Id.

The Defendants thereafter challenged this construction, and advanced a more limited construction that did not comprise, among other parts, the wheels, wheel arches, tires, or support jacks that rest beneath the plant support frame. The Court rejected this challenge.

At the conclusion of the trial, the Court instructed the jury that the claim term "chassis" "includes the wheels or tires and the wheel arches . . . [and] also includes the tracks and assembly on which the tracks rotate and are mounted because these elements are beneath the functional parts of the screener." (Trial Tr., at 5346:6-9.)

First, in their motion for a new trial, the Defendants argue that the Court erred in its original definition of the term "chassis" by defining it to include more

than the pair of longitudinal beams. However, the reasoning underlying the original claim construction determination by this Court remains, and therefore, the Court does not see any reason to alter its earlier decision.

Second, the Defendants allege that in the jury instructions the Court materially and improperly changed its construction of "chassis" after the close of the evidence. The Defendants claim that the explicit inclusion of tracks and the track assembly in the definition of chassis to the jury was significantly prejudicial in that it increased the lateral width of the term, because the tracks and track assembly are not "*beneath* the plant support frame" as defined in the claim construction, but rather are laterally to the side of, and partially below, the plant support frame. According to the Defendants, this, in turn, increased the width of the "chassis" by the width of the tracks. In addition, by including wheels and wheel arches in the definition of "chassis," the Defendants assert that this also inappropriately expanded the width of the chassis.

In the previous claim construction decision by this Court, the term "chassis" was defined to mean "the entire assembly of parts that rest beneath the plant support frame." Metso I, 681 F. Supp. 2d at 321. When the Court charged the jury, it reiterated this definition and stated that the claim "chassis" "includes the wheels or tiers and the wheel arches . . . [and] also includes the tracks and assembly on which the tracks rotate and are mounted because these elements are beneath the functional parts of the screener." (Trial Tr., at 5346:6-9. )

In Metso I, the Court did express a hesitation to explicitly construe "chassis" to include or exclude part of the tracks on a "track-mounted screener." 681 F.

Supp. 2d at 321. However, that reluctance was specifically connected to the intrinsic evidence only, which the Court found wanting. Although the Court found that the definition of "chassis" had to necessarily include more than just longitudinal beams and other structures found only in the preferred embodiment, i.e., the wheels and wheel arches of the invention, the Court struggled with the "tracks" in the accused screeners, because that specific structure does not appear in the patent's preferred embodiment. In other words, based upon the intrinsic evidence of the patent alone, the Court was reluctant to include or exclude "tracks" as part of the definition of "chassis."

However, the Court thereafter relied upon the extrinsic evidence of Powerscreen's Spare Parts Listings for its mobile screeners, in which it used the terms "track chassis" and a "wheel chassis" to refer to the "entire assembly of supports, wheels, tracks, and other related parts on which would rest the other operative structures of the screening plant." Metso I, 681 F. Supp. 2d at 321. In the Court's view, this was evidence that one skilled in the art would define "chassis" as referring to the *entire assembly* that rests beneath the functional parts of the screener, and that this was consistent with the intrinsic evidence in the patent itself. Thus, when the Court construed the term "chassis" in the claim construction decision to mean "the entire assembly of parts that rest beneath the plant support frame," the Court implicitly defined the term to include the supports, wheels, tracks, and other related parts on which the operative structures of the screener, i.e., the functional parts of the screener, would rest.

Of course, to "change[] the rules of the game" and alter the construction of key claim terms after the case had been tried would not be permitted.  <u>See Johns Hopkins Univ. CellPro. Inc.</u>, 152 F.3d 1342, 1357 (Fed. Cir. 1998).  However, that is not the circumstance at hand.  The Defendants are comparing the Court's instruction to the jury with the Court's prior dicta—not the Court's actual claim construction.  Accordingly, the Court's claim construction and the Court's jury instruction are consistent with one another and there is no need to consider whether a change in construction was manifestly prejudicial.  Therefore, the Court will not award a new trial on the basis of the term "chassis" as utilized in the jury instructions.

### b.  "Wheel Mounted Chassis"

The next contentious patent term, argued in both the renewed motion for judgment as a matter of law and the motion for a new trial, is "wheel mounted chassis."  The Defendants make several arguments based solely on this phrase in both of their respective motions.

The patent claims asserted by the Plaintiff require that a mobile, road-hauled aggregate processing plant have a "wheel mounted chassis."  At the claim construction and summary judgment stage, the Defendants argued that the accused *track* mounted screeners could not have "wheel mounted chasses" as required under the patent claims for a finding of infringement.  According to the Defendants, the definition of "wheel" did not encompass "tracks", either literally or by equivalent, and thus the track-mounted screeners could not be considered "wheel mounted".

To the contrary, the Plaintiff argued that track mounted screeners had chasses that are nonetheless "wheel mounted," because the chasses were mounted on a number of wheels that drove and guided the track parts that came into contact with the ground. The Court declined to grant summary judgment in favor of either party on this ground, because it found that this was a question most appropriate for the jury because material issues of fact existed with respect to how the tracks operated and what role their wheels played in their functioning.

At the charge conference, the Defendants again raised the argument that even if the jury were to determine that track assemblies somehow have wheels, it would be insufficient to decide that those screeners have "wheel mounted chasses" as required under the terms of the patent. The Defendants objected to an instruction to that effect, claiming that the proffered charge would deprive the jury of the ability to decide what is or is not a "wheel mounted chassis" within the claim limitation. These arguments were taken into consideration by the Court.

In the charge, the Court instructed the jury "to decide whether the Defendants' screeners on a track-mounted chassis have 'wheels.'" The Court further charged that "if an accused Powerscreen screener is mounted on tracks," they were to determine "whether or not the tracked chassis of that screen has wheels, as I have defined the term 'wheels.'" The jury thereafter found that two of the track-mounted screeners—the Chieftain 2100 and the H5163—literally infringed this requirement of the '618 patent claim. The jury also found that the four other track-mounted screeners—the Chieftain 1400, the Chieftan 1700, the

Chieftan 1800, and the Chieftain 2100X—infringed this requirement of the '618 patent under the doctrine of equivalents.

In the Defendant's renewed motion for judgment as a matter of law, the Defendants argue that because these six accused screeners are mounted on tracks, not wheels, that they could not be found to have infringed the '618 patent, either literally or under the doctrine of equivalents. Their position hinges on the assertion that the Court erroneously instructed the jury in such a way that it impermissibly abrogated the "wheel mounted chassis" limitation of the asserted claims. The Defendants reason in their motion that because the Court defined "chassis" to include the tracks and track assembly on track mounted screeners, and thereby instructed the jury that it needed only to find that the track-mounted screeners had wheels to conclude that those screeners infringed, that the Court essentially erased the words "mounted" and "chassis" from the patent specifications.

In addition, the Defendants claim that the Court in effect told the jury to ignore evidence that a wheel mounted chassis was fundamentally different from a track mounted chassis. In support of the Defendant's motions, they contend that the industry generally categorizes screeners as being either track-mounted or wheel-mounted, and that they are intended for different environments and both are structured and perform differently. Thus, because "[t]hey do not perform the same functions in the same way to achieve the same result," the Defendants argue that no reasonable jury could have concluded that Powerscreen's track-mounted screeners had a wheel-mounted chassis as required by claim 1 and the asserted dependent

claims of the '618 patent. The Defendants repeat these claims in their motion for a new trial, arguing that the Court's instructions constitute prejudicial error.

At its core, the Defendants' argument is that the jury instruction changed the relevant inquiry from a "wheel mounted chassis" to simply whether a screener had "wheels". On the other hand, the Plaintiffs assert that their witness, Stephen Whyte, testified that the track-mounted screeners did infringe the "wheel mounted" chassis claim of the '618 patent, either literally or under the doctrine of equivalents.

As the Court explained in its previous claim construction opinion, the Plaintiff raised a genuine issue of material fact as to whether a track-mounted screener could nevertheless have a chassis that was "wheel-mounted," if the chassis is mounted on a number of wheels that drive and guide the track parts that come in contact with the ground. In addition, the Court properly instructed the jury that the definition of "chassis" included tracks, wheels, or any other part that rested beneath the plant support frame. Thus, when the Court instructed the jury, it did so in accordance with the Court's interpretation of what a track mounted screener with a wheel-mounted chassis would be. The jury did not have free reign**,** without constraint**,** to find that a track-mounted screener with a wheel anywhere in the screening plant would be infringing. Rather, the Court specifically instructed that the jury was to determine "whether or not the tracked *chassis* of that screen has wheels." Thus, the issue before the jury was whether the assembly of parts that rested beneath the plant support frame contained wheels, and the factual issue of whether a track-mounted screener could nevertheless have a wheel-mounted chassis was thereby properly before the jury. The instruction was not erroneous and

certainly did not warrant a new trial.  Also, in this regard, the Court does not find that there was a complete absence of evidence supporting the jury's verdict to warrant a judgment as a matter of law.

### c.  "Head articulation means"

Another claim term that is a source of contention in the post-trial context is "head articulation means" ("HAM").  The claim term HAM is undisputedly a means plus function claim, and therefore must be construed by first identifying the function of the term, and then identifying the structures that carry out this function.  In the Court's previous claim construction decision, it construed the function of this claim to mean:

> connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis.

Metso I, 681 F. Supp. 2d at 326.  In addition, the Court found the following structures to be necessary to carry out this function: "a pivot joint, a connecting pin, a bushing, wing plates, and a holding plate."  The HAM was therefore interpreted to incorporate these specific structures and their equivalents.

Thereafter, the Defendants did not oppose the Court's definition of the HAM function, but did challenge the Court's determination of which structures carry out this function.  Specifically, the Defendants contended that the HAM should be construed to additionally comprise a "C-clip," the "tapered parts" of the head and tail sections of the conveyor, and a "hydraulic ram."  In the

reconsideration decision, <u>Metso Minerals, Inc. v. Powerscreen Int'l Distribution</u> <u>Ltd.</u>, 722 F. Supp. 2d 316 (E.D.N.Y. 2010) ("<u>Metso II</u>"), the Court stated that it had already discussed the basis for excluding those terms in <u>Metso I</u> and found no reason to alter the Court's previous construction of the HAM.  However, the Court did reverse its determination with respect to whether all of the required structures of the HAM, as laid out in <u>Metso I</u>, were actually present in the accused screeners and found that the existence of two elements—wing plates and a holding plate— remained a question of fact.

At the trial, the Court instructed the jury with regard to the  HAM by stating that one of the issues it had to decide with respect to infringement of the claim one was:

> First, whether or not the mechanism that causes a lateral conveyor of the accused Powerscreen screeners to fold and unfold, allows that lateral conveyor to fold into a transport position so that the lateral conveyor "does not project laterally beyond the chassis" of the screener.
>
> Second, whether or not that mechanism has "wing plates" and "a holding plate."

(Trial Tr., at 5337:24-5338:12.)

The Defendants make several arguments with regard to this claim term, which are substantially the same in both their motion for a new trial and their renewed motion for judgment as a matter of law.

First, the Defendants contend that the Court did not give specific, explanatory instructions as to the "means-plus-function" limitation format so that it did not adequately inform the jury of the law.  The Defendants assert that the Court

should have charged the jury that to find infringement it needed to conclude that (1) the accused screeners performed the specified function *exactly*, and (2) the defined structures or their equivalents were the required means for performing that function. At the outset, the Court rejects this argument. The instruction to the jury clearly delineated two steps for the jury—first, to determine whether the function of the accused screeners was the same as that of the HAM, and second, to determine whether the defined structures at issue were contained in the mechanism that performed that function.

Second, the Defendant argues that the accused screeners do not perform the same exact function that was defined in the claim construction, specifically the "connecting" portion of the limitation, that the HAM was to "connect[] the head section to the tail section." Metso I, 681 F. Supp. 2d at 326. The Defendants claim that the folding mechanism in the accused screeners that causes the movement of the side conveyors does not connect the head section to the tail section, but connects the head section to the plant support frame. Thus, because the Court did not instruct the jury with regard to this particular function, the Defendants allege that this led the jury to an incorrect result that warrants a new trial or judgment as a matter of law of non-infringement.

The Court agrees with the Plaintiff that its instruction was not improper.

In its summary judgment decision, the Court agreed that the function of the HAM was to connect the head and tail sections so that the conveyors do not protrude laterally beyond the chassis when folded and deemed there to be no genuine issue of material fact as to whether the structures carried out the recited

function of the HAM or its equivalent. However, in the reconsideration decision, the Court determined that the only factual issue remaining with regard to the HAM's function was whether the conveyors on the accused screeners "protrude[d] laterally beyond the chassis," and that a structure that failed to carry out this function was not a HAM within the meaning of the '618 patent. The Court explicitly said that "there are issues of fact as to whether the alleged [HAM] on the accused screeners carry out this function," implicitly rejecting any other issue of fact with regard to the function of the HAM. Therefore, the Court properly instructed the jury to make a determination only as to this aspect of the HAM's function and a new trial or judgment as a matter of law is not warranted on this basis.

Third, the Defendants acknowledge that part of the function, to enable to the head section to be moved from the operative position to the transport position, is accomplished by the accused screener's folding mechanism at issue. However, the Defendants claim that the function of the accused folding mechanism is not exactly the same because "the arrangement of the struts in combination with the hydraulic cylinders . . . at the same time provides support for the lateral conveyer in the operating position when the conveyors have a load on them." Thus, the Defendants argue that the accused folding mechanism operates in an entirely different manner and does not achieve the same result as required by the claimed function of the HAM. The Court disagrees.

The fact that the folding mechanism in the accused screeners performs the claimed function and also performs an additional function, does not change the

finding that the structure actually performs the recited function. "[A]n accused device that contains the same feature as the patented device cannot escape infringement because in it that feature performs an additional function it does not perform in the patented device. Radio Steel & Mfg. Co. v. MTD Products, Inc., 731 F.2d 840, 848, 221 U.S.P.Q. 657 (Fed. Cir. 1984).

Fourth, the Defendants reassert their earlier and rejected argument that the Court's determination of the structures required to perform the claimed function were unduly narrow, and should include elements such as tapered parts and a hydraulic ram. The Court sees no reason to alter its earlier decision in this regard.

### d. "Not Project Laterally Beyond the Chassis"

The last claim term that forms the basis for several arguments in the Defendants' motion for a new trial and renewed motion for judgment as a matter of law is that the side conveyors "not project laterally beyond the chassis" when in the transport position.

At trial, the jury found that six of the accused screeners infringed the Plaintiff's patent under the doctrine of equivalents. In the Defendants' motions, they assert that as a matter of law, there could not be a theory of infringement by equivalence for the limitation that the side conveyors "not project laterally beyond the chassis" when in the transport position. The Defendants have two bases for this argument.

The first contention of the Defendants is that the vitiation doctrine applies, so that the trier of fact could not have reached an equivalence analysis. The claim-vitiation doctrine provides that "an element of an accused product or process is not,

as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation." Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing Warner–Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29, 117 S. Ct. 1040, 137 L. E. 2d 146 (1997)). "There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation . . . . Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." Freedman, 420 F.3d at 1359. "Claim vitiation applies when there is a 'clear, substantial difference or a difference in kind' between the claim limitation and the accused product." Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1355 (Fed. Cir. 2010) (quoting Freedman, 420 F.3d at 1360). "It does not apply when there is a 'subtle difference in degree.'" Id. The doctrine of equivalents does not allow recapture of subject matter excluded by a deliberate claim-drafting decision. Planet Bingo, LLC v. GameTech Int'l, Inc., 472 F.3d 1338, 1344 (Fed. Cir. 2006).

The Court agrees with the Defendants that the "doctrine of equivalence cannot be used to erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" Conopco, Inc. v. May Dep't Stores Co., 46 F.3d 1556, 1562 (Fed. Cir. 1994) (internal citation omitted)); see, e.g., Tronzo v. Biomet, Inc., 156 F.3d 1154, 1160 (Fed. Cir. 1998) (noting that the finding of all shapes to be equivalent structures would entirely

vitiate the limitation requiring a "generally conical shape"). However, the Court

finds that the vitiation doctrine is not applicable in the present case.

The claim to "not project laterally beyond the chassis" can lead to several

variations of infringement, from insubstantial projection so that the doctrine of

equivalents is applicable, to substantial projection so that the vitiation doctrine

could apply. The Court has previously rejected the Defendants' argument that there

is a binary difference between conveyors that extend beyond the chassis and those

that do not. Cf. Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091, 1106

(Fed. Cir. 2000). The Court at that time found that "even if minimally protruding

conveyers were deemed to be equivalent to non-protruding conveyers, the term

'does not project laterally beyond the chassis' would still limit the patent." Metso I,

681 F. Supp. 2d at 332. In addition, the Plaintiff's expert witness stated that the

projection of the lateral conveyors was "so minimal that it is of no consequence."

(Trial Tr., at 2368:9-2369:19.) While the Defendants contend that the Plaintiff

expands the scope of their limitation to the exact opposite –"does project"—this is

not the case. Rather, it is a question of degree. The Plaintiff's expert merely

testified that the projection was so minimal that it was essentially the same as not

projecting. This would likely not have been the case had the projection been more

substantial.

The second contention of the Defendants is that Metso is estopped from

asserting infringement by equivalence of the claim limitation that the lateral

conveyors "not project laterally beyond the chassis" while in the transport position

because of arguments made to the Patent and Trademark Office ("PTO") during the

prosecution of the '618 patent.  In particular, the Defendants point to the following

statements:

- "Claims 1 and 12 are further amended to more clearly indicate what constitutes the operative position and the transport position, the former having elements extending laterally of the chassis, the latter having *no elements extending laterally of the chassis*."

- "[I]t is more clearly recited that:

  - the tail section is connected to the plant frame, and it extends laterally for operation and substantially upright *without projecting laterally beyond the chassis for transport* . . .

  - the head articulation means renders the head section movable to extend longitudinally above the chassis and thereby be positioned with respect to other parts of the plant *so that it does not project laterally beyond the chassis.*

Prosecution history estoppel may, as a matter of law, prevent a patentee

from subsequently relying on the doctrine of equivalents for a particular claim

limitation.  Bai v. L & L Wings, Inc., 160 F.3d 1350, 1354 (Fed. Cir. 1998).  The

Defendants in the present case rely on estoppel by argument, not by amendment.  In

order for this form of estoppel to apply, there must be a "clear and unmistakable"

surrender of the equivalent asserted by the patentee.  See Litton Sys. v. Honeywell,

Inc., 140 F.3d 1449, 1458 (Fed. Cir. 1998) (requiring a "clear and unmistakable

surrender" in order for argument-based estoppel to apply).

Here, the Court does not find that any of the statements made to the PTO or

by Mr. Rafferty's lawyers at trial, clearly and unmistakably abandoned an

infringement claim of mere minimal projection beyond the chassis under the

30

doctrine of equivalents. The only thing indicated by these statements is the importance of the actual claim to not project laterally beyond the chassis. They do not simultaneously preclude an eventual finding that a minimal projection beyond the chassis could be found to equivalently infringe.

In sum, the Court does not find that a new trial or JMOL is warranted in light of this claim term.

### 2. As to the Alleged Errors Regarding Obviousness

The next subject area that forms the basis for several arguments in the post-trial motions of the Defendants is the defense of obviousness. Because it is addressed extensively in both the motion for a new trial and the renewed motion for judgment as a matter of law, each will be addressed separately.

### a. Motion for a New Trial

In the Defendants' motion for a new trial, the Defendants claim that the Court committed highly prejudicial errors in instructing the jury on the rules governing the Defendants' obviousness defense. First, the Defendants allege that the Court erred in failing to instruct the jury that the Defendants needed only to show obviousness by a preponderance of the evidence in view of Defendants' reliance on prior art not cited to the PTO. Second, the Defendants allege that the Court erred in instructing the jury that only fully operational or functional products could be considered prior art.

As to the first ground, at the trial, the Court instructed the jury that in light of all of the prior art of the '618 patent, obviousness must be shown by clear and convincing evidence. The Defendants claim that this was not the appropriate

standard with respect to prior art that was not disclosed to the PTO.  In support of this argument, the Defendants cite to KSR Intern. Co. v. Telexflex, Inc., 550 U.S. 398, 426, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007), in which the Supreme Court found that while there is a presumption of validity when the PTO approves a claim in light of the prior art, that presumption is much diminished where the PTO never considered certain prior art.  However, the Supreme Court explicitly did not address whether the failure to disclose prior art to the PTO voided the presumption of validity.  Id.  More importantly, the Supreme Court did not hold that the standard of evidence was lowered for a defense of obviousness when certain prior art was not disclosed to the PTO.

Moreover, since the filing of the post-trial motions, the Supreme Court has decided the exact issue it declined to decide in KSR.  In Microsoft Corp. v. i4i Limited Partnership, 564 U.S. __, __ Slip Op. at 5-6, (June 9, 2011),  the Supreme Court rejected the contention that a preponderance standard must apply when an invalidity defense rests on evidence that was never considered by the PTO in the examination process.  Thus, there is no longer any basis for the Defendants' argument that the instruction of a clear and convincing evidentiary standard was improper.

Although the Defendants make much out of the Supreme Court's dicta that "the challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain," the Supreme Court did not hold that this particular language was essential to include in a jury instruction.  Rather, the Supreme Court stated that "[i]n this respect . . . we have no occasion to endorse any

32

particular formulation." The Court went on only to state that "a jury instruction on the effect of new evidence *can*, and when requested, most often should be given. . . to consider that it has heard evidence that the PTO had no opportunity to evaluate before granting the patent." Id. at 17 (emphasis added).

The Court in this case rejected the Defendants' requested charge that "[w]hile Defendants must still prove invalidity by clear and convincing legal evidence, Defendants may more easily do so if the prior art that they contend renders a claim obvious and invalid was not considered by the examiner and is more pertinent that the prior art that was considered." (DE No. 469.) However, the Court instructed the jury as follows:

> A granted patent is presumed to be valid, but that presumption of validity can be overcome if clear and convincing evidence is presented that proves the patent is invalid. One example of a way in which the presumption can be overcome is if the United States Patent Office has not considered, for whatever reason, prior art that would invalidate the patent."

(Trial Tr., at 5323-4.) This instruction sufficiently complied with the Supreme Court's direction to instruct the jury "to consider that it has heard evidence that the PTO had no opportunity to evaluate before granting the patent." Microsoft Corp., Slip Op. at 17.

As for the second ground, the Defendants claim that the following instruction to the jury was erroneous:

> For any machine that you may determine is prior art, the Defendants must prove by clear and convincing evidence how that particular machine operated before September 7, 1993, in the manner that the Defendants allege is pertinent to the claims of the '618 patent, and *that that machine, if any, was fully operational and functional in that respect.*

(Trial Tr., at 5369:3-9.)  The Defendants argue that this instruction was erroneous because there is no requirement that a preexisting machine be "fully operational and functional" for it to qualify as prior art for purposes of obviousness.  They further assert that because they had no obligation to prove that the Dominator or Masterstock conveyors were fully operational and functional, they did not do so at trial, and therefore the imposition of this requirement of proof after all the evidence had been submitted was manifestly unfair.

Under 35 U.S.C. § 103(a), a patent is invalid "if the differences between the [claimed] subject matter . . . and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  The Federal Circuit has recently expressly noted that "a reference need not work to qualify as prior art."  Geo M. Martin Co. v. Alliance Machine. Sys. Intern. LLC, 618 F.3d 1294, 1302 (Fed. Cir. 2010).  Thus, the Defendants are correct that the Court's instruction in this regard was erroneous.

However, the Court does not find that this error resulted in substantial prejudice.  An erroneous jury instruction is prejudicial unless "the court is convinced that the error did not influence the jury's verdict."  Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000).  In this case, even if the Dominator mobile screener and the MasterStock 70/80 conveyors were considered prior art to the '618 patent, there was still sufficient evidence from which the jury could conclude that the '618 patent was not obvious in view of these two machines.  The Defendants' own expert, Frank Loeffler, acknowledged that combining these

references would not result in the invention claimed in the '618 patent because the combination omitted any teaching of a stop to prevent the head section of the folded lateral conveyor from folding beyond 90º. The Defendants contend that this addition of a stop, to make the patent nonobvious, cannot be sufficient because the Court did not construe the patent claims to require stops. They also point out that stops were well-known to one of ordinary skill in the relevant field. However, this was an issue of fact for the jury, and they concluded, notwithstanding the instruction with regard to functionality and optionality, that the defense of invalidity on the ground of obviousness was without merit.

In addition, there was sufficient evidence to conclude that the Defendants proved by a clear and convincing standard that the Dominator and MasterStock 70/80 were fully operational and functional. For example, Anthony Parascando testified that he and his father purchased the Dominator machine in August 1993, had it for five or six years, and then gave the machine to a man named Bill Griffits. (Trial Tr., at 3593:7-24.) Though testified to explicitly, there is nothing to indicate that this machine was not fully operational and functional, and the clear implication of Parascando's testimony is that the machine worked for its intended purpose. In addition, Richard Byrne testified to invoices of MasterStocks and Dominators being sold into the US about 1990. (Trial Tr. 3323:4-7.; 3340:19-21.) Again, the clear implication of this testimony is that these two conveyors were fully operational and functional.

Thus, the addition of the instruction to the jury to find that the machines qualified as prior art only if they were fully operational and functional was not

35

substantially prejudicial. The jury's conclusion as to whether the Dominator and the Masterstock conveyors were prior art was not influenced by the imposition of an "operability" requirement, because that was not a point of contention in this case. Therefore a new trial is not warranted on this ground.

### b. Renewed JMOL

In the Defendants' renewed motion for judgment as a matter of law, the Defendants assert that no reasonable jury, properly instructed on the governing law, would have had a legal basis for finding the '618 patent was not invalid as obvious. The Defendants further advance the contention that consistent with the teachings of KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 416, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007), that the claimed invention in the present case was a combination of familiar elements which yielded no unexpected results. The Court has previously rejected this argument, agreeing with the Plaintiff that it was a proper issue for the jury as to whether the results were unexpected or not. The Court sees no reason to now disturb a decision that was properly in the province of the jury. Therefore, the Defendants' motion for summary judgment as a matter of law on the ground that no reasonable jury could have concluded that all asserted claims were not invalid as obvious under 35 U.S.C. § 103 is denied.

### 3. As to the Alleged Errors Regarding Willful Infringement

At trial, the Court charged the jury with regard to willful infringement as follows:

> Willful infringement is established where it is shown that:
>
> The Defendant was aware of the [Plaintiff's] patent.

The Defendant had no reasonable basis for reaching a good faith conclusion that its making, using or selling its device avoided infringement of the patent.

Willful infringement may also be established where it is shown that a defendant did not exercise due care to determine whether or not it was infringing Plaintiff's patent, once the Defendant acted in reckless disregard of the claims of the Plaintiff's patent.

One factor to consider with respect to a Defendant's good faith and due care is whether the Defendant obtained and followed competent legal advice from counsel after having actual notice of Plaintiff's patent, and before beginning or continuing the allegedly infringing activities. Competent legal advice means an opinion by counsel based on a reasonable examination of the facts and law relating to the validity and infringement issues, consistent with the standards and practices generally followed by competent lawyers.

No factor by itself requires a finding of willful or nonwillful infringement. In considering whether the Defendant's infringement was willful, you should consider the totality of the circumstances, and all of the evidence demonstrating the Defendant's intentions.

(Trial Tr., at 5392:1-5393:16.) Again, because this issue is addressed extensively in both the motion for a new trial and the renewed motion for judgment as a matter of law, each will be addressed separately.

### a. Renewed Judgment as a Matter of Law

In the Defendants' renewed motion for judgment as a matter of law, the Defendants argue that no reasonable jury, properly instructed on the law, would have had a legally sufficient evidentiary basis to find that the Defendants willfully infringed the '618 patent.

As stated under In re Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007), a willful infringement analysis requires two steps. First, "a patentee must show by clear and convincing evidence that the infringer acted despite an

objectively high likelihood that its actions constituted infringement of a valid patent . . . . The state of mind of the accused infringer is not relevant to this objective inquiry." Id., 497 F.3d at 1371. Then, if this inquiry is satisfied, "the patentee must also demonstrate that this objectively-defined risk was either known or so obvious that it should have been known to the accused infringer." Id. The Defendants claim that neither of these prongs was satisfied.

With regard to the first prong, the Defendants contend that the jury did not have a legally sufficient basis to find, by clear and convincing evidence, that the Defendants were objectively reckless. In order to support this contention, the Defendants point to both their non-infringement defense and the invalidity defense of obviousness.

The existence of an objective risk of infringement is "determined by the record developed in the infringement proceeding." Id. The objective prong is not established when the accused infringer puts forward a reasonable defense to infringement, even if the jury ultimately reaches a verdict of infringement. See Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc., 620 F.3d 1305, 1319 (Fed. Cir. 2010) (holding that the objective prong for willful infringement is generally not met "where an accused infringer relies on a reasonable defense to a charge of infringement"); DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1336 (Fed. Cir. 2009) (finding that an accused infringer presented a substantial question of noninfringement which precluded a finding of objective recklessness despite the jury's ultimate finding of infringement).

In this case, the Court does not find that the Defendants presented a substantial question of noninfringement.

First, although the Defendants maintain that their defenses were objectively reasonable because of the Court's denial of the Plaintiff's motion for summary judgment, that ruling is not determinative. The Court's determination that there were factual disputes regarding infringement does not preclude a subsequent finding of willful infringement. The Court merely found that the Defendants provided sufficient evidence to give rise to a genuine issue of material fact with regard to its claims. Just because "an issue [i]s submitted to a jury does not automatically immunize an accused infringer from a finding of willful infringement . . . ." Depuy Spine, 567 F.3d at 1337. It is a case specific inquiry.

Second, the Defendants contend that in the first place there was only a trial issue because of the Court's construction of the term "chassis." However, the Court has previously rejected the Defendants' construction of certain claim terms as a matter of law. Cf. Cohesive Techs., Inc. v. Waters Corp., 543 F.3d 1351, 1374 (Fed. Cir. 2008) (upholding district court's finding of no willful infringement where a disputed claim term could have reasonably been construed differently and in a manner under which the defendant's product would not have infringed). The Defendants cannot rely upon rejected definitions of claim terms to pose a hypothetical substantial noninfringement defense.

Third, the Defendants assert that even under the Court's construction of certain claim terms, the question of infringement was "hotly contested at trial." (Def. Mem. 2, at 14.) However, the Court agrees with the Plaintiff that the

Defendants' non-infringement defense was merely relegated to arguing that the accused screeners contained elements or features that the '618 claim did not have, such as the existence of hydraulic rams and a pair of struts.  Moreover, the Defendants maintain that they proved that track mounted accused screeners do not meet the "wheel mounted chassis" limitation.  However**,** as determined above, that is not correct.  The Defendants' own witness Tony Weir admitted that the accused screeners had a number of types of "wheels," and therefore based upon the Court's earlier claim construction, this issue of infringement was not a "close call" as the Defendants have characterized.  In addition, the Defendants did not present a defense at trial to infringement under the doctrine of equivalents.  (<u>See, e.g.</u>, Trial Tr., at 3886-90.)

The Defendants are correct that a finding of objective recklessness cannot be based merely upon a comparison of the accused screeners with an illustration of the preferred embodiment, as the Plaintiff suggests.  <u>See Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.</u>, 285 F.3d 1046, 1052 (Fed. Cir. 2002) ("Infringement, either literally or by equivalents, does not arise by comparing the accused product 'with a preferred embodiment described in the specification' . . .")  However, the law of infringement does require a comparison of the accused product with the patent claims, and in fact this was the crucial inquiry at trial.

Thus, overall, the Court does not find that the Defendants' non-infringement defense was so compelling and substantial as to preclude a finding of willful infringement.  The Defendants' pretrial invalidity defenses were subject to

reasonable argument, but it based its entire non-infringement pretrial case on an improper construction of essential claim terms.

As to the Defendants' contention that they presented credible invalidity arguments regarding obviousness, the Defendants point to proof introduced at the trial regarding a previous machine called the Dominator, which was manufactured by MastersKreen International, the company owned by the patent applicant, which met all of the limitations of claim 1 of the '618 patent except that it did not fold as required by the HAM. The Defendants also maintain that they put forth evidence that the missing limitation was met by other standalone conveyors manufactured and sold by MastersKreen. Neither of these devices were disclosed to the PTO.

While the Court recognizes that the Defendants' claim was not a frivolous assertion of obviousness, it also does not find that the Defendants made a substantial and compelling case of obviousness. The Court agrees with the Plaintiff that the Defendants' analysis does not take into account the secondary considerations of non-obviousness, such as the commercial success of the invention, and the failure of anyone to develop the invention for more than a decade. In addition, and most compelling, the Defendants do not indicate when they became aware of these previous machines. Thus, it does not appear that the Defendants had knowledge of the alleged "prior art" at the time of the infringement to lead to an invalidity defense that would overcome a finding of willful infringement.

With regard to the second prong, the Defendants contend that they put forward compelling evidence which demonstrated that they conducted a reasonable

investigation of the scope of the '618 patent, undertook to design around it, and believed it had successfully done so.

However, the Court agrees with the Plaintiff that the Defendants cannot escape a finding of willful infringement by "evincing ostrich-like, head-in-the-sand behavior." (Pl. Opp. Mem. 3, at 13.) Putting aside that the Defendants' companies employed a large number of attorneys whom they could have consulted, the Defendants' opinion of non-infringement was based on a cursory understanding of the patent claims. Richard Byrne only read an abstract of the '618 patent (Trial Tr., at 3555) and Daniel McCusker and Joe Daly relied upon the "opinions" of Neill Suitor to form their own sentiments. (McCusker Dep., at 98, 115 and Daly Dep., at 135-17–136-11.) Neill Suitor, however, did not testify as to the basis of his opinions on patent infringement. Finally, Keiran Hegarty based his post-infringement opinion of non-infringement solely on his discussions with the above mentioned employees and also did not bother to read the '618 patent himself. (Trial Tr., at 3081-2, 3087-90, 3109-12). While it may have been reasonable for Hegarty to rely on the company's engineers, those engineers should have, at the very least, read the actual patent.

As for the fact that the Defendants did not present evidence that they obtained an exculpatory opinion of counsel before commencing infringing activity, the Court agrees that this is not itself sufficient for a finding of willful infringement, for there must be "objective recklessness" before failure to obtain an exculpatory opinion of counsel can establish willful infringement. Seagate, 497 F.3d at 1371. "However, the [Seagate] court did not hold that after willful infringement is

established, it is improper to consider whether the infringer exercised adequate investigation of any adverse patents." Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1348 (Fed. Cir. 2011). With the size and resources of the Defendant companies, it is highly probative and proper for this Court to consider that no evidence was presented that a qualified legal opinion was sought.

Thus, because neither the Defendants' noninfringement or invalidity defenses presented a "close factual call[]," the Court does not find that a finding of willfulness was precluded. See Uniloc USA, Inc. v. Microsoft Corp., 640 F. Supp. 2d 150, 177 (D. R.I. 2009). Accordingly, the renewed motion for judgment as a matter of law on the ground that no reasonable jury, properly instructed on the law, would have had a legally sufficient evidentiary basis to find that the Defendants willfully infringed the '618 patent, is denied.

### b. New Trial

The Defendants raise various similar arguments with regard to the finding of willful infringement in the context of their motion for a new trial. The Defendants argue in this motion that the jury was improperly instructed as to willful infringement. Specifically, the Defendants assert that: (1) the Court erred in instructing the jury that the Defendants had a duty to exercise "due care"; and (2) it was prejudicial error to instruct the jury that whether the Defendants obtained opinion of counsel is "[o]ne factor to consider with respect to a defendant's good faith and due care."

The Seagate ruling in 2007 dramatically changed the relevant inquiry for a willful infringement analysis. The core of this decision was that the threshold for

willful infringement should be higher than simply the duty to exercise due care, which was something more akin to negligence. The <u>Seagate</u> Court's explicit holding was that "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." <u>Seagate</u>, 497 F.3d at 1371.

This Court's instruction, though mentioning due care, did not lower the threshold for willful infringement back to pre-<u>Seagate</u> levels. Rather, the Court's instruction embodied the concept of objective recklessness. The Court properly charged the jury that willful infringement could be found when there was "no reasonable basis for reaching a good faith conclusion that its making, using or selling its device avoided infringement of the patent" or "once the Defendant acted in reckless disregard of the claims of the Plaintiff's patent." This instruction follows the guidance of <u>Seagate</u> that a patentee need to demonstrate that the infringer acted "despite an objectively high likelihood that its actions constituted infringement of a valid patent." <u>Seagate</u>, 497 F.3d at 1371.

The Court did not instruct as to what <u>Seagate</u> expressly overruled—that there was a presumption of willful infringement flowing from an infringer's failure merely to exercise the affirmative duty of due care to avoid infringement. Rather, this Court instructed that it was one factor, among many, under "the totality of the circumstances . . . demonstrating the Defendants' intentions." In fact, the Court explicitly stated that due care was only relevant "once the Defendant acted in reckless disregard of the claims of the Plaintiff's patent."

In addition, <u>Seagate</u> made it clear "that there is no *affirmative* obligation to obtain opinion of counsel." <u>Seagate</u>, 497 F.3d at 1371; <u>Voda v. Cordis Corp.</u>, 536

F.3d 1311, 1327 (Fed. Cir. 2008) ("The <u>Seagate</u> decision also clarified that there is 'no affirmative obligation to obtain opinion of counsel' in order to avoid liability for willful infringement"); <u>see also</u> <u>Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.</u>, 383 F.3d 1337, 1345 (Fed. Cir. 2004) ("When the defendant had not obtained legal advice, is it appropriate to draw an adverse inference with respect to willful infringement? ¶ The answer, again, is 'no.' ").

Because there was no affirmative duty on the part of the Defendants to seek advice of counsel, the Court was correct to inform the jury during the trial not to draw an adverse inference from the fact that the Defendants were not relying on the advice of counsel as a defense to Metso's allegations of willful infringement. Notwithstanding this statement, it was also appropriate for the Court to subsequently instruct the jury in the charge to consider advice of counsel as one relevant factor in their analysis.  In the Court's view, the Federal Circuit would not completely remove advice of counsel from a determination regarding willful infringement.  <u>See Seagate</u>, 497 F.3d at 1369 (finding that "whether or not an alleged infringer sought the advice of counsel is 'crucial to the [willfulness] analysis.'").  In fact, the Federal Circuit considers advice of counsel to be of such significance that "good faith" reliance on "competent and objective counsel" that provides "exculpatory advice" has been held sufficient, standing alone, to defeat a claim of willful infringement.  <u>See Vulcan Eng'g Co., Inc., v. Fata Aluminum, Inc.</u>, 278 F.3d 1366, 1378-79 (Fed . Cir. 2002).

The proposition of the Defendants that the issue of advice of counsel should not be considered as a factor in the willful infringement analysis is simply not

supported by the language of <u>Seagate</u>.  <u>See Tyco Healthcare Group, LP v. Applied Med. Res. Corp.</u>, No. 06 Civ. 151, 2009 WL 5842063, at *2 (E.D. Tex. Mar. 30, 2009) ("neither <u>Seagate</u> nor [<u>Knorr-Bremse System Fuer Nutzfahrzeuge v. Dana Corp.</u>, 383 F.3d 1337, 1345 (Fed. Cir. 2004)] hold that the trier of fact cannot take the failure to seek advice of counsel into account.").  <u>Knorr-Bremse</u> held that even though an adverse inference could not be drawn from the alleged infringer's failure to obtain the advice of counsel, it also held that it was proper for the fact finder to consider the totality of circumstances.  <u>See also Franklin Elec. Co., Inc. v. Dover Corp.</u>, No. 05 Civ. 598, 2007 WL 5067678, at *8 (W.D. Wis. Nov.15, 2007) (holding that Defendant's failure to seek advice of counsel "goes to the second component of the <u>Seagate</u> test—what [D]efendant knew or should have known with respect to the likelihood of infringement.").  The <u>Seagate</u> court cited <u>Knorr-Bremse</u> with approval, and the Court sees no reason to doubt its validity.  "In short, <u>Seagate</u> does not foreclose the possibility that the trier of fact could consider the failure to seek an opinion of counsel when determining whether the second prong of the willfulness test is satisfied, so long as it does not automatically draw an adverse inference from such a failure."  <u>Tyco</u>, 2009 WL 5842063, at *2 n.3.

Thus, the Defendants' motion for a new trial on the ground of an improper jury instruction with regard to willful infringement is denied.  After reviewing the evidence, as well as the parties' arguments, the Court finds that the jury determination was reasonable and based on the evidence in finding that the Defendants willfully infringed the Plaintiff's patent.

### 4. As to the Alleged Errors in Admitting the Royalty Rate Evidence

Finally, in the Defendants' motion for a new trial, they allege one additional ground—that the Court erred in admitting the expert testimony of Catharine Lawton regarding a 10% royalty rate in the calculation of damages.

Royalty rates in this context are statutorily based upon 35 U.S.C. § 284, which states that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The common approach to calculate a reasonable royalty is "called the hypothetical negotiation or the 'willing licensor-willing licensee' approach, [which] attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citing Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). Both parties in the present case adopted the hypothetical negotiation approach, and therefore both parties must accept **the fact** that any reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1345 (Fed. Cir. 2011) (quoting Unisplay, S.A. v. Am. Elec. Sign Co., Inc., 69 F.3d 512, 517 (Fed. Cir. 1995)); Boston Scientific Corp. v. Johnson & Johnson, 550 F. Supp. 2d 1102, 1120 (N.D. Cal 2008) ("The reasonably royalty analysis involves an approximation of the market as it would have hypothetically developed . . . ). The

well-settled methodology for analyzing whether a royalty damages conclusion is reasonable is the 15-factor test set forth in Georgia-Pacific Corp. 318 F. Supp. at 1116.

The Defendants previously sought to exclude Ms. Lawton's expert opinion testimony through a motion *in limine* and simultaneous Daubert motion. At a proceeding before this Court, the Defendants argued that she relied on licensing agreements which (1) were not relevant to the technology at issue; (2) occurred outside the territory of the United States; (3) were not all licensing agreements but rather supply agreements; and (4) dealt with trade dress and trademarks, not patents. The Plaintiff pointed out that it was an issue of the totality of the analysis under all of the Georgia-Pacific factors. At that time, the Court found that Lawton's testimony was admissible and that the Defendants' contentions could be properly raised in cross-examination.

At the trial, Ms. Lawton testified that in March 2000, if the Plaintiff and Powerscreen had engaged in a hypothetical negotiation, they would have agreed to a running royalty rate of 10% of net sales of accused infringing screeners, and that the total royalties should be $27,822,614. She based this conclusion, in part, on certain licensing information, which led her to utilize a range of potential royalty rates from 4 percent to 10 percent as a general starting place for her analysis. (Trial Tr., at 2031:16-18.)

The Defendants now allege again that she based her analysis upon licensing agreements which were unreliable and irrelevant, so that her entire damages analysis should be excluded. On the other hand, the Plaintiff points out that Ms.

Lawton's analysis did not rest entirely on these license agreements, but rather used them only as a general starting part in her analysis of licensing customs in the industry. The Plaintiff also emphasizes that she thoroughly evaluated all of the relevant <u>Georgia-Pacific</u> factors in her damages opinion. <u>See Georgia-Pacific Corp.</u>, 318 F. Supp. at 1120. In response, the Defendants point out that Ms. Lawson cannot start with a fundamentally flawed premise, and then adjust it based on legitimate considerations specific to the facts of the case, because this nevertheless ultimately results in a flawed conclusion.

The Defendants are correct that only license agreements from the same or comparable industry are probative for purposes of establishing a reasonable royalty rate. The relevant question then is whether the license agreements relied upon by Ms. Lawton are sufficiently analogous to a hypothetical license of the '618 patent at issue in this case. The Defendants recognize that a handful of the agreements utilized by Ms. Lawson were licenses to use patented technology, but assert that any license not for a "mobile screener" should not have been considered. In addition, the Defendants point out that most of the agreements relied upon by Ms. Lawton took place outside of the United States. However, as the Court previously ruled in the context of the same *in limine* motion, neither of these considerations necessarily means that the license agreements were "radically different from the hypothetical agreement under consideration" so that they would not be probative to the analysis. <u>Lucent</u>, 580 F.3d at 1327-28.

Although Ms. Lawson's starting point was critical to the legitimacy of her conclusion, her initial premise was not ultimately flawed as the Defendants

contend, **so** that her testimony should have been excluded.  Ms. Lawson

recognized that there was limited similar licensing information available for her to

utilize, and thus she looked at the information she obtained through the lens of

Factor No. 12, "the portion of the profit or selling price that's customary in the

industry."  Thus, she did not attempt to construe this licensing information as

royalties received by the patentee for the licensing of the patent in suit, as in Factor

No. 1, but rather used it to glean insight into Metso's licensing approach in the

industry.

   The Court sees no reasons to retreat from its initial determination that Ms.

Lawton's expert testimony was "not only relevant, but reliable", as required under

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L.

Ed. 2d 469 (1993).  Ms. Lawson has 25 years of experience in the area of patent

infringement damages, and extensively reviewed the information available to her

reach her conclusion**s**.  In addition, she engaged in a thorough analysis of the 15

Georgia-Pacific factors as it related to the facts of this case.  This is not a case

where an expert impermissibly relied on improper licensing agreements and then

only considered a few of the Georgia-Pacific factors, finding one particular factor

to be controlling.  Cf. ResQNet.com, Inc. v. Lansa, Inc, 594 F.3d 860, 870 (Fed.

Cir. 2010).  This is also not a case where an expert ignored certain highly relevant

licensing agreements and relied on extraneous market information.  Cf. I.P.

Innovation L.L.C. V. Red Hat, Inc., 705 F. Supp. 2d 687, 690-91 (E.D. Texas

2010).  Although Ms. Lawson did disavow reliance on a prior agreement

concerning the patent-in-suit, Ms. Lawson did so because they it was a purchasing

agreement, and she therefore believed that it was "not the type of information that would be relied upon for purposes of determining what damages would be an infringement situation." (Trial Tr., at 2050: 17-20.)

Finally, this is not the case where a damages calculation lacked a sufficient evidentiary basis. Cf. Lucent, 580 F.3d 1301. The Defendants do not cite a case, and the Court has not found one, where an expert's opinion was rejected for relying on all the arguably relevant licensing agreements available and then thoroughly considering all the Georgia-Pacific factors, as was the case here. The Defendants' disagreements are with Ms. Lawson's conclusion, not her methodology, and any contentions by the Defendants in this regard go to the weight, not the admissibility, of her opinion. See i4i, 598 F.3d at 854. The Defendants had both an opportunity to cross-examine Ms. Lawson and to present their own expert testimony. The jury chose to accept Ms. Lawson's analysis, as was their rightful choice.

Thus, there were no substantial errors in the admission of evidence with regard to the expert testimony by Ms. Lawson that would warrant a new trial.

### 5. As to the Allegations of Newly Discovered Evidence

As this ground for a new trial was analyzed independently, the Court refers to its earlier discussion on the matter. See supra II.B.

### C. As to the Motion by the Defendant Terex for Judgment as a Matter of Law or, Alternatively, for a New Trial

Finally, the Court will address the motion by the Defendant Terex Corporation for judgment as a matter of law, or alternatively for a new trial, on the

issue of whether the Plaintiff proved infringement by the Defendant Terex Corporation. The Defendants maintain, as they have from the beginning stages of this case, that the only connection Terex Corporation has to this case is that it is the corporate parent of the Defendant Powerscreen International Distribution, Ltd.

Terex can only be liable for Powerscreen's infringement under 35 U.S.C. § 271(a) "if the evidence reveals circumstances justifying disregard of the status of [the parent] and [the subsidiary] as distinct, separate corporations." A Stucki Co. v. Worthington Indus., Inc., 849 F.2d 593, 596 (Fed. Cir. 1988). To determine whether the necessary dominion and control exists for the Court to pierce the corporate veil, the Court must examine several factors, including (1) the sharing of a common office, staff, and ownership; (2) the intermingling of funds; (3) the treatment of the corporations as one, not separate, profit centers; (4) the lack of the conventions of corporate existence; and (5) any inadequate earnings. Williams Passalacqua Builders Inc. v. Resnick Developers S. Inc., 933 F.2d 131, 139 (2d Cir. 1991); Farber v. NP Funding II L.P., No. 96 Civ. 4322, 1997 WL 913335, at *2 (E.D.N.Y. Dec. 9, 1997). In applying these factors, "there is a presumption of separateness . . . which is entitled to substantial weight." American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir.1988), cert. denied, 488 U.S. 852, 109 S. Ct. 136, 102 L. Ed. 2d 109 (1988) (internal citation omitted).

Terex previously made a Rule 50(a) motion at the close of the Plaintiff's case to dismiss the complaint against it because there was no evidence that Terex committed any infringing acts under 35 U.S.C. § 271(a). The Court reserved decision with regard to this ground. Thereafter, at the close of all of the evidence,

Terex again moved for judgment as a matter of law on the ground that it was not liable for an infringement. The Court at that time stated that "Terex is Powerscreen. Terex and Powerscreen are interchangeable. And the evidence is clear that that's so." (Trial Tr., at 4722:1-3.) The Defendants do not present any argument that would negate this finding. Rather, there was ample evidence to demonstrate this synonymy.

For example, Kieran Hegarty, at the time of trial, was both the President of Terex's Material Processing business unit and an employee of Powerscreen. (Trial Tr., at 3100-3101.) Hegarty testified that his responsibilities at Terex were the broad financial performance of Powerscreen and that he was appointed to oversee the strategy of the business as a whole. He also testified that once Terex acquired Powerscreen, "it became much more involved operationally, and in the terms of the business. . ." His testimony made clear that there was more than mere ownership in this case. There was control and management that, as the Court previously found, "goes beyond alter ego." (Trial Tr., at 4723-18).

Moreover, every infringing screening machine bore the name of the Terex Corporation. The name Terex also appears on Powerscreen's advertising brochures and on Powerscreen's website. In fact, Terex advertises Powerscreen's screeners on the Terex Corporation website.

In addition, the Defendants contend that there was no intermingling of funds. However, it appears that Powerscreen's profits do contribute to Terex Corporation's bottom line. In addition, when a distributor seeks to purchase a Powerscreen infringer, it is Terex that offers financial assistance. In the world of

complex corporate structures, there does not need to be the sharing of a monetary safe to justify a finding of intermingling of funds.

As a final example, Terex stated in its December 31, 2004 year end 10k that it "designs, manufactures and markets three primary categories of equipment . . . [including] mobile crushing and screening equipment." Terex even went on to state that these products "are currently marketed principally under the Terex brand name and the following brand names, including in some cases the use of the Terex name in conjunction with these historic brand names: . . . . Powerscreen. . ."

Individually, none of these facts is sufficient. However, the culmination and combination of these facts inevitably leads to one conclusion. The evidence put forth at trial demonstrates the treatment of the corporations as one, not separate, profit centers. The Court agrees with the Plaintiff that "Terex Corporation represents to the word that <u>it</u> is the manufacturer and seller of the infringing mobile screeners." (Pl. Opp. Mem. 3, at 4.)

This is not the case where there is mere stock ownership. <u>See, e.g.</u>, <u>A. Stucki</u>, 849 F.2d at 596 (noting that the plaintiff pointed to no evidence supporting the assertion of control and domination over the subsidiary beyond the acquisition of stock); <u>Milgo Elec. Corp. v. United Business Communications</u>, 623 F.2d 645, 660, 206 USPQ 481, 492 (10th Cir.), cert. denied, 449 U.S. 1066, 101 S. Ct. 794, 66 L. Ed. 2d 611 (1980) ("Mere ownership of stock is not enough to pierce the corporate veil"). In this case, although the Defendant's contend otherwise, this finding by this Court of alter ego liability is not based merely on the fact that

Powerscreen was acquired by Terex and is a subsidiary three times removed, or based merely on "branding."

Beyond alter ego liability, there was sufficient evidence to find that Terex Corporation was a direct infringer. For a finding of infringement, there need only be one infringing act to, without authority, make, use, offer to sell, or sell any patented invention. SRI Int'l, Inc. v. Internet Sec. Sys., Inc., 647 F. Supp. 2d 323, 338 (D. Del. 2009), aff'd, 402 Fed App'x 530 (Fed. Cir. 2010). While the Defendants contend that the Plaintiff did not present any evidence whatsoever that Terex itself committed any acts of direct infringement, the Court finds that the jury had sufficient evidence from which to conclude that Terex itself offered for sale one or more of the infringing Powerscreen mobile screeners. Terex has sufficiently identified itself to the world that it is the manufacturer and seller of the accused screeners.

The Defendants point out that piercing the corporate veil is typically a question of fact for the trier of fact to determine upon all of the evidence. See Wm. Passalacqua Builders, Inc., 933 F.2d at 137 (whether or not those factors . . . that will justify ignoring the corporate form and imposing liability on affiliated corporations or shareholders are present in a given case is the sort of determination usually made by a jury because it is so fact specific."). However, while this is generally the case, this is not a hard and fast rule to be followed by a trial court. Instead, there may be times where it is appropriate for a court to decide that as a matter of law, the equitable remedy of corporate veil piercing is appropriate. See Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co., 417 U.S. 703, 713,

94 S. Ct. 2578, 2584, 41 L. Ed. 2d 418 (1974) ("[T]he corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy. . . . In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form."); United States v. Golden Acres, Inc., 684 F. Supp. 96, 103 (D. Del. 1988) ("Piercing the corporate veil is an action that sounds in equity."), Fletcher, Cyc. Corp. § 41 (1990 perm. ed.) ("Since the doctrine of piercing the corporate veil is an equitable one that is particularly within the province of the trial court, the right to a jury trial on the issue of piercing the corporate veil does not exist.").

In sum, the Court cannot say that there "exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming 'that reasonable and fair minded [persons] could not arrive at a verdict against [it].' " Luciano v. Olsten Corp., 110 F.3d 210, 214 (2d Cir. 1997) (quoting Cruz v. Local Union No. 3, 34 F.3d 1148, 1154 (2d Cir. 1994)) (alterations in original). Thus, the motion for judgment as a matter of law on the ground that no reasonable, properly instructed jury could have concluded that Terex committed any act of direct infringement, is denied.

In addition, the Court cannot say that the rulings in this case were erroneous or that the verdict was a miscarriage of justice. Therefore, the motion for a new trial on this additional ground is also denied.

**D. As to the Defendants' Motion for a New Trial on the Basis of Newly Discovered Evidence**

    **1. The Motion**

The Court will first consider the motion filed by all four Defendants on April 5, 2011, pursuant to Fed. R. Civ. P. 59(a)(1)(A), 60(b)(2), 60(b)(3) and 60(b)(6), for an order granting a new trial on the basis of newly discovered evidence ("Def. Mem. 1").

The Defendants argue in their motion that it was recently revealed that Michael Rafferty, the inventor and applicant of the '618 patent, as well as a critical fact witness, has a compensation scheme with the Plaintiff Metso pending success in this litigation. In particular, the Defendants claim that Rafferty told Cornelis Hoogendoorn, the President of Keestrack N.V. ("Keestrack"), a Belgian manufacturer of mobile screeners, that Metso had won a $15.8 million dollar verdict in this case, and that Rafferty had an agreement with Metso to receive 1.5 percent of any recovery obtained by Metso in the litigation. (Hoogendoorn Dec., ¶¶ 2-3.). The Defendants maintain that they repeatedly tried to obtain information of this nature throughout the discovery process, and that Rafferty wrongfully withheld this information and "that goes to the crux of the integrity of Plaintiff's case." (Def. Mem. 1, at 2.) The Defendants put forth a declaration by Hoogendoorn, in which he claims that Rafferty told him about this compensation agreement at a Las Vegas trade show and Hoogendoorn then communicated this message to the Defendant Powerscreen, who, coincidentally, was at this very same trade show.

In response to the Defendants' motion for a new trial, the Plaintiff states that there is no factual basis for this motion, because Hoogendoorn is a witness whose statements are false and lack credibility. More importantly, the Plaintiff points out that this evidence would only have been useful for impeachment purposes and thus, even if admissible, would not have changed the outcome of the case and thereby cannot provide the basis for a new trial. Also of importance is the Plaintiff's allegation that Hoogendoorn is an interested witness because his company, Keestrack, is allegedly also infringing the '618 patent and Metso has indicated their intent to pursue litigation against them in the future.

Both sides acknowledge that Benjamin Hansbury, Metso's designated corporate representative and a Rule 30(b)(6) witness, testified in a deposition that Rafferty requested a compensation arrangement with Metso, but that Metso had declined. The Defendants did not pursue questioning Hansbury again about the possibility of such a compensation agreement when he testified at the trial. It is also undisputed that the Defendants asked Rafferty himself at his videotaped deposition, subsequently shown at the trial, whether he had "any agreement whatsoever, regarding the payment of fees or expenses in connection with this proceeding." (Rafferty Tr., at 351:21-23.) Rafferty answered "No." (Id., at 351:24.)

## 2. As to Whether the Defendants' Motion for a New Trial on the Basis of Newly Discovered Evidence Should be Granted

The newly discovered evidence alleged by the Defendants is that Rafferty was promised a percentage of Metso's damages or settlement award; or, in other words, a contingency-based compensation agreement existed.

The Plaintiff does not assert that this evidence was not "newly discovered" by the Defendants. Nor does the Plaintiff argue that the Defendants were not diligent in discovering this evidence. Instead, the Plaintiff disputes the existence of any compensation agreement in the first instance and argues that this "newly discovered" evidence (1) would not be admissible at the trial; (2) would not be likely to change the original trial's outcome; and (3) is cumulative and impeaching. The Court will discuss each of these considerations in turn.

### a. Whether the Defendants Have Sufficiently Established Newly Discovered Evidence

As a preliminary matter, it is necessary to determine whether the Defendants have sufficiently established the existence of newly discovered evidence in the first instance. The Defendants assert that Hoogendoorn's declaration has established that a compensation scheme exists between the Plaintiff Metso and its key witness, Michael Rafferty. The Plaintiff, on the other hand, argues that the allegation is untrue and that no compensation scheme exists to reward Rafferty from the recovery in this litigation.

The motion in this case is based on alleged newly discovered evidence of what is essentially a perjury allegation by a witness. Mr. Hansbury testified in his deposition that Rafferty had requested an arrangement where he would share in the

proceeds of any damages or settlement but that the Plaintiff refused to agree to his request.  The Defendants claim that this statement was false because the request was in fact granted.  In addition, Rafferty was questioned at his deposition in Northern Ireland whether any such agreement existed and his answer was "no."  Thus, the "threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury."  United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006) (quoting United States v. White, 972 F.2d 16, 20 (2d Cir. 1992)).  "To have this Court vacate its prior order, the moving party was obligated to show reasonable inquiry sufficient to support the allegations . . ."  Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc., 683 F. Supp. 452, 454 (S.D.N.Y. 1988).

The Defendants have attempted to demonstrate the existence of this newly discovered evidence through the submission of a single declaration by Hoogendoorn, recounting a conversation he had with Rafferty regarding the alleged compensation scheme.  The Plaintiff does not refute this declaration with an affidavit from Rafferty himself.  However, the Plaintiff does submit two counter declarations from Hansbury and Pekka Pohjoismaki, the Senior Vice President of Metso's Crushing and Screening Business Unit.  Both individuals deny any knowledge of a contract, agreement, promise, understanding, arrangement or deal between Metso and Rafferty that Metso would pay Rafferty any money that Metso ultimately would receive from the Defendants as a result of this litigation.

The Court agrees with the Plaintiff that there appears to be sufficient reasons to believe that Hoogendoorn's declaration is suspect and lacks credibility.  See United States v. Donald, 417 Fed App'x 41, 44 (2d Cir. 2011) (finding that district

court's refusal to hold an evidentiary hearing was not an abuse of discretion where court determined affidavits impeaching testimony were suspect and lacked credibility). As the Plaintiff points out, Hoogendoorn had been informed that Metso intended to pursue a case against his company for a similar cause of action of patent infringement and therefore Hoogendendoorn has a direct financial interest in seeing Metso lose this lawsuit. Moreover, there is a real possibility that Hoogendendoorn misunderstood the statements that Rafferty supposedly made regarding a compensation scheme.

In addition, although the Defendants claim that there exist other indicia of reliability, this is simply not the case. The Defendants only point to one other circumstance to bolster Hoogendoorn's declaration —that Rafferty had previously requested such an arrangement of the Plaintiff. However, Hansbury unequivocally testified to that fact in his deposition, and this occurrence alone does not lend credence to the conclusion that the arrangement was in fact put in place.

The Defendants emphasize in their supporting memoranda that the Plaintiff only insists that "there is no agreement between Mesto and Mr. Rafferty concerning compensation to be paid to Mr. Rafferty *in connection with this lawsuit.*" (Pl. Opp. Mem. 1, at 2.) Thus, the Defendants argue that the Plaintiff's response does not deny that compensation has been or will be provided to Rafferty *not* in connection with this lawsuit. However, the Defendants are conjecturing on the basis of semantics alone. Moreover, the gist of their "newly discovered evidence" is exactly that—evidence that Rafferty stood to gain from a damages award or settlement *in*

*connection with this lawsuit*. Thus, the Court rejects the Defendants' argument in this regard.

On a motion for a new trial based on newly discovered evidence, the Defendant carries a "heavy burden" to show that relief is warranted. United States v. Garcia-Alvarez, 541 F.3d 8, 17 (1st Cir. 2008); accord United States v. Gigante, 982 F. Supp. 140, 176 (E.D.N.Y. 1997), aff'd, 166 F.3d 75 (2d Cir. 1999), cert. denied, 528 U.S. 1114, 120 S. Ct. 931, 145 L. Ed. 2d 811 (2000). Here, the Court finds that the Defendants have failed to carry this heavy burden.

Nevertheless, even if this Court were to find that the Defendants have sufficiently put forward newly discovered evidence of the existence of a compensation agreement between the Plaintiff and their key witness, this evidence would still not warrant the granting of a new trial in consideration of the necessary factors set forth below.

### b. Whether the Evidence Would Have Been Admissible

First, the Court acknowledges that evidence of a compensation agreement between Metso and Rafferty would likely have been admissible at the trial. The Defendants argue that it would be admissible under two alternative grounds: (1) to impeach Hansbury's testimony; or (2) as a declaration against Rafferty's interests because he was "unavailable" under Federal Rule of Evidence 804(b)(3).

The Court does not need to address the second ground because evidence of a compensation agreement could have been admitted to impeach Hansbury's testimony. Hansbury testified at his deposition that no such agreement existed. Specifically, Hansbury was asked, "[d]id Malachy Rafferty ever give you a price

for his cooperation?" to which Hansbury replied "[h]e suggested that [he] would be interested in if we were successful in our litigation a portion of the damages or any settlement that we might receive." (Hansbury Dep., at 59.) Hansbury then testified that he later told Rafferty "[t]hat we were not interested in sharing any damages or settlement in the case." However, if evidence of a compensation agreement was uncovered, this would be in direct contradiction to Hansbury's deposition testimony.

The Plaintiff argues that testimony of a compensation agreement would not have been admissible as impeachment evidence against Hansbury because there is no reason to conclude that he would have been involved in this type of scheme. However, Hansbury himself stated in his declaration that "[i]t is likely that I would have been a participant in any discussions or negotiations concerning such a contract, agreement, promise, understanding, arrangement or deal with Mr. Rafferty because of my previous dealings with Mr. Rafferty and because I have been the Metso executive in the United States with supervisory responsibility for this litigation." (Rafferty Decl., at ¶ 5.)

Therefore, the Court finds that this evidence would be admissible as impeachment evidence against Hansbury.

### c. Whether the Evidence Would Have Changed the Outcome

The next crucial consideration, assuming arguendo that newly discovered evidence actually exists, is whether evidence of a compensation agreement would have changed the outcome of the trial. The Defendants claim that Rafferty's credibility was crucial to the Plaintiff's claim, so that if the jurors had learned of

this agreement, they likely would have reached a different verdict. The Defendants maintain that this is particularly true with respect to obviousness and inequitable conduct, because the video deposition of Rafferty's testimony shown at trial was so essential to those defenses.

The Court recognizes that if an important witness lied, it is a serious matter. "Payment ... to a witness to testify in a particular way, payment of money to prevent a witness's attendance at a trial and the payment . . . to make him 'sympathetic' . . . are all payments which are absolutely indefensible . . ." N.L.R.B. v. Thermon Heat Tracing Sevs., Inc., 143 F.3d 191 (5th Cir. 1998) (quoting In re Robinson, 151 A.D. 589, 136 N.Y.S. 548, 556 (N.Y. App. Div. 1912), aff'd 209 NY 354, 103 N.E. 160 (1913)). Rafferty was certainly an important witness at the trial, if not a key witness, but that alone is not determinative. Rather, the central issue is whether "the alleged perjury was of such importance that it probably would have changed the outcome," Teamsters, 247 F.3d at 391, that is, whether the jury would have decided differently had the Defendants had knowledge of the alleged compensation scheme.

This Court is satisfied that the particular misstatement or falsehood in question, even if true and unequivocally to be condemned, is not of a nature to have likely changed the outcome and therefore does not undermine the Court's confidence in the jury's verdict. "[O]rdinarily newly discovered evidence which goes only to the credibility of a witness is not a sufficient basis for granting a motion for a new trial." Gill v. United States, 184 F.2d 49, 55 (2d Cir. 1950); see also United States v. Int'l Bhd. Of Teamsters, 179 F.R.D. 444, 447-48 (S.D.N.Y.

1998) ("It is well established that evidence offered solely to impeach the credibility of a witness does not meet the stringent standards for relief under Rule 60(b)(2)."). The Defendants argue that the evidence that would have been elicited if Rafferty and Hansbury were truthful in their depositions and if the Plaintiff had been forthcoming in discovery, does not concern merely the credibility of Rafferty and Hansbury, but rather goes to the heart of the integrity of the entire Plaintiff's case. The Court disagrees.

As an initial matter, the Defendants had another material basis for questioning Rafferty's credibility at the trial, even without the existence of a compensation agreement. Hoogendoorn's declaration states that Rafferty told him that "if Mesto did not win its lawsuit, Metso would 'go after him' in connection with moneys he had been paid for the patent." (Hoogendoorn Decl., at ¶ 3.) Although the Defendants attempt to characterize this as "newly discovered evidence," that is inaccurate. Due to the nature of the patent ownership in this case, this consequence of the litigation was always a reasonable possibility. It was clear to all those involved from the initial stages of this case that if the Plaintiff lost its patent infringement suit on the grounds of obviousness or invalidity of the patent, then Metso could initiate a cause of action against Rafferty in connection with moneys that he had been paid for the patent. Whether Rafferty had something to gain as a result of Metso recovering in this litigation or had something to lose a result of Metso being defeated in this litigation, they are flip sides of the same coin. The Defendants even acknowledge that "[b]ecause Mr. Rafferty was promised a windfall if Plaintiff succeeded in this litigation *and because he believed he was*

*subject to liability for assigning the Patent to Plaintiff if Plaintiff failed in this action,* Mr. Rafferty had every incentive to ensure an outcome favorable to Plaintiff." (Def. Mem. 1, at 7.) If Mr. Rafferty had an incentive to withhold documents and information from the Defendants, that incentive already existed and could have been presented to the jury.

Furthermore, the Court is not persuaded that this evidence goes beyond attacking the credibility of Rafferty. The Defendants argue that the whole of Rafferty's testimony would be tainted and that "Rafferty could have been excluded altogether as a witness on behalf of Metso." However, the operative word in that statement is "could." On occasion, and rarely**,** courts have held that disclosure of the compensation agreement alone is not a sufficient remedy and that payments by a party to a witness would render that witness incompetent to testify. See Golden Door Jewelry Creations, Inc., v. Lloyds Unerwriters Non-Marine Assoc., 865 F. Supp. 1516, 1524–26 (S. D. Fla. 1994), aff'd in relevant part 117 F.3d 1328, 1335 n.2 (11th Cir. 1997) (barring party from introducing testimony of a fact witness as a sanction for compensating that witness); N.L.R.B.,143 F.3d at190 (same).

However, whether the Court would exclude Rafferty as a witness is a discretionary decision that would rest with this Court. The appropriate remedy may also be to give the opposing party access to the terms of the agreement between the paying party and the compensated witness. Many courts, including courts in this Circuit, have found that a compensated fact witness is competent to testify as long as the fact that payments were made to that witness is disclosed to the trier of fact. See Jamaica Time Petroleum, Inc. v. Federal Ins. Co., 366 F.2d 156, 158 (10th Cir.

1966) (finding that an agreement to pay a reward or "[t]he payment of the reward affects the credibility of the witness and the weight to be given his testimony. These factors are not determinative of competence to testify."); Goldstein v. Exxon Research and Eng'g Co., No. 95 Civ. 2410, 1997 WL 580599, at *6 (D. N.J. Feb. 28, 1997); New York v. Solvent Chem. Co., 166 F.R.D. 284, 291 (W.D.N.Y. 1996) (holding that the appropriate sanction was to require the defendant to disclose the nature of the agreement with the witness).

In sum, the "newly discovered evidence" put forward by the Defendants would go only to credibility and therefore may not have changed the outcome at trial.

### d.  Whether the Evidence Is Merely Cumulative or Impeaching

Finally, for the reasons set forth above, the Court similarly finds that evidence of this compensation agreement, if true, would be cumulative and only impeaching material if admitted at the trial.

Again, the Defendants had ample ammunition with which to question Rafferty's credibility without evidence of this alleged compensation agreement, because the Defendants were aware of the high stakes of the litigation and the potential consequences for Rafferty if Metso were to lose this litigation. Accordingly, any indication that Rafferty also had something to gain if the litigation were successful would be merely cumulative of the evidence already in the Defendant's hands, which evidence could have been brought out by the Defendants at trial.  The Defendants state that they had no duty to question Hansbury again at the trial regarding the existence of a compensation agreement.  This is true.

However, there was nothing to prevent the Defendants from questioning Hansbury with regard to other potential consequences of this litigation as to Rafferty, such as whether Metso could or would pursue an action against Rafferty if the company lost this suit due to invalidity of the patent or obviousness.

In addition, as set forth above, this evidence at issue in this motion would be introduced only for impeachment purposes. This is the precisely why the "newly discovered evidence," with reasonable certainty, would probably not change the outcome of the trial. The evidence could only have been used to impeach Rafferty's credibility and suggest that Rafferty had a motive to lie at his deposition. However, it is well established that "evidence offered solely to impeach the credibility of a witness does not meet the stringent standards of relief under Rule 60(b)(2)." Teamsters, 170 F.R.D. 447-48. Although the Defendants argue that it wouldn't be used just for impeachment value but to "question the integrity of the entire Metso prosecution," (Def. Reply Mem. 1, at 7), the Court does not agree with that assertion.

Accordingly, the Court finds that the Defendants have not sufficiently demonstrated to the Court that they are entitled to a new trial on the basis of newly discovered evidence.

### 3. As to the Defendant's Motion for a New Trial on the Basis of Fraud, Misrepresentation, or Misconduct

Although the Defendants' motion is substantially centered on the basis of "newly discovered evidence," the Defendants also move this Court for a new trial on the basis of "fraud . . ., misrepresentation, or misconduct of an opposing party."

The parties do not devote much of their briefing to this issue. In fact, the Plaintiff does not address this ground at all in its opposition. In short, the Defendants allege that failure to produce requested discovery constitutes misconduct under Rule 60(b)(3) if the failure prevents a litigant from "fully and fairly" presenting their case. State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d Cir. 2004). The failure to produce discovery in the present case is the Plaintiff's alleged failure to come forward with information evidencing that a compensation agreement was in place. In addition, the moving party here, the Defendants, question Rafferty's and Hansbury's "candor" in their depositions when they denied that such an agreement exists.

It is true that a litigant "need not show that the outcome would have been different absent [the] misconduct" in order to establish that it was prevented from fully and fairly litigating its case. Catskill Dev. L.L.C. v. Park Place Entm't Corp., 286 F. Supp. 2d 309, 315 (S.D.N.Y. 2003). Rather, the Defendants only need to demonstrate that the "undisclosed material either would have been important as evidence at trial or would have been a valuable tool for obtaining meaningful discovery." Id. This burden is not met with evidence that is merely "cumulative, insignificant, or of marginal relevance." Id.

The Defendants point out that Hoogendoorn's declaration raises a "strong inference" that key documents and testimony were wrongfully withheld from the Defendants. (Def. Mem. 1, at 7.) However, that is not the appropriate standard. A party seeking relief pursuant to Rule 60(b)(3) must establish by *clear and convincing evidence* that the opposing party engaged in fraud or other misconduct.

See Fleming v. New York Univ., 865 F.2d 478, 484 (2d Cir. 1989).  The

Defendants' declaration of the Hoogdendoorn evidence, without any other indicia

of reliability, is insufficient to meet the clear and convincing standard to allege that

the Plaintiff in this case engaged in fraud or other misconduct.  Thus, the Court

need not address whether the Defendants were prevented from "fully and fairly"

presenting their case.  In any event, this was an unlikely result in the present case, in

light of the Defendants' opportunity to impeach Rafferty's testimony through other

means, as set forth above.

Therefore, the Defendant's motion for a new trial on the grounds of fraud or

misrepresentation pursuant to Rule 60(b)(3) is denied.

### 4. As to the Defendant's Motion for a New Trial on the Basis that it Accomplishes Substantial Justice

Finally, the Defendants point out in the same motion that Rule 60(b) has a

catch-all provision that grants the trial court discretion to relieve a party from a final

judgment "when appropriate to accomplish justice . . ."  Matarese v. LaFevre, 801

F.2d 98, 106 (2d Cir. 1986) (citation and internal quotations omitted); Rule

60(b)(6).  Bearing in mind the extensive discussion set forth above, the Court does

not find that justice would not be accomplished if this motion is denied.  In

addition, this case does not present circumstances in which the specific clauses of

Rule 60(b) are inapplicable.  Teamsters, 247 F.3d at 391-92 ("Controlling cases

have held that if the reasons offered for relief from judgment can be considered in

one of the more specific clauses of Rule 60(b), such reasons will not justify relief

under Rule 60(b)(6)") (citations omitted).  The Defendants appropriate**ly** moved

under Rule 60(b)(2) and 60(b)(3), and therefore, relief under clause (6) is inappropriate.

### III. CONCLUSION

For the foregoing reasons, it is hereby

      **ORDERED** that the Defendants' renewed motion for judgment as a matter of law; motion for a new trial; motion for a new trial on the basis of newly discovered evidence; and Defendant Terex's motion for judgment as a matter of law, or, alternatively, for a new trial, are all denied.

**SO ORDERED.**

Dated: Central Islip, New York
December 8, 2011

                    */s/ Arthur D. Spatt*
                    ARTHUR D. SPATT
                 United States District Judge